Colleen R. Smith (ISB No. 10023)  
Stris & Maher LLP  
American Civil Liberties Union of  
   Idaho Foundation Cooperating Attorney  
1717 K Street NW, Suite 900  
Washington, DC 20006  
T: 202-800-5749  
csmith@stris.com  

Katherine V. Mackey*  
Wilmer Cutler Pickering  
  Hale and Dorr LLP  
60 State Street  
Boston, MA 02109  
T: 617-526-6993  
F: 617-526-5000  
katherine.mackey@wilmerhale.com  

Peter G. Neiman*  
Alan E. Schoenfeld*  
Michelle Nicole Diamond*  
Rachel E. Craft*  
Wilmer Cutler Pickering  
  Hale and Dorr LLP  
7 World Trade Center  
New York, NY 10007  
T: 212-230-8800  
F: 212-230-8888  
peter.neiman@wilmerhale.com  
alan.schoenfeld@wilmerhale.com  
michelle.diamond@wilmerhale.com  
rachel.craft@wilmerhale.com  

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on following page*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**
**SOUTHERN DIVISION**

| | |
|---|---|
| **PLANNED PARENTHOOD GREAT NORTHWEST, HAWAII, ALASKA, INDIANA, KENTUCKY**, on behalf of itself, its staff, physicians and patients, **CAITLIN GUSTAFSON, M.D.**, on behalf of herself and her patients, and **DARIN L. WEYHRICH, M.D.**, on behalf of himself and his patients,<br><br>      Plaintiffs,<br><br>  v.<br><br>**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **MEMBERS OF THE IDAHO STATE BOARD OF MEDICINE** and **IDAHO STATE BOARD OF NURSING**, in their official capacities, **COUNTY PROSECUTING ATTORNEYS**, in their official capacities,<br><br>      Defendants. | Case No. 1:23-cv-142 |

1

Jennifer R. Sandman*
Catherine Peyton Humphreville*
Planned Parenthood Federation of America
123 William Street
New York, NY 10038
212-965-7000
jennifer.sandman@ppfa.org
catherine.humphreville@ppfa.org

Michael J. Bartlett (ISB No. 5496)
Bartlett & French LLP
1002 W Franklin St.
Boise, Idaho 83702
T: 208-629-2311
F: 208-629-2460 (fax)
Michael@BartlettFrench.com

*Attorneys for Plaintiff Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky*

Dina Flores-Brewer (ISB No. 6141)
American Civil Liberties Union of
   Idaho Foundation
P.O. Box 1897
Boise, ID 83701
T: 208-344-9750
DFloresBrewer@acluidaho.org

Andrew Beck*
Meagan Burrows*
Ryan Mendías*
Scarlet Kim*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2633
F: 212-549-2649
abeck@aclu.org
mburrows@aclu.org
rmendias@aclu.org
scarletk@aclu.org

*Attorneys for Physician Plaintiffs*

* *Pro hac vice applications forthcoming*

**DECLARATION OF CAITLIN GUSTAFSON, M.D.**

I, Caitlin Gustafson, M.D., hereby declare as follows:

1. I am over the age of eighteen. I make this declaration based on personal knowledge of the matters stated herein and on information known or reasonably available to my organization. If called to do so, I am competent to testify as to the matters contained herein.

**Personal Background**

2. I am a physician licensed to practice medicine in the State of Idaho since 2004 and have been a practicing doctor in Idaho for nearly two decades. I have been a board-certified family medicine physician with a fellowship in obstetrics since 2007.

3. I practice family medicine, obstetrics, and gynecology. Because of size and resource limitations at the rural hospital and clinic where I practice, I primarily serve lower-risk hospitalized patients and refer higher-risk patients to larger hospitals better able to offer a higher level of care. A significant number of my patients are from rural and other underserved communities, mostly located in Northern Idaho. In addition to my hospital practice, I previously provided care at Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, in Meridian, Idaho, and will be doing so at Planned Parenthood Columbia Willamette, in Oregon in the near future.

4. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunctive Relief. I have read the letter from Attorney General Labrador, including his statement that "Idaho law prohibits an Idaho medical provider from . . . referring a woman across state lines to access abortion services." Compl. Ex. 1 at 2.

5. I have also read Attorney General Labrador's statement that "Idaho law requires the suspension of a health care professional's license when he or she" refers a woman for out-of-state abortion services. *Id*.

6. Unless and until this Court prevents Idaho authorities from implementing the Attorney General's interpretation of the law, I will be forced to violate medical ethics and basic principles of patient care by refusing to provide information and referrals to patients seeking abortion care in other states that Idaho bars me from providing. The Attorney General is effectively compelling me to abandon my patients by silencing myself rather than communicate the information to patients and to out-of-state healthcare providers that helps to facilitate access to safe health care. This appalling intrusion into my trusted relationships with my patients is the antithesis of good medical practice and will harm my patients and my relationship with them.

7. The facts and opinions included here are based on my education, training, practical experience, information, and personal knowledge I have obtained as a family medicine physician and as an abortion provider; my attendance at professional conferences; review of relevant medical literature; and conversations with other medical professionals.

**My Practice Prior to the Attorney General's Actions**

8. Prior to the point when Idaho's abortion ban took effect, I provided medication and procedural abortion care for patients seeking such services. Once the ban took effect, I stopped providing abortions in Idaho.

9. As the American College of Obstetricians and Gynecologists recognizes, a pregnant person has three options: carry the pregnancy to term and parent; give birth and give the

3

baby up for adoption; or pregnancy termination.[1] Although I am no longer able to provide abortions in Idaho, I continue to see pregnant patients who decide to have an abortion for a myriad of reasons. Among the multitude of reasons that a person may decide to have an abortion are that continuing the pregnancy imposes risks to the patient's physical or mental health; that the patient has been the victim of sexual abuse or trauma; that the patient lacks the financial stability to care for a child; fetal anomalies; and many other reasons.

10. A myriad of health conditions may lead some patients to consider abortion. For example, some pregnant patients may require abortions following placental abruption, an infection, or the onset of pre-eclampsia. As a result, these patients could face serious health risks, or even death, if they continue their pregnancies. Similarly, pregnant women with cardiomyopathy may seek abortions because they are more likely to die than women without this condition and, without an abortion, may suffer long-term health consequences that could lead to death later in the pregnancy or even long after labor and delivery. Such risks could be avoided or mitigated through termination of the pregnancy.

11. Some pregnant patients may require abortions as a result of high-risk health conditions unrelated to pregnancy, such as cancer treatments, which could put the pregnant woman's health and even life at risk if forced to carry to term.

12. Before Attorney General Labrador's letter, my care for pregnant patients would include options counseling, which involves an open-ended conversation with the patient that would cover giving birth, adoption, and abortion. If the patient said they were considering terminating the pregnancy, I would provide details about their different abortion options and discuss with them

---

[1] *See* PREGNANCY CHOICES: RAISING THE BABY, ADOPTION, AND ABORTION, https://www.acog.org/womens-health/faqs/pregnancy-choices-raising-the-baby-adoption-and-abortion (last visited April 5, 2023).

which one made the most sense for their situations. I would also explain that, under Idaho law, abortion services are unavailable in Idaho clinics and hospitals. I would provide them with information about where abortion services remain legal and advise them on their out-of-state options for abortion care. Depending on where patients were in their decision-making process, I might have several conversations with them over multiple days.

13. When requested to, or when medically advisable, I would provide an out-of-state referral for an abortion provider outside of Idaho. In some instances, this would involve speaking not only to the patient (to tell them about the care that I am unable to provide and how to access it) but also to out-of-state providers to help facilitate continuity of care and provide medically pertinent information to the receiving physician. For instance, if a patient presented with a medically complex pregnancy—such as a severe autoimmune disorder or a heart condition— and needed abortion care, I would typically make phone calls to abortion providers out-of-state in order to communicate the patient's relevant medical history and clinical presentation. Similarly, some patients have complex mental health or social histories, which make it necessary to communicate with providers out of state to ensure that patients receive medical care that is tailored to their specific needs.

**Impact of the Attorney General's Letter on My Practice**

14. Having reviewed Attorney General Labrador's letter, I understand that, from now on, if I were to have conversations with patients concerning the availability of abortion services outside of Idaho, or if I were to recommend or make a referral to an out-of-state abortion provider or speak to that provider to discuss pertinent details of a patient's history or clinical status to assist the provision of safe care, my professional license could be suspended and/or revoked.

15. I further fear that, due to the conclusions articulated in the Attorney General's letter, I could be subject to prosecution for providing abortion services or information related to abortion care in Oregon through my anticipated future work with Planned Parenthood Columbia Willamette, even though such care—provided pursuant to my Oregon medical license—is perfectly legal in Oregon. In light of the disruption to my livelihood and liberty that such adverse licensure action or prosecution would entail, I am deeply concerned about my ability to provide care and information both within and outside of Idaho absent a court order blocking the enforcement of this harmful interpretation of Idaho law.

16. I understand that being charged with a crime is not the same thing as being convicted, and being brought before the medical licensing board is not necessarily the same thing as having one's license suspended or revoked. But I cannot afford to jeopardize my freedom or my ability to practice medicine in the face of the Attorney General's threats. Consequently, I will not be able to provide necessary information to these patients or adhere to the standard of care in medicine that I was trained to follow (which requires physicians provide a referral when they are unable to provide the needed services) because doing so could potentially cause me to permanently lose my livelihood and prevent me from ever practicing medicine again.

17. As a result of the Attorney General's letter, therefore, when my patients require abortions, I am now forced to tell them that I am unable to help them and that I cannot say anything about their abortion options in other states, even though that care is lawful in those states.

18. This letter therefore has a very strong chilling effect on my ability to speak with, counsel, and care for my patients, which is contrary to my ethical obligation to care for my patients and to provide them with information about all appropriate medical options. It is also contrary to the standard of care in medicine that I, and all other physicians, are taught.

**Serious Harm to Patients**

19. This government-mandated silence about abortion will have devastating effects for my patients, who will likely suffer serious mental and physical health consequences if they cannot receive that care. It will also negatively impact me as a provider because I am being prevented from adequately caring for my patients.

20. As a physician, my job is to get my patients the care they need. That may mean providing the care myself, or it may mean ensuring that the patient has access to information, resources, and referrals so they can obtain care that I am unable to provide. But it is untenable for a physician to censor herself and refuse to provide information that a patient needs—it is a breach of my basic duties as a healthcare provider.

21. Such state-mandated censorship will have disastrous impacts on my patients. It will delay their access to safe care and in some cases prevent them from accessing that care altogether.

22. Patients who are unable to obtain information on out-of-state abortion options in time will be forced to carry an unwanted pregnancy to term. This may make it more difficult to bring themselves and their families out of poverty.[2] Persons who wanted, but could not access, an abortion are more likely to be marginally employed, unemployed, or enrolled in public safety net programs compared to those who obtained an abortion.[3]

---

[2] Upadhyay et al., *The Effect of Abortion on Having and Achieving Aspirational One-Year Plans*, 15 BMC Women's Health 102 (2015); Foster et al., *Effects of Carrying an Unwanted Pregnancy to Term on Women's Existing Children*, 205 J. Pediatr. 183 (2019); Foster et al., *Comparison of Health, Development, Maternal Bonding, and Poverty Among Children Born After Denial of Abortion vs After Pregnancies Subsequent to an Abortion*, 172 JAMA Pediatr. 1053 (2018).

[3] *See* Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United State*, 108 Am. J. of Pub. Health 407, 409-13 (2018).

23. And in many cases, those who are victims of partner violence will face increased difficulty escaping that relationship because of new financial, emotional, and legal ties with that partner.[4]

24. Stifling access to information on abortions will also disproportionately affect persons of color and indigenous individuals in Idaho who already struggle with accessing adequate health care.[5] To take just one example, many of my patients were born in other countries and do not have lawful immigration status in the United States. Many of them also do not speak fluent English. For these patients, it is absolutely essential that their health care providers be able to speak openly about their options and to provide them information about and referrals to abortion providers out of state when they request that care. I fear that, if one of these patients were unable to receive information about their options concerning abortion from their trusted medical provider, they would not have anywhere else to turn.

25. There are also medical circumstances when a person's health or life will be placed at risk if they are unable to access timely out-of-state abortion care with the information and assistance that I provided until the Attorney General deemed it unlawful. For example, I know that when I have patients seeking abortions who are past a certain gestational age or who have underlying medical conditions that complicate treatment, there are certain out-of-state providers who are able to provide the care they need and others who are not. For example, until the Attorney General issued his letter, I could tell a patient who was 20 weeks pregnant and with a medically complicated pregnancy that her best out-of-state option for abortion care was in Portland or Seattle,

---

[4] *See* Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy after Receiving or Being Denied an Abortion*, 12 BMC Med. 144 (2014).
[5] Marley, *Segregation, Reservations, and American Indian Health*, 33:2 Wicazo Sa Rev. 49, 51 (Fall 2018), https://doi.org/10.5749/wicazosareview.33.2.0049.

because many other hospitals and clinics cannot provide appropriate care for such patients. Moreover, I could—and did—correspond with the care team there to ensure that they were well-positioned to give the patient the care she needed. But now that I am muzzled by the Attorney General's letter, how is my patient supposed to know hospitals are best suited to provide the care she needs?

26. The Attorney General's censorship forces me to act in a manner that is contrary to my medical training, denies my patients access to safe care that I am trained to provide, impedes my right to speak to and counsel my patients, and will greatly harm many Idahoans.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 4, 2023, in _____McCall_____, _____Idaho_____.

_____/s/ Caitlin Gustafson, MD_____
Caitlin Gustafson, M.D.

9