# EXHIBIT A

Wendy J. Olson, ISB No. 7634
STOEL RIVES LLP
101 S. Capitol Blvd.
Suite 1900
Boise, ID 83702
Telephone:  208.389.9000
Facsimile:  208.389.9040
wendy.olson@stoel.com

*Counsel for Amicus Curiae*
*St. Luke's Health System, Ltd.*

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PLANNED PARENTHOOD GREAT NORTHWEST, HAWAII, ALASKA, INDIANA, KENTUCKY, *on behalf of itself, its staff, physicians and patients, et al.*, | Case No. 1:23-CV-142-BLW |
| *Plaintiffs*, | |
| v. | **PROPOSED AMICUS CURIAE BRIEF OF IDAHO MEDICAL ASSOCIATION AND ST. LUKE'S HEALTH SYSTEM, LTD. IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| RAUL LABRADOR, *in his official capacity as Attorney General of the State of Idaho, et al.* | |
| *Defendants*. | |

## CORPORATE DISCLOSURE STATEMENT

St. Luke's Health System, Ltd. is an Idaho nonprofit corporation. St. Luke's Health System, Ltd. has no parent corporation.  No publicly held corporation, nor any other person or entity, owns any stock in St. Luke's Health System, Ltd.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iii

STATEMENT OF INTEREST ......................................................................................1

ARGUMENT ...............................................................................................................3

I.     The Attorney General's Interpretation of Idaho Code § 18-622 Will Prevent Physicians From Providing The Best Medical Care. ............................................3

II.    The Attorney General's Interpretation of Idaho Code § 18-622 Will Drive Physicians Away From Idaho, Harming Patients, The Medical Profession, And The State As A Whole ........................................................................................11

CONCLUSION...........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d 1112
(9th Cir. 2008)....................................................................................................19

*National Institute of Family & Life Advocates v Becerra*, 138 S. Ct. 3261 (2018).........................9

## STATUTES

Idaho Code § 18-622...................................................................................................4

2023 Idaho Sess. Laws ch. 298 (H.B. 374)....................................................................4

## OTHER AUTHORITIES

Patrick Boyle, *America's Medical Residents, By the Numbers*, AAMC (Dec. 1,
2021), https://bit.ly/43HDsZT ...................................................................................12

Cleveland Clinic, *HELLP Syndrome*, https://bit.ly/3KQ24XV (last visited Apr. 18,
2023) ..........................................................................................................................6

Loren Colson, Commentary, *Our Idaho Legislators Should Want to Save Pregnant
Women. This Maternal Health Data Could Help.*, Idaho Capital Sun (Apr. 17,
2023), https://bit.ly/3ot3xvJ ...............................................................................17, 18

Kylie Cooper, *Idaho's Abortion Laws Put Mothers and Babies at Risk*, The
Spokesman-Review (Feb. 9, 2023), https://bit.ly/3UNvQB4 ....................................14

McKay Cunningham, Commentary, *Survey Shows Idaho's Maternal Health
Doctors Are Leaving the State, or Soon Will*, Idaho Capital Sun (Apr. 7, 2023),
https://bit.ly/41F0FKn...............................................................................................15

Arati Dahal & Susan M. Skillman, *Idaho's Physician Workforce in 2021* at 4,
Center for Health & Workforce Studs. (July 2022), https://bit.ly/41EtYwS.........................16

Idaho Dep't Health & Welfare, *Bureau of Rural Health & Primary Care Brief* (Jan.
2023), https://bit.ly/3QEEcrp...................................................................................12

IQVIA, *The Economic Impact of Physicians in Idaho, State Report* (Jan. 2018),
https://bit.ly/41iutg5................................................................................................18

IQVIA, *The National Economic Impact of Physicians, National Report* (Jan. 2018),
https://bit.ly/3AaZmHq.............................................................................................18

Johns Hopkins Med., *Twin Reversed Arterial Perfusion (TRAP)*,
https://bit.ly/3KNy8f4 (last visited Apr. 18, 2023)....................................................7

Heather Landi, *Idaho Hospital to Stop Obstetrical Services, Citing Doc Shortages, Fewer Births and 'Political Climate,'* FIERCE Healthcare (Mar. 23, 2023), https://bit.ly/3KQ4iXg ..................................................................................15

Jennifer Liposchak et al., Idaho Maternal & Child Health, *2020 Maternal Deaths in Idaho* (Dec. 2022), https://bit.ly/3oo6Yno...........................................................17

Caroline Ruth Mathias & Carmela Rizvi, *The Diagnostic Conundrum of Maternal Mirror Syndrome Progressing to Pre-Eclampsia*, 23 Case Reps. in Women's Health e00122 (July 2019), https://bit.ly/3KQk0lj ................................................6

Mayo Clinic, *Preeclampsia*, https://bit.ly/3mI2Aiw (last accessed Apr. 18, 2023) .......................5

Kelcie Moseley-Morris, *Citing Staffing Issues and Political Climate, North Idaho Hospital Will No Longer Deliver Babies*, Idaho Capital Sun (Mar. 17, 2023), https://bit.ly/3NeTW6f..............................................................................14

Kelcie Moseley-Morris, *Idaho Medical School Director to Budget Committee: Residencies Still a Challenge for Students*, Idaho Capital Sun (Jan. 27, 2023), https://bit.ly/43IenOC ...........................................................................12

Kelcie Moseley-Morris, *Report: Deaths Among Pregnant Women in Idaho More Than Doubled in 2020*, Idaho Capital Sun (Dec. 12, 2022), https://bit.ly/3GSOpOn ..........................................................................17

Nat'l Inst. of Neurological Disorders & Stroke, *Anencephaly*, https://bit.ly/40mwZ3A (last visited Apr. 18, 2023)................................................8

Eilis O'Neill, *Health Care Providers Travel to WA for Abortion Training They Can't Get at Home*, KUOW (Feb. 14, 2023), https://bit.ly/3otxprE ................................12, 13

Deb Owen, *BGH Obstetrics Closure Is Heartbreaking to See*, Bonner County Daily Bee (Mar. 19, 2023), https://bit.ly/3N0AFVM ................................................15, 16

Press Release, Bonner General Health, *Discontinuation of Labor & Delivery Services at Bonner General Hospital* (Mar. 17, 2023), https://bit.ly/41nox5I ......................15

*Understanding Idaho's Doctor Shortage*, Boise State Public Radio, https://bit.ly/3doQyFO (last visited Aug. 12, 2022) ................................................11

U.S. Dep't of Health & Human Servs., *Projections of Supply and Demand for Women's Health Service Providers: 2018-2030* (Mar. 2021), https://bit.ly/3PhGagh ..............................................................................12

## STATEMENT OF INTEREST[1]

St. Luke's is the only Idaho-based, not-for-profit, community-owned and community-led health system.  Its mission is to improve the health of people in the communities it serves.  To fulfill that mission, St. Luke's operates hospitals, clinics, and other health facilities across Southwest and South-Central Idaho.  St. Luke's employs 16,039 people and is the largest private employer in Idaho.  Its providers and nurses treat patients millions of times each year, including 1,022,571 hospital visits, 207,062 emergency department visits, and 1,872,601 clinic visits in 2021 alone.  Many of those patients are pregnant women; St. Luke's helps to welcome thousands of newborns each year, more than any other provider in the state.

Attorney General Raul Labrador's letter contending that Idaho law "prohibits an Idaho medical provider from … referring a woman across state lines to access abortion services," and asserting that any healthcare professional who does so will have their license suspended, will have grave implications for St. Luke's, its employees, and its patients.  Critically, the "abortion services" referenced by the Attorney General can include everything from elective abortions to care for patients experiencing miscarriages or other life- and health-threatening conditions.  As a result, physicians in Idaho are presently deterred from even discussing with their patients all sorts of essential medical care that can only be accessed across state lines.  This is true despite the Attorney General's April 7 letter purporting to withdraw his March 27 interpretation—even without a binding interpretation, the Attorney General has made his views on the statute clear, and those views are highly likely to carry weight with the county prosecutors charged with enforcing this

---

[1] No party or party's counsel authored the proposed brief in whole or in part, and no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief.  No person other than St. Luke's or its counsel has made a monetary contribution to fund the preparation or submission of this brief.

law and with the Idaho Division of Occupational and Professional Licenses, which relies on the Attorney General and his deputies for interpretation of Idaho law.  Moreover, the constantly changing interpretations and representations only exacerbate the pervasive confusion surrounding what, precisely, physicians are permitted to say and do with respect to their patients.  This confusion will chill physicians in the exercise of their medical judgment, in scenarios where time is of the essence to preserve the health of the mother and the fetus, and it will have grave health consequences for these physicians' patients.

Given the vital role St. Luke's plays in administering health care in Idaho, St. Luke's has significant interests in the important issues raised by this case. St. Luke's can provide valuable, first-hand insight about the current state of Idaho's OB-GYN departments and the perspective of Idaho physicians on the Attorney General's legal position and its consequences in Idaho hospitals and clinics.  These physicians are dedicated to helping successfully bring children into the world by providing both parent and child with the highest-quality medical care. Because of the Attorney General's interpretation of Idaho law, as expressed in his letter, physicians now understand they risk legal liability and suspension of their medical licenses for simply having frank conversations with their patients.  Physicians find themselves unable to provide the gold standard of medical care—or even discuss it—for risk of criminal penalties or license revocations.  At best, patient care will be delayed for physicians to consult legal counsel.  At worst, patient care will be denied entirely.  As a result, patients will experience harmful and entirely avoidable consequences.

Moreover, St. Luke's can offer a unique perspective on how this state of affairs is harming Idaho's medical system more broadly.  Specifically, in St. Luke's current experience, the Attorney General's position is contributing to decreased physician morale, the flight of doctors from the

2

state, the closure of OB-GYN programs at hospitals, and a general decrease in the availability of quality medical care to Idaho communities and patients.

St. Luke's understands the Legislature's reasons for enacting Idaho Code § 18-622 and appreciates the Legislature's obligation to enact laws that reflect the needs and values of Idahoans. St. Luke's also acknowledges the Attorney General's position that his March 27 letter was intended to be an internal communication.  However, the letter was disseminated to the public, and the Attorney General's interpretation will likely have serious unintended consequences for the thousands of people who provide medical advice to Idaho residents, as it will expose them to needless and grave potential liability, rendering their jobs significantly more difficult.  And as physicians find it more and more difficult to practice medicine, Idaho residents will find it more and more difficult to access meaningful care. This change has already begun, and it will only accelerate if the Attorney General's legal interpretation is implemented, and likely even if it is not rejected.

Because *amicus* is dedicated to improving the health and well-being of Idahoans and supporting their physicians, and because the Attorney General's interpretation of Idaho Code § 18-622 undermines those goals, *amicus* respectfully offers its perspective as friends of the Court that the Attorney General's legal interpretation Idaho Code § 18-622 should be preliminarily enjoined.

## ARGUMENT

### I.    The Attorney General's Interpretation of Idaho Code § 18-622 Will Prevent Physicians From Providing The Best Medical Care.

*Amicus* represents thousands of physicians throughout the state who have a deep interest in the health and well-being of Idaho's residents.  In particular, *amicus* writes to highlight the stories of those medical professionals tasked with the critical job of bringing newborns into the world.  These physicians have studied for years to be able to provide this necessary service, and

they work tirelessly to provide the highest-quality care to women throughout their pregnancies. Although Idaho's leaders defend Idaho Code § 18-622 as necessary to protect the health of unborn children, the physicians represented in this brief write to stress that the reality is something far different:  This law, and in particular the Attorney General's stringent interpretation of it, is hindering the availability of adequate medical care, deterring physicians from doing their jobs to the best of their ability, and causing tangible and concrete harm to patients.

Idaho's abortion law has already created serious uncertainty among Idaho's physicians as to what kind of care they are legally able to provide.  In particular, although the statute currently provides physicians with an affirmative defense for abortions "necessary to prevent the death of the pregnant woman," and only if the abortion constituted "the best opportunity for the unborn child to survive" unless "termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman," what conditions and procedures qualify for that safe harbor are not currently clear.  Idaho Code § 18-622.  And although the legislature amended the law to provide that abortions necessary to prevent the death of the pregnant woman are exceptions, rather than an affirmative defense,[2] that change does nothing to alleviate the deep uncertainty as to what circumstances actually qualify for this exception.  This ambiguity alone creates grave uncertainty for physicians attempting to provide the gold standard of medical care in high-stakes situations where the health of the patient is at grave risk.  But before the Attorney General's interpretation, even if physicians could not themselves perform a termination to preserve the health or fertility of a patient for fear of legal liability, they could at least advise patients as to options that might exist in neighboring states, ensuring that their patients understood the availability of procedures to alleviate the risks to the mother's health or the life and health of the fetus.  Now,

---

[2] *See* 2023 Idaho Sess. Laws ch. 298 (H.B. 374) (effective July 1, 2023).

even that option carries with it severe legal risks, forcing physicians to either hold their tongues—endangering their patients—or to provide medical advice that could expose them to liability.

These concerns are not hypothetical or academic.  Idaho physicians already have had to help their patients confront these difficult decisions.  One St. Luke's maternal fetal medicine physician[3] treated a patient prior to the enactment of § 18-622 who was transferred to the hospital with dangerously high blood pressure and an extremely inflamed liver; she had a severe form of preeclampsia,[4] for which the standard of medical care is delivery.  Although the fetus was several weeks from viability, and although the mother deeply wanted to carry the pregnancy to term, her health was deteriorating; had she continued with her pregnancy, she would have been at great risk of stroke, liver rupture, and death.  The physician explains that they had an "excruciating" discussion "with the family, but it was clear that the only way to preserve the mother's life was to induce labor."  Today, the physician is uncertain not only as to whether the patient could receive the standard medical care for this condition in Idaho—and if so, how long the physician would have to wait before inducing labor, and whether that induction would be justified under the law—but also whether the patient may even be referred out of state to receive it.

A board-certified OB-GYN specializing in high risk and abnormal pregnancy management shares a different but equally compelling story.  This physician's entire line of work is to manage pregnancies to help ensure that pregnancies survive.  In one case, a patient's fetus was diagnosed with a chromosomal abnormality that can, in some instances, cause no significant health problems, but can also cause pregnancy loss due to problems with the fetus's lymphatic system.  If those lymphatic issues arise, they can lead to a fluid accumulation that is highly likely to cause a

---

[3] These stories come to *amicus* directly from Idaho physicians.
[4] Mayo Clinic, *Preeclampsia*, https://bit.ly/3mI2Aiw (last accessed Apr. 18, 2023).

stillbirth; prediction of if or when stillbirth will happen, however, is almost impossible.  But in the meantime, the mother is at risk of developing "mirror syndrome,"[5] in which she experiences swelling and can develop preeclampsia.  The only way to address this is through delivery or termination of the pregnancy, but this OB-GYN advised the mother that "it is unclear how ill she would need to become before terminating in Idaho."  That physician must deal with the excruciating reality that the patient may not be advised to seek care out of state, even though remaining in Idaho for the duration of her pregnancy could be life-threatening.

Still another physician shared a similarly distressing story.  When a patient pregnant with twins was admitted with abdominal pain, tests revealed the demise of one of the twins, that the other twin was measuring two weeks behind in size, and that the mother was developing hemolysis, low platelets, elevated liver enzymes syndrome ("HELLP").[6]  HELLP is a severe condition, and the medical recommendation is immediate delivery, either by inducing labor or through a cesarian section.  The surviving fetus, however, would be at significant risk of stillbirth if delivered at 19 weeks.  Without the option to deliver the fetus, the mother was at high risk of declining renal function, the potential loss of the transplanted kidney, hemorrhage, seizure, stroke, or death.  Complicating matters further, the patient had had a renal transplant two years before.  The physician knew "the gold standard of medical care" to be clear: "recommendation for immediate induction of labor or a procedure to remove the contents of the uterus."  But the physician did not feel that they could provide that recommendation at that stage in the pregnancy in light of Idaho's law.  As they put it, the "lack of clarity on a termination in order to save the life of the mother is

---

[5] Caroline Ruth Mathias & Carmela Rizvi, *The Diagnostic Conundrum of Maternal Mirror Syndrome Progressing to Pre-Eclampsia*, 23 Case Reps. in Women's Health e00122 (July 2019), https://bit.ly/3KQk0lj.
[6] Cleveland Clinic, *HELLP Syndrome*, https://bit.ly/3KQ24XV (last visited Apr. 18, 2023).

frustrating to me and my colleagues," particularly given "the threat of a felony charge."  Although "medically, the decision is obvious"—the physician should "act now"—they noted that "legally, the decision becomes ambiguous" in light of Idaho's Total Abortion Ban.  Worse still, if the physician is prohibited from referring the patient out of state, they would have no option but to stand by and silently watch their patient grow gravely ill.

Critically, these circumstances can and do arise in cases where the parents deeply want to carry their pregnancies to term.  They also often arise in cases of twin and triplet gestations, where a procedure is necessary to save the life of one of the fetuses.  One physician treated a patient pregnant with twins who, after an abnormal ultrasound at 11 weeks gestation, learned that the twins had twin reversed arterial perfusion sequences (TRAP sequence),[7] a rare condition in which the twins share a placenta but one twin lacks cardiac activity or even a cardiac system.  The healthy twin pumps blood into the other twin, meaning that one fetus is supplying blood flow to both fetuses, placing both fetuses at risk of death.  The gold standard treatment for this condition is to sever the cord connecting the twins, after which survival rates of the remaining fetus approach or exceed 80%.  Without the procedure, both fetuses would very likely die.  In Idaho, however, this treatment was viewed as prohibited by law.  As a result, the patient had to go out of state for the procedure.  The physician observes, "if Idaho physicians were not allowed to refer patients out of state for this type of service, the state of Idaho has all but essentially determined there be no dual survivorship in cases such as this."  If the Attorney General's interpretation was adopted or implemented, the law would require physicians to tolerate such a painful—and preventable—outcome.

---

[7] Johns Hopkins Med., *Twin Reversed Arterial Perfusion (TRAP)*, https://bit.ly/3KNy8f4 (last visited Apr. 18, 2023).

Another physician recounts the case of a patient who conceived triplets after undergoing fertility treatments with reproductive endocrinology.  At ten weeks, doctors learned that one triplet was affected by anencephaly,[8] which causes the skull to form abnormally, exposing the cranial neural tube.  Sonographic diagnosis of this condition is highly accurate, and by 16 to 20 weeks gestational age, there is complete destruction of major portions of neural tissue.  Infants born with anencephaly will be permanently unconscious, and the majority die within days of birth.  There are no neurosurgical management options.  Given that triplet gestations present significantly higher risk of complication, the standard of care when a lethal fetal anomaly is identified is to offer and recommend selective fetal reduction.  Particularly given that fetuses with anencephaly will develop significant excess amniotic fluid, which is itself a significant risk factor for preterm labor, continuing with all three fetuses would have increased the mother's "risk of losing the entire pregnancy in the pre- or peri-viable period."  While a year ago, the patient could have undergone a selective fetal reduction surgery and significantly improved the changes of a near-term delivery for the remaining two fetuses, the physician observes, such a patient "now will have to travel over 400 miles to obtain care that could prove life saving for her remaining twins.  What could have been a 2-hour office visit close to home, now becomes a 2-3 day trip."  If the patient cannot be referred out of state at all, the mother is likely to lose the entire pregnancy.

As these cases demonstrate, requiring travel to access care can have serious consequences.  One physician notes that it can require "long drives, flights, hotel stays and potentially child care," which for many "may be inaccessible, and this tragically may result in the patient losing the entire pregnancy or delivering peri-viable neonates who then have life-long disabilities stemming from

---

[8] Nat'l Inst. of Neurological Disorders & Stroke, *Anencephaly*, https://bit.ly/40mwZ3A (last visited Apr. 18, 2023).

complications of severe prematurity."  Moreover, even procedures that are exceedingly safe when performed early in the pregnancy—like selective fetal reduction surgeries—grow more dangerous when performed later in a pregnancy.  As another physician put it, "delaying appropriate treatment only increases the risks specific to the patient's health and likelihood of recovery."

Idaho's stringent ban on abortions, and the lack of clarity surrounding when termination of a pregnancy is permissible to save the life of the mother, itself creates grave uncertainty for physicians attempting to provide the gold standard of medical care when it matters most.  But before the Attorney General's interpretation, even if physicians could not themselves perform the procedure for fear of legal liability, they could at least advise the couples as to the options that might exist in neighboring states.  Now, even that option carries severe legal risks.  As a result, not only can physicians not provide what they have been taught is the gold standard for care—they cannot even confidently *discuss* with patients their options for where to obtain that care.  What ought to be a candid and informed conversation between a patient and a trained professional instead becomes a legal risk, to the detriment of all.  "Doctors help patients make deeply personal decisions, and their candor is crucial."  *Nat'l Inst. of Fam. & Life Advocs. v Becerra*, 138 S. Ct. 2361, 2374 (2018) (quotation marks omitted).  The Attorney General's interpretation of Idaho law inhibits that candor and will directly worsen health outcomes for the patients who cannot obtain complete medical information or critical care when they need it most.

One St. Luke's physician laments, "I'm struggling to navigate my practice in obstetrics in an environment in which the interpretation of the law seems to be continually changing."  This physician has "devoted a lot of [their] personal time in the last year to understanding" Idaho Code § 18-622 "and educating [their] fellow colleagues," and is trying in good faith to stay abreast of the legal developments.  But the recent Attorney General opinion, as they put it, "has left me

realizing there is too much left up to one's individual interpretation, and I have too much personally at stake to be unclear about a law that could leave me facing felony charges." The physician went on: "The Attorney General's opinion leaves me censored as an obstetrician. My words put me at risk of legal charges. I can no longer speak openly to my patients and educate them about how to manage their complicated pregnancies. This opinion forces me to violate a code of ethics" and "to provide care that is inadequate and misaligned with national standards of care."

The Attorney General's April 7 letter, which purports to "withdraw" his earlier legal interpretation, does nothing but contribute to the confusion. For a physician trying to make a judgment call in a high-stakes situation for their patient, the complex legal landscape and patchwork of conflicting letters is not enough for them to rely on. Physicians need clarity in what they are permitted to say and do; the Attorney General's second letter provides none. Moreover, although the Attorney General is attempting to walk back his formal position, the bell cannot be unrung: Across the state, county prosecutors now know that, in the Attorney General's view, Idaho Code § 18-622 prohibits out-of-state referrals. This could empower any one of these prosecutors to pursue criminal prosecutions against these physicians, likely citing the Attorney General's own analysis. And even if only one prosecutor adopts the Attorney General's interpretation, that is sufficient to chill Idaho physicians from providing the gold standard of care for fear of prosecution, and that alone will jeopardize the health of pregnant people. Idaho's physicians and patients need a court order holding that this interpretation is contrary to law—nothing less will give them the clarity they need to make these critical decisions regarding patients' health and safety.

The Attorney General's interpretation of Idaho Code § 18-622 has put physicians in an untenable position. Instead of acting on their medical training, they are forced to stop and consider a series of legal hypotheticals, all the while their patients are suffering and deteriorating. As one

doctor wondered when considering whether they would advise terminating a pregnancy for a high-risk patient, "Do I wait for her to seize, or stroke, or bleed?  Should I wait until I cannot control her blood pressures any longer?  Should I wait until her transplanted kidney shows signs of decreased function?  Medically the decision is obvious—no."  But these are precisely the kinds of questions the law forces physicians to ask themselves, and upon which hinge severe criminal and professional liability.

## II.     The Attorney General's Interpretation of Idaho Code § 18-622 Will Drive Physicians Away From Idaho, Harming Patients, The Medical Profession, And The State As A Whole.

The gravest consequence of Idaho Code § 18-622 and the Attorney General's recent interpretation is of course the harms they will inflict on patients facing dangerous complications. But the harms by no means stop there.  Subjecting physicians to these kinds of arduous and fraught decisions day in and day out takes a serious toll on physician morale and well-being.  Indeed, the law has already caused a number of specially trained physicians to leave Idaho, has prompted hospitals to shutter their obstetrics programs, and has made recruiting physicians to the state to replace these departing doctors substantially more difficult.  This dearth of qualified medical care, in turn, will only further exacerbate the harms to patients, and will harm the state as a whole, both medically and economically.

Even before § 18-622 took effect, medical providers in Idaho were stretched thin.  Idaho trails far behind other states regarding its number of physicians per capita.[9]  A January 2023 Report by the Idaho Department of Health and Welfare shows that 98.2% of areas in Idaho have a primary

---

[9] *Understanding Idaho's Doctor Shortage*, Boise State Public Radio, https://bit.ly/3doQyFO (last visited Apr. 20, 2023).

care professional shortage.[10]  And Idaho is one of the states most affected by the nationwide OB-GYN shortage.[11]  This shortage is both caused and exacerbated by the lack of a single OB-GYN residency program in the State of Idaho.[12]  As Jeff Seegmiller, the Regional Dean and Director of the Washington, Wyoming, Alaska, Montana and Idaho (WWAMI) regional Medical Education Program, put it, OB-GYN is just one "of the residencies that our state should have so our students can decide to stay in Idaho."[13]  That gap means that every OB-GYN physician must be recruited to Idaho from out of state.  But a majority of medical students (57.1% between 2011 and 2020) continue to practice in the state where they completed their residency—and that number is trending upward.[14]  Making it more difficult for OB-GYNs in Idaho to treat patients will exacerbate the already difficult task of recruiting OB-GYNs to practice in the State.

Indeed, the new law is even affecting residents in other related programs.  Dr. Tyler McChane, an Idaho medical resident training in family medicine, explained in an interview that he chose his residency because it would give him "access to abortion training" so that he could help patients facing pregnancy complications and miscarriages, as he would "fit that in [to his] day-to-day clinic alongside routine visits for diabetes, or hypertension," or any other run-of-the-mill conditions a family medicine physician faces in a day.[15]  Dr. Rachel Chisausky, another

---

[10] Idaho Dep't Health & Welfare, *Bureau of Rural Health & Primary Care Brief* (Jan. 2023), https://bit.ly/3QEEcrp.
[11] U.S. Dep't of Health & Human Servs., *Projections of Supply and Demand for Women's Health Service Providers: 2018-2030* (Mar. 2021), https://bit.ly/3PhGagh (projecting demand of OB-GYNs to exceed supply in Idaho).
[12] Kelcie Moseley-Morris, *Idaho Medical School Director to Budget Committee: Residencies Still a Challenge for Students*, Idaho Capital Sun (Jan. 27, 2023), https://bit.ly/43IenOC (noting Idaho lacks residencies in pediatrics and OB-GYN).
[13] *Id.*
[14] Patrick Boyle, *America's Medical Residents, By the Numbers*, AAMC (Dec. 1, 2021), https://bit.ly/43HDsZT.
[15] Eilis O'Neill, *Health Care Providers Travel to WA for Abortion Training They Can't Get at Home*, KUOW (Feb. 14, 2023), https://bit.ly/3otxprE.

resident in the same program, hopes to practice in a rural area without many specialists; in order to best serve her patient population, Dr. Chisausky, too, wanted to know how to handle a scenario where "somebody comes in with a miscarriage and profusely bleeding."[16]  As she put it, "that's a skill that I need to have."[17]  Physicians like Drs. McChane and Chisausky are now forced to travel regularly to Washington state to seek the training they assumed they could get in Idaho.  Whether physicians can obtain that training depends on whether they have the financial means to travel frequently (as they must often foot the bill themselves), as well as whether clinics in neighboring states have the capacity to train out-of-state residents.[18]  A faculty member at a residency program in a state where abortion is now illegal told a Washington reporter that he was not sure if the residency program would be able to fill its resident class in light of new abortion laws.[19]  Together, Idaho's dearth of OB-GYN residencies, and its legal inability to teach miscarriage management to its medical students and residents in adjacent specialties, are already exacerbating Idaho's already-dire physician shortage.

Unfortunately, Idaho Code § 18-622 and the Attorney General's interpretation are also worsening these provider shortages by deterring medical professionals from practicing here.  St. Luke's can report firsthand that physicians are already leaving Idaho in light of these recent legal developments.  As one physician described, because of these changes to the law, in the last three months, two physicians from the maternal fetal medicine practice at St. Luke's have left or given notice that they are leaving.  And while that number may seem small, that constitutes *one third* of the maternal fetal medicine practice—and to put that number in perspective, only two physicians

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

left in the prior 17 years (one of whom retired at 72).  While St. Luke's is recruiting to replace the two departing physicians, candidates who had previously expressed enthusiasm are now reconsidering coming to Idaho in light of the restrictive abortion laws and interpretations by the Attorney General.  The physician concluded, "I fear if this trend continues, this practice will not exist in the near future and there will be no one left in Idaho to care for these high-risk pregnant mothers."  Another physician confirmed that the recent legal changes have driven physicians away and is preventing the hospital from recruiting more physicians.  The physician wrote, "I personally know of three obstetricians who have left or are planning to leave citing the Total Abortion Ban and fear of legal consequences."

Another maternal fetal medicine doctor, Dr. Kylie Cooper, publicly announced earlier this year that she is "leaving Idaho because of the abortion bans."[20]  As she put it, "[t]hese laws have impacted the management of pregnancy complications and lowered the standard of care."  In light of the new legal regime, her life "has been turned upside down."  She wondered, "How do I keep my patients safe?  How do I stay safe? … I need to be able to protect my patients' lives, their health and future fertility without fear of becoming a felon.  This fear is why I'm leaving Idaho."[21]  Dr. Amelia Huntsberger, an OB-GYN at another hospital, similarly announced that she would leave the state due to the abortion laws.[22]  As St. Luke's physicians show, and as data is beginning to reveal, this is just the tip of the iceberg.  When a survey conducted by the Idaho Coalition for Safe Reproductive Health Care asked maternal health care doctors if they were considering

---

[20] Kylie Cooper, *Idaho's Abortion Laws Put Mothers and Babies at Risk*, The Spokesman-Review (Feb. 9, 2023), https://bit.ly/3UNvQB4.
[21] *Id.*
[22] Kelcie Moseley-Morris, *Citing Staffing Issues and Political Climate, North Idaho Hospital Will No Longer Deliver Babies*, Idaho Capital Sun (Mar. 17, 2023), https://bit.ly/3NeTW6f.

relocating out of state in the coming year, 41% said yes, while another 23% said maybe.[23]  Of the 75 physicians who said yes or maybe, *all but two* said that Idaho's laws were contributing to their consideration of leaving medical practice in Idaho.[24]

Moreover, at least one prominent hospital has announced that it will cease providing obstetrical services—due, in large part, to the political climate and growing physician shortage. Bonner General Health, the only hospital in Sandpoint (a city of more than 9,000), announced last month that it would no longer provide labor and delivery services effective immediately.[25]  Bonner explicitly cited "Idaho's legal and political climate," which expose Idaho physicians "providing the standard of care" to "civil litigation and criminal prosecution," as part of the reason for the decision, not least because "[h]ighly respected, talented physicians are leaving" and "[r]ecruiting replacements will be extraordinarily difficult."[26]  Bonner's closure means that pregnant women will need to drive at least 46 miles to the closest hospital to deliver their babies.[27]

Recruitment, too, will suffer, as Bonner recognized.  Dr. Deb Owen, an Idaho OBGYN, wrote that "recruitment of new OBGYN physicians to Idaho will be almost impossible going forward."[28]  As Dr. Owen put it, "[n]ew graduates are wary of accepting a job in states with the most restrictive laws," and they have a plethora of options in other states that do not pose these

---

[23] McKay Cunningham, Commentary, *Survey Shows Idaho's Maternal Health Doctors Are Leaving the State, or Soon Will*, Idaho Capital Sun (Apr. 7, 2023), https://bit.ly/41F0FKn.
[24] *Id.*
[25] Press Release, Bonner General Health, *Discontinuation of Labor & Delivery Services at Bonner General Hospital* (Mar. 17, 2023), https://bit.ly/41nox5I.
[26] *Id.*
[27] Heather Landi, *Idaho Hospital to Stop Obstetrical Services, Citing Doc Shortages, Fewer Births and 'Political Climate,'* FIERCE Healthcare (Mar. 23, 2023), https://bit.ly/3KQ4iXg.
[28] Deb Owen, *BGH Obstetrics Closure Is Heartbreaking to See*, Bonner County Daily Bee (Mar. 19, 2023), https://bit.ly/3N0AFVM.

same legal risks.[29]  "Most physicians don't go into medicine because they want to have frequent contact with the legal profession."[30]

Again, the Attorney General's subsequent letter attempting to withdraw his interpretation cannot and will not alleviate these harms.  Medical students and physicians need to be able to plan their lives and rely on legal *certainties*.  A medical student with many options is unlikely to simply take the Attorney General's word that he will not prosecute them for doing their jobs (word that the Attorney General pointedly has not given and will not give), when that position could change at any moment.  The ever-changing legal landscape simply creates too much risk for a physician to feel confident that they can practice medicine effectively and safely.  Without that confidence, Idaho will continue to see highly trained physicians leave the state.

These departures and closures will harm all Idahoans, but not necessarily equally.  Rural communities will be hit especially hard by these changes, as those patients are forced to travel even farther distances to seek medical care.  A July 2022 study showed that Idaho had just 9.7 OB-GYNs per 100,000,[31] but that number is driven largely by the availability of OB-GYNs in urban and, to a lesser extent, large rural populations.  The number of OB-GYNs per 100,000 in small rural populations and isolated small rural populations, respectively, was 4.8 and 3.0.[32]  Moreover, many of Idaho's most rural counties have the highest percentages of physicians age 55 and older— in two counties (Butte and Lincoln), *one hundred percent* of physicians were over 55.[33]  As these

---

[29] *Id.*

[30] *Id.*

[31] Arati Dahal & Susan M. Skillman, *Idaho's Physician Workforce in 2021*, Ctr. for Health & Workforce Studs. at 3 (July 2022), https://bit.ly/41EtYwS.

[32] *Id.*

[33] *Id.*

physicians leave the state (or simply retire), people in these areas will be left without accessible care.

A dearth of qualified physicians trained in maternal fetal medicine—or able to implement their training effectively without fear of legal liability—will undoubtedly contribute to worse maternal health outcomes going forward.  Idaho already struggles with a high maternal mortality rate.  The Idaho Maternal Mortality Review Committee's 2020 report found that Idaho's maternal death rate was almost double the national average.[34]  That report also found that the rate of pregnancy-related deaths per 100,000 live births had grown steeply since 2019—from 13.6 deaths per 100,000 live births in 2019 to 41.8 deaths per 100,000 live births in 2020.[35]  Moreover, all eleven deaths were determined to be preventable, and most were caused at least in part by lack of comprehensive knowledge or lack of continuity of care.[36]  These causes will only be exacerbated by the current legal uncertainty and the flight of trained specialists.  Worse still, the state has let the Maternal Mortality Review Committee expire, meaning that there is no infrastructure to collect the data on the negative health consequences of the recent legal changes.  As Dr. Loren Colson, a family medicine physician, put it: "A lack of support for policies that help pregnant women has been exacerbated by continued efforts to criminalize medicine, which put our physician workforce in jeopardy.  What will happen when there's more pregnant people due to the abortion ban and less physicians to care for them?  It will be more important than ever to review circumstances

---

[34] Loren Colson, Commentary, *Our Idaho Legislators Should Want to Save Pregnant Women. This Maternal Health Data Could Help.*, Idaho Capital Sun (Apr. 17, 2023), https://bit.ly/3ot3xvJ.

[35] Jennifer Liposchak et al., Idaho Maternal & Child Health, *2020 Maternal Deaths in Idaho* at 15 (Dec. 2022), https://bit.ly/3oo6Yno.  That number includes deaths due to injury, substance abuse, and suicide, but even eliminating those deaths, the rate still jumped from 18.1 to 32.5 deaths per 100,000 live births.  *Id.* at 16; *see also* Kelcie Moseley-Morris, *Report: Deaths Among Pregnant Women in Idaho More Than Doubled in 2020*, Idaho Capital Sun (Dec. 12, 2022), https://bit.ly/3GSOpOn.

[36] Liposchak et al., *supra* note 35, at 5.

where the medical system failed and troubleshoot how to prevent the same events from happening again."[37]

Finally, *amicus* notes that physicians, as well as the thousands of other medical practitioners and professional staff employed at hospitals and medical facilities, contribute to the general economic well-being of the community.  Nationally, physicians are responsible for $2.3 trillion in contribution to the economy and account for nearly 12.6 million jobs.  Physicians add value "by creating jobs, purchasing goods and services, and supporting state and community public programs through generated tax revenues."[38]  And more specifically in Idaho, that study showed that each individual physician "supported $1,890,806 in output," through a combination of direct and indirect economic output.[39]  Each physician supported an average of 12.12 jobs and $900,894 in total wages and benefits, as well as $61,584 in local and state tax revenues.[40]  Each physician who leaves the state because of these restrictive statutes and legal interpretations is therefore causing quantifiable harm to the state's financial well-being, too.

In sum, although the impetus behind the legislation at issue may be to protect the welfare of Idahoans, physicians in Idaho have grave concerns about the real-world implications of these changes.  Forbidding physicians from counseling patients on the standard of care for complications that threaten their life or health could lead to needless suffering; depriving physicians of the tools to do their jobs adequately will lead to stress and burnout and has already prompted some physicians to leave the state; and decreasing the availability of maternal medicine in Idaho

---

[37] Colson, *supra* note 34

[38] IQVIA, *The National Economic Impact of Physicians, National Report* at 3 (Jan. 2018), https://bit.ly/3AaZmHq.

[39] IQVIA, *The Economic Impact of Physicians in Idaho, State Report* at 5 (Jan. 2018), https://bit.ly/41iutg5.

[40] *Id.*

generally will disserve patients and the general public.  The consequences of provider shortages are serious.  Without enough physicians and nurses to provide medical care to a community, the quality of care suffers, wait times for an appointment increase, and practitioners become overworked and stressed, causing burnout and—in a vicious cycle—deterring other people from entering the medical field or practicing here, which only compounds the shortages going forward. Again, these consequences will be felt by far more than just the pregnant patients most directly affected by Idaho Code § 18-622 and the Attorney General's recent interpretation.  By making it materially more difficult to attract and retain OB-GYNs, family practitioners, emergency physicians, maternity nurses, and other medical providers, the Attorney General's interpretation of Idaho Code § 18-622 will harm the public interest.  *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (granting stay because "the general public has an interest in the health of San Francisco residents and workers").

*Amicus* concludes with the words of another St. Luke's physician:  "I have wondered many times in the last year if I would leave this state.  As more providers leave, it is becoming more a question of when."  This physician is not alone—this will be the future of medical care in the state under the new interpretation of Idaho Code § 18-622.  *Amicus* is deeply concerned about the ramifications for all Idahoans, and thus respectfully requests that the Court enjoin the Attorney General's interpretation of Idaho Code § 18-622.

## CONCLUSION

For the foregoing reasons, *amicus curiae* St. Luke's Health System, Ltd. respectfully requests that the Court grant the motion for a temporary restraining order and preliminary injunction and deny Defendants' motion to dismiss the complaint.

DATED:  April 21, 2023.

STOEL RIVES LLP

/s/ Wendy J. Olson
Wendy J. Olson

*Counsel for Amicus Curiae St. Luke's Health System, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed via the Court's electronic filing system on this 21st day of April, 2023, to be served by operation of the electronic filing system on all ECF-registered counsel of record.

/s/ Wendy J. Olson
Wendy J. Olson