# Exhibit 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL PORK PRODUCERS COUNCIL ET AL. *v.* ROSS, SECRETARY OF THE CALIFORNIA DEPARTMENT OF FOOD AND AGRICULTURE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 21–468.   Argued October 11, 2022—Decided May 11, 2023

This case involves a challenge to a California law known as Proposition 12, which as relevant here forbids the in-state sale of whole pork meat that comes from breeding pigs (or their immediate offspring) that are "confined in a cruel manner."   Cal. Health & Safety Code Ann. §25990(b)(2).   Confinement is "cruel" if it prevents a pig from "lying down, standing up, fully extending [its] limbs, or turning around freely." §25991(e)(1).   Prior to the vote on Proposition 12, proponents suggested the law would benefit animal welfare and consumer health, and opponents claimed that existing farming practices did better than Proposition 12 protecting animal welfare (for example, by preventing pig-on-pig aggression) and ensuring consumer health (by avoiding contamination).   Shortly after Proposition 12's adoption, two organizations—the National Pork Producers Council and the American Farm Bureau Federation (petitioners)—filed this lawsuit on behalf of their members who raise and process pigs alleging that Proposition 12 violates the U. S. Constitution by impermissibly burdening interstate commerce.   Petitioners estimated that the cost of compliance with Proposition 12 will increase production costs and will fall on both California and out-of-state producers.   But because California imports almost all the pork it consumes, most of Proposition 12's compliance costs will be borne by out-of-state firms.   The district court held that petitioners' complaint failed to state a claim as a matter of law and dismissed the case.   The Ninth Circuit affirmed.

*Held*: The judgment of the Ninth Circuit is affirmed.

6 4th 1021, affirmed.

Syllabus

JUSTICE GORSUCH delivered the opinion of the Court, except as to Parts IV–B, IV–C, and IV–D, rejecting petitioners' theories that would place Proposition 12 in violation of the dormant Commerce Clause even though petitioners do not allege the law purposefully discriminates against out-of-state economic interests. Pp 5–17, 27–29.

(a) The Constitution vests Congress with the power to "regulate Commerce . . . among the several States." Art. I, §8, cl. 3. Although Congress may seek to exercise this power to regulate the interstate trade of pork, and many pork producers have urged Congress to do so, Congress has yet to adopt any statute that might displace Proposition 12 or laws regulating pork production in other States. Petitioners' litigation theory thus rests on the *dormant* Commerce Clause theory, pursuant to which the Commerce Clause not only vests Congress with the power to regulate interstate trade, but also "contain[s] a further, negative command," one effectively forbidding the enforcement of "certain state [economic regulations] even when Congress has failed to legislate on the subject." *Oklahoma Tax Comm'n* v. *Jefferson Lines*, *Inc.*, 514 U. S. 175, 179. This Court has held that state laws offend this dormant aspect of the Commerce Clause when they seek to "build up . . . domestic commerce" through "burdens upon the industry and business of other States." *Guy* v. *Baltimore*, 100 U. S. 434, 443. At the same time, though, the Court has reiterated that, absent purposeful discrimination, "a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to" the interests of its citizens. *Ibid.*

The antidiscrimination principle lies at the "very core" of the Court's dormant Commerce Clause jurisprudence. *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 581. This Court has said that the Commerce Clause prohibits the enforcement of state laws "driven by . . . 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 337–338 (quoting *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273–274). Petitioners here disavow any discrimination-based claim, conceding that Proposition 12 imposes the same burdens on in-state pork producers that it imposes on out-of-state pork producers. Pp 5–8.

(b) Given petitioners' concession that Proposition 12 does not implicate the antidiscrimination principle, petitioners first invoke what they call the "extraterritoriality doctrine." They contend that the Court's dormant Commerce Clause cases suggest an additional and "almost *per se*" rule forbidding enforcement of state laws that have the "practical effect of controlling commerce outside the State," even when those laws do not purposely discriminate against out-of-state interests.

Syllabus

Petitioners further insist that Proposition 12 offends this "almost *per se*" rule because the law will impose substantial new costs on out-of-state pork producers who wish to sell their products in California. Petitioners contend the rule they propose follows ineluctably from three cases: *Healy* v. *Beer Institute*, 491 U. S. 324; *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573; and *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511. But a close look at those cases reveals that each typifies the familiar concern with preventing purposeful discrimination against out-of-state economic interests. In *Baldwin*, a New York law that barred out-of-state dairy farmers from selling their milk in the State for less than the minimum price New York law guaranteed in-state producers "plainly discriminate[d]" against out-of-staters by "erecting an economic barrier protecting a major local industry against competition from without the State." *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354 (discussing *Baldwin*). In *Brown-Forman*, a New York law that required liquor distillers to affirm that their in-state prices were no higher than their out-of-state prices impermissibly sought to force out-of-state distillers to "surrender" whatever cost advantages they enjoyed against their in-state rivals, which amounted to economic protectionism. 476 U. S., at 580.

The Court reached a similar conclusion in *Healy*, which involved a Connecticut law that required out-of-state beer merchants to affirm that their in-state prices were no higher than those they charged in neighboring States. 491 U. S., at 328–330. As the Court later explained, "[t]he essential vice in laws" like Connecticut's is that they "hoard" commerce "for the benefit of" in-state merchants and discourage consumers from crossing state lines to make their purchases from nearby out-of-state vendors. *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383, 391–392.

Petitioners insist that *Baldwin*, *Brown-Forman*, and *Healy* taken together suggest an "almost *per se*" rule against state laws with "extraterritorial effects." While petitioners point to language in these cases pertaining to the "practical effect" of the challenged laws on out-of-state commerce and prices, "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341. The language highlighted by petitioners in *Baldwin*, *Brown-Forman*, and *Healy* appeared in a particular context and did particular work. A close look at those cases reveals nothing like the "almost *per se*" rule against laws that have the "practical effect" of "controlling" extraterritorial commerce that petitioners posit, and indeed petitioners' reading would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers. *Baldwin*, *Brown-Forman*, and *Healy* did not mean to do so much. In rejecting petitioners' "almost *per se*" theory

4              NATIONAL PORK PRODUCERS COUNCIL *v.* ROSS

Syllabus

the Court does not mean to trivialize the role territory and sovereign boundaries play in the federal system; the Constitution takes great care to provide rules for fixing and changing state borders.  Art. IV, §3, cl. 1.  Courts must sometimes referee disputes about where one State's authority ends and another's begins—both inside and outside the commercial context.  Indeed, the antidiscrimination principle found in the Court's dormant Commerce Clause cases may well represent one more effort to mediate competing claims of sovereign authority under our horizontal separation of powers.  But none of this means, as petitioners suppose, that *any* question about the ability of a State to project its power extraterritorially must yield to an "almost *per se*" rule under the dormant Commerce Clause.  This Court has never before claimed so much "ground for judicial supremacy under the banner of the dormant Commerce Clause."  *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. 330, 346–347.  Pp 8–14.

  (c) Petitioners next point to *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, which they assert requires a court to at least assess "'the burden imposed on interstate commerce'" by a state law and prevent its enforcement if the law's burdens are "'clearly excessive in relation to the putative local benefits.'"  Brief for Petitioners 44.  Petitioners provide a litany of reasons why they believe the benefits Proposition 12 secures for Californians do not outweigh the costs it imposes on out-of-state economic interests.

  Petitioners overstate the extent to which *Pike* and its progeny depart from the antidiscrimination rule that lies at the core of the Court's dormant Commerce Clause jurisprudence.  As this Court has previously explained, "no clear line" separates the *Pike* line of cases from core antidiscrimination precedents.  *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298, n. 12.  If some cases focus on whether a state law discriminates on its face, the *Pike* line serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose.  *Pike* itself concerned an Arizona order requiring cantaloupes grown in state to be processed and packed in state.  397 U. S., at 138–140.  The Court held that Arizona's order violated the dormant Commerce Clause, stressing that even if that order could be fairly characterized as facially neutral, it "requir[ed] business operations to be performed in [state] that could more efficiently be performed elsewhere."  *Id.*, at 145.  The "practical effect[s]" of the order in operation thus revealed a discriminatory purpose—an effort to insulate in-state processing and packaging businesses from out-of-state competition.  *Id.*, at 140.  While this Court has left the "courtroom door open" to challenges premised on "even nondiscriminatory burdens," *Davis*, 553 U. S., at 353, and while "a small number of our cases have invalidated state laws . . . that appear to have been genuinely nondiscriminatory,"

Syllabus

*Tracy*, 519 U. S., at 298, n. 12,  petitioners' claim about Proposition 12 falls well outside *Pike*'s heartland.  Pp 15–18.

(d) The Framers equipped Congress with considerable power to regulate interstate commerce and preempt contrary state laws.  See U. S. Const., Art. I, §8, cl. 3; Art. IV, §2.  While this Court has inferred an additional judicially enforceable rule against certain state laws adopted even against the backdrop of congressional silence, the Court's cases also suggest extreme caution is warranted in its exercise.  Disavowing reliance on this Court's core dormant Commerce Clause teachings focused on discriminatory state legislation, petitioners invite the Court to endorse new theories of implied judicial power.  They would have the Court recognize an "almost *per se*" rule against the enforcement of state laws that have "extraterritorial effects"—even though it has long recognized that virtually all state laws create ripple effects beyond their borders.  Alternatively, they would have the Court prevent a State from regulating the sale of an ordinary consumer good within its own borders on nondiscriminatory terms—even though the *Pike* line of cases they invoke has never before yielded such a result.  Like the courts that faced this case below, this Court declines both incautious invitations.  Pp 27–29.

JUSTICE GORSUCH, joined by JUSTICE THOMAS and JUSTICE BARRETT, concluded in Part IV–B that, accepting petitioners' allegations, the *Pike* balancing task that they propose in this case is one no court is equipped to undertake.  Some out-of-state producers who choose to comply with Proposition 12 may incur new costs, while the law serves moral and health interests of some magnitude for in-state residents. In a functioning democracy, those sorts of policy choices—balancing competing, incommensurable goods—belong to the people and their elected representatives.  Pp 18–21.

JUSTICE GORSUCH, joined by JUSTICE THOMAS, JUSTICE SOTOMAYOR, and JUSTICE KAGAN, concluded in Part IV–C that the allegations in the complaint were insufficient as a matter of law to demonstrate a substantial burden on interstate commerce, a showing *Pike* requires *before* a court may assess the law's competing benefits or weigh the two sides against each other, and that the facts pleaded merely allege harm to some producers' favored "methods of operation" which the Court found insufficient to state a claim in *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 127.  Pp 21–25.

JUSTICE GORSUCH, joined by JUSTICE THOMAS and JUSTICE BARRETT, concluded in Part IV–D that petitioners have not asked the Court to treat putative harms to out-of-state animal welfare or other noneconomic interests as freestanding harms cognizable under the dormant Commerce Clause, and in any event that the Court's decisions authorizing claims alleging "burdens on commerce," *Davis*, 553 U. S., at 353,

6            NATIONAL PORK PRODUCERS COUNCIL *v.* ROSS

Syllabus

do not provide judges "a roving license" to reassess the wisdom of state legislation in light of any conceivable out-of-state interest, economic or otherwise.  *United Haulers*, 550 U. S., at 343.  Pp 25–27.

JUSTICE SOTOMAYOR, joined by JUSTICE KAGAN, concluded that the judgment should be affirmed, not because courts are incapable of balancing economic burdens against noneconomic benefits as *Pike* requires or because of any other fundamental reworking of that doctrine, but because petitioners fail to plausibly allege a substantial burden on interstate commerce as required by *Pike*.  Pp 1–3.

JUSTICE BARRETT concluded that the judgment should be affirmed because *Pike* balancing requires both the benefits and burdens of a State law to be judicially cognizable and comparable, see *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 354–355, but the benefits and burdens of Proposition 12 are incommensurable; that said, the complaint plausibly alleges a substantial burden on interstate commerce because Proposition 12's costs are pervasive, burdensome, and will be felt primarily (but not exclusively) outside California.  Pp 1–2.

GORSUCH, J., announced the judgment of the Court, and delivered the opinion of the Court with respect to Parts I, II, III, IV–A, and V, in which THOMAS, SOTOMAYOR, KAGAN, and BARRETT, JJ., joined, an opinion with respect to Parts IV–B and IV–D, in which THOMAS and BARRETT, JJ., joined, and an opinion with respect to Part IV–C, in which THOMAS, SOTOMAYOR, and KAGAN, JJ., joined.  SOTOMAYOR, J., filed an opinion concurring in part, in which KAGAN, J., joined.  BARRETT, J., filed an opinion concurring in part.  ROBERTS, C. J., filed an opinion concurring in part and dissenting in part, in which ALITO, KAVANAUGH, and JACKSON, JJ., joined.  KAVANAUGH, J., filed an opinion concurring in part and dissenting in part.

Cite as: 598 U. S. ____ (2023)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 21–468

———

## NATIONAL PORK PRODUCERS COUNCIL, ET AL., PETITIONERS *v.* KAREN ROSS, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE CALIFORNIA DEPARTMENT OF FOOD & AGRICULTURE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 11, 2023]

JUSTICE GORSUCH announced the judgment of the Court and delivered the opinion of the Court, except as to Parts IV–B, IV–C, and IV–D.

What goods belong in our stores? Usually, consumer demand and local laws supply some of the answer. Recently, California adopted just such a law banning the in-state sale of certain pork products derived from breeding pigs confined in stalls so small they cannot lie down, stand up, or turn around. In response, two groups of out-of-state pork producers filed this lawsuit, arguing that the law unconstitutionally interferes with their preferred way of doing business in violation of this Court's dormant Commerce Clause precedents. Both the district court and court of appeals dismissed the producers' complaint for failing to state a claim.

We affirm. Companies that choose to sell products in various States must normally comply with the laws of those various States. Assuredly, under this Court's dormant Commerce Clause decisions, no State may use its laws to

Opinion of the Court

discriminate purposefully against out-of-state economic in-
terests.  But the pork producers do not suggest that Califor-
nia's law offends this principle.  Instead, they invite us to
fashion two new and more aggressive constitutional re-
strictions on the ability of States to regulate goods sold
within their borders.  We decline that invitation.  While the
Constitution addresses many weighty issues, the type of
pork chops California merchants may sell is not on that list.

## I

Modern American grocery stores offer a dizzying array of
choice.  Often, consumers may choose among eggs that are
large, medium, or small; eggs that are white, brown, or
some other color; eggs from cage-free chickens or ones
raised consistent with organic farming standards.  When it
comes to meat and fish, the options are no less plentiful.
Products may be marketed as free range, wild caught, or
graded by quality (prime, choice, select, and beyond).  The
pork    products    at    issue    here,    too,    sometimes
come with "antibiotic-free" and "crate-free" labels.  USDA,
Report  to  Congress:  Livestock  Mandatory  Reporting
18    (2018),    https://www.ams.usda.gov/sites/default/files/
media/LMR2018ReporttoCongress.pdf.  Much of this prod-
uct differentiation reflects consumer demand, informed by
individual taste, health, or moral considerations.

Informed by similar concerns, States (and their predeces-
sors) have long enacted laws aimed at protecting animal
welfare.  As far back as 1641, the Massachusetts Bay Col-
ony prohibited "Tirranny or Crueltie towards any bruite
Creature."   Body  of  Liberties  §92,  in  A  Bibliographical
Sketch  of  the  Laws  of  the  Massachusetts  Colony  52–53
(1890).  Today, Massachusetts prohibits the sale of pork
products from breeding pigs (or their offspring) if the breed-
ing pig has been confined "in a manner that prevents [it]
from lying down, standing up, fully extending [its] limbs or
turning around freely."   Mass. Gen. Laws Ann., ch. 129,

Opinion of the Court

App. §§1–3, 1–5 (Cum. Supp. 2023). Nor is that State alone. Florida's Constitution prohibits "any person [from] confin[ing] a pig during pregnancy . . . in such a way that she is prevented from turning around freely." Art. X, §21(a). Arizona, Maine, Michigan, Oregon, and Rhode Island, too, have laws regulating animal confinement practices within their borders. See Ariz. Rev. Stat. Ann. §13–2910.07(A) (2018); Me. Rev. Stat. Ann., Tit. 7, §§4020(1)–(2) (2018); Mich. Comp. Laws §287.746(2) (West Cum. Supp. 2022); Ore. Rev. Stat. §§600.150(1)–(2) (2021); R. I. Gen. Laws §4–1.1–3 (Supp. 2022).

This case involves a challenge to a California law known as Proposition 12. In November 2018 and with the support of about 63% of participating voters, California adopted a ballot initiative that revised the State's existing standards for the in-state sale of eggs and announced new standards for the in-state sale of pork and veal products. App. to Pet. for Cert. 37a–46a. As relevant here, Proposition 12 forbids the in-state sale of whole pork meat that comes from breeding pigs (or their immediate offspring) that are "confined in a cruel manner." Cal. Health & Safety Code Ann. §25990(b)(2) (West Cum. Supp. 2023). Subject to certain exceptions, the law deems confinement "cruel" if it prevents a pig from "lying down, standing up, fully extending [its] limbs, or turning around freely." §25991(e)(1). Since Proposition 12's adoption, the State has begun developing "proposed regulations" that would permit compliance "certification[s]" to be issued "by non-governmental third parties, many used for myriad programs (*e.g.*, 'organic') already." Brief for Intervenor Respondents 30, n. 8.

A spirited debate preceded the vote on Proposition 12. Proponents observed that, in some farming operations, pregnant pigs remain "[e]ncased" for 16 weeks in "fit-to-size" metal crates. M. Scully, A Brief for the Pigs: The Case of *National Pork Producers Council* v. *Ross*, National Review, July 11, 2022, https://www.nationalreview.com/2022/

4      NATIONAL PORK PRODUCERS COUNCIL *v.* ROSS

Opinion of the Court

07/a-brief-for-the-pigs-the-case-of-national-pork-producers-council-v-ross/.  These animals may receive their only opportunity for exercise when they are moved to a separate barn to give birth and later returned for another 16 weeks of pregnancy confinement—with the cycle repeating until the pigs are slaughtered.  *Ibid.*  Proponents hoped that Proposition 12 would go a long way toward eliminating pork sourced in this manner "from the California marketplace."  A. Padilla, Cal. Secretary of State, California General Election—Official Voter Information Guide 70 (Nov. 6, 2018) (Voter Guide), https://vig.cdn.sos.ca.gov/2018/general/pdf/complete-vig.pdf.  Proponents also suggested that the law would have health benefits for consumers because "packing animals in tiny, filthy cages increases the risk of food poisoning." *Ibid.*; see App. to Pet. for Cert. 201a–202a.

Opponents pressed their case in strong terms too.  They argued that existing farming practices did a better job of protecting animal welfare (for example, by preventing pig-on-pig aggression) and ensuring consumer health (by avoiding contamination) than Proposition 12 would.  *Id.*, at 185a–187a; see also Voter Guide 70–71.  They also warned voters that Proposition 12 would require some farmers and processors to incur new costs.  *Id.*, at 69.  Ones that might be "passed through" to California consumers.  *Ibid.*

Shortly after Proposition 12's adoption, two organizations—the National Pork Producers Council and the American Farm Bureau Federation (collectively, petitioners)—filed this lawsuit on behalf of their members who raise and process pigs.  App. to Pet. for Cert. 154a–155a.  Petitioners alleged that Proposition 12 violates the U. S. Constitution by impermissibly burdening interstate commerce.  *Id.*, at 230a–232a.

In support of that legal claim, petitioners pleaded a number of facts.  They acknowledged that, in response to consumer demand and the laws of other States, 28% of their

industry has already converted to some form of group housing for pregnant pigs. *Id.*, at 186a. But, petitioners cautioned, even some farmers who already raise group-housed pigs will have to modify their practices if they wish to comply with Proposition 12. *Id.*, at 208a–209a. Much of pork production today is vertically integrated, too, with farmers selling pigs to large processing firms that turn them into different "cuts of meat" and distribute the "different parts . . . all over to completely different end users." *Id.*, at 334a–335a. Revising this system to segregate and trace Proposition 12-compliant pork, petitioners alleged, will require certain processing firms to make substantial new capital investments. *Id.*, at 205a–206a. Ultimately, petitioners estimated that "compliance with Proposition 12 will increase production costs" by "9.2% . . . at the farm level." *Id.*, at 214a. These compliance costs will fall on California and out-of-state producers alike. *Ibid.* But because California imports almost all the pork it consumes, petitioners emphasized, "the majority" of Proposition 12's compliance costs will be initially borne by out-of-state firms. *Ibid.*

After considerable motions practice, the district court held that petitioners' complaint failed to state a claim as a matter of law and dismissed the case. 456 F. Supp. 3d 1201 (SD Cal. 2020). With Judge Ikuta writing for a unanimous panel, the Ninth Circuit affirmed. 6 F. 4th 1021 (2021). Following that ruling, petitioners sought certiorari and we agreed to consider the complaint's legal sufficiency for ourselves. 596 U. S. \_\_\_ (2022).

## II

The Constitution vests Congress with the power to "regulate Commerce . . . among the several States." Art. I, §8, cl. 3. Everyone agrees that Congress may seek to exercise this power to regulate the interstate trade of pork, much as it has done with various other products. Everyone agrees, too, that congressional enactments may preempt conflicting

Opinion of the Court

state laws.  See Art. VI, cl. 2.  But everyone also agrees that
we have nothing like that here.  Despite the persistent ef-
forts of certain pork producers, Congress has yet to adopt
any statute that might displace Proposition 12 or laws reg-
ulating pork production in other States.  See, *e.g.*, H. R. 272,
116th Cong., 1st Sess., §2 (2019); H. R. 4879, 115th Cong.,
2d Sess., §2(a) (2018); H. R. 3599, 115th Cong., 1st Sess.,
§2(a) (2017); H. R. 687, 114th Cong., 1st Sess., §2(a) (2015).

That has led petitioners to resort to litigation, pinning
their hopes on what has come to be called the *dormant* Com-
merce Clause.  Reading between the Constitution's lines,
petitioners observe, this Court has held that the Commerce
Clause not only vests Congress with the power to regulate
interstate trade; the Clause also "contain[s] a further, neg-
ative command," one effectively forbidding the enforcement
of "certain state [economic regulations] even when Con-
gress has failed to legislate on the subject."  *Oklahoma Tax
Comm'n* v. *Jefferson Lines*, *Inc.*, 514 U. S. 175, 179 (1995).

This view of the Commerce Clause developed gradually.
In *Gibbons* v. *Ogden*, Chief Justice Marshall recognized
that the States' constitutionally reserved powers enable
them to regulate commerce in their own jurisdictions in
ways sure to have "a remote and considerable influence on
commerce" in other States.  9 Wheat. 1, 203 (1824).  By way
of example, he cited "[i]nspection laws, quarantine laws,
[and] health laws of every description."  *Ibid.*  At the same
time, however, Chief Justice Marshall saw "great force in
th[e] argument" that the Commerce Clause might impliedly
bar certain types of state economic regulation.  *Id.*, at 209.
Decades later, in *Cooley* v. *Board of Wardens of Port of Phil-
adelphia ex rel. Soc. for Relief of Distressed Pilots*, this
Court again recognized that the power vested in Congress
to regulate interstate commerce leaves the States substan-
tial leeway to adopt their own commercial codes.  12 How.
299, 317–321 (1852).  But once more, the Court hinted that
the Constitution may come with some restrictions on what

Opinion of the Court

"may be regulated by the States" even "in the absence of all congressional legislation." *Id.*, at 320.

Eventually, the Court cashed out these warnings, holding that state laws offend the Commerce Clause when they seek to "build up . . . domestic commerce" through "burdens upon the industry and business of other States," regardless of whether Congress has spoken. *Guy* v. *Baltimore*, 100 U. S. 434, 443 (1880). At the same time, though, the Court reiterated that, absent discrimination, "a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to" the interests of its citizens. *Ibid.*

Today, this antidiscrimination principle lies at the "very core" of our dormant Commerce Clause jurisprudence. *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 581 (1997). In its "modern" cases, this Court has said that the Commerce Clause prohibits the enforcement of state laws "driven by . . . 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 337–338 (2008) (quoting *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273–274 (1988)); see also *Tennessee Wine and Spirits Retailers Assn.* v. *Thomas*, 588 U. S. ___, ___ (2019) (slip op., at 9) (observing that this Court's cases operate principally to "safeguard against state protectionism"); *Northwest Airlines*, *Inc.* v. *County of Kent*, 510 U. S. 355, 373, n. 18 (1994) (describing "a violation of the dormant Commerce Clause" as "discrimination against interstate commerce").

Admittedly, some "Members of the Court have authored vigorous and thoughtful critiques of this interpretation" of the Commerce Clause. *Tennessee Wine*, 588 U. S., at ___ (slip op., at 7) (citing cases). They have not necessarily quarreled with the antidiscrimination principle. But they have suggested that it may be more appropriately housed

elsewhere in the Constitution. Perhaps in the Import–Export Clause, which prohibits States from "lay[ing] any Imposts or Duties on Imports or Exports" without permission from Congress. Art. I, §10, cl. 2; see *Camps Newfound/Owatonna*, 520 U. S., at 621–637 (THOMAS, J., dissenting). Perhaps in the Privileges and Immunities Clause, which entitles "[t]he Citizens of each State" to "all Privileges and Immunities of Citizens in the several States." Art. IV, §2; see *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 265 (1987) (Scalia, J., concurring in part and dissenting in part). Or perhaps the principle inheres in the very structure of the Constitution, which "was framed upon the theory that the peoples of the several [S]tates must sink or swim together." *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, 545 U. S. 429, 433 (2005) (internal quotation marks omitted).

Whatever one thinks about these critiques, we have no need to engage with any of them to resolve this case. Even under our received dormant Commerce Clause case law, petitioners begin in a tough spot. They do not allege that California's law seeks to advantage in-state firms or disadvantage out-of-state rivals. In fact, petitioners *disavow* any discrimination-based claim, conceding that Proposition 12 imposes the same burdens on in-state pork producers that it imposes on out-of-state ones. As petitioners put it, "the dormant Commerce Clause . . . bar on protectionist state statutes that discriminate against interstate commerce . . . is not in issue here." Brief for Petitioners 2, n. 2.

### III

Having conceded that California's law does not implicate the antidiscrimination principle at the core of this Court's dormant Commerce Clause cases, petitioners are left to pursue two more ambitious theories. In the first, petitioners invoke what they call "extraterritoriality doctrine." *Id.*, at 19. They contend that our dormant Commerce Clause

cases suggest an additional and "almost *per se*" rule forbidding enforcement of state laws that have the "practical effect of controlling commerce outside the State," even when those laws do not purposely discriminate against out-of-state economic interests. *Ibid.* Petitioners further insist that Proposition 12 offends this "almost *per se*" rule because the law will impose substantial new costs on out-of-state pork producers who wish to sell their products in California.

### A

This argument falters out of the gate. Put aside what problems may attend the minor (factual) premise of this argument. Focus just on the major (legal) premise. Petitioners say the "almost *per se*" rule they propose follows ineluctably from three cases—*Healy* v. *Beer Institute*, 491 U. S. 324 (1989); *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573 (1986); and *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935). A close look at those cases, however, reveals nothing like the rule petitioners posit. Instead, each typifies the familiar concern with preventing purposeful discrimination against out-of-state economic interests.

Start with *Baldwin*. There, this Court refused to enforce New York laws that barred out-of-state dairy farmers from selling their milk in the State "unless the price paid to" them matched the minimum price New York law guaranteed in-state producers. *Id.*, at 519. In that way, the challenged laws deliberately robbed out-of-state dairy farmers of the opportunity to charge lower prices in New York thanks to whatever "natural competitive advantage" they might have enjoyed over in-state dairy farmers—for example, lower cost structures, more productive farming practices, or "lusher pasturage." D. Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091, 1248 (1986). The problem with New York's laws was thus a simple one:

Opinion of the Court

They "plainly discriminate[d]" against out-of-staters by "erecting an economic barrier protecting a major local industry against competition from without the State." *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354 (1951) (discussing *Baldwin*). Really, the laws operated like "a tariff or customs duty." *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 194 (1994); see *Baldwin*, 294 U. S., at 523 (condemning the challenged laws for seeking to "protec[t]" New York dairy farmers "against competition from without").

*Brown-Forman* and *Healy* differed from *Baldwin* only in that they involved price-affirmation, rather than price-fixing, statutes. In *Brown-Forman*, New York required liquor distillers to affirm (on a monthly basis) that their in-state prices were no higher than their out-of-state prices. 476 U. S., at 576. Once more, the goal was plain: New York sought to force out-of-state distillers to "surrender" whatever cost advantages they enjoyed against their in-state rivals. *Id.*, at 580. Once more, the law amounted to "simple economic protectionism." *Ibid.* (internal quotation marks omitted).

In *Healy*, a Connecticut law required out-of-state beer merchants to affirm that their in-state prices were no higher than those they charged in neighboring States. 491 U. S., at 328–330. Here, too, protectionism took center stage. As the Court later noted, "[t]he essential vice in laws" like Connecticut's is that they "hoard" commerce "for the benefit of" in-state merchants and discourage consumers from crossing state lines to make their purchases from nearby out-of-state vendors. *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383, 391–392 (1994). Nor did the law in *Healy* even try to cloak its discriminatory purpose: "By its plain terms, the Connecticut affirmation statute applie[d] solely to interstate" firms, and in that way "clearly discriminate[d] against interstate commerce." 491 U. S., at 340–341. The Court also worried that, if the Connecticut law

stood, "each of the border States" could "enac[t] statutes essentially identical to Connecticut's" in retaliation—a result often associated with avowedly protectionist economic policies. *Id.*, at 339–340.

### B

Petitioners insist that our reading of these cases misses the forest for the trees. On their account, *Baldwin*, *Brown-Forman*, and *Healy* didn't just find an impermissible discriminatory purpose in the challenged laws; they also suggested an "almost *per se*" rule against state laws with "extraterritorial effects." Brief for Petitioners 19, 23. In *Healy*, petitioners stress, the Court included language criticizing New York's laws for having the "'practical effect'" of "control[ling] commerce 'occurring wholly outside the boundaries of [the] State.'" Brief for Petitioners 21, 25 (quoting 491 U. S., at 336). In *Brown-Forman*, petitioners observe, the Court suggested that whether a state law "'is addressed only to [in-state] sales is irrelevant if the "practical effect" of the law is to control'" out-of-state prices. Brief for Petitioners 21 (quoting 476 U. S., at 583). Petitioners point to similar language in *Baldwin* as well. Brief for Petitioners 37 (quoting 294 U. S., at 523–524).

In our view, however, petitioners read too much into too little. "[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341 (1979). Instead, we emphasize, our opinions dispose of discrete cases and controversies and they must be read with a careful eye to context. See *Cohens* v. *Virginia*, 6 Wheat. 264, 399–400 (1821) (Marshall, C. J.). And when it comes to *Baldwin*, *Brown-Forman*, and *Healy*, the language petitioners highlight appeared in a particular context and did particular work. Throughout, the Court explained that the challenged statutes had a *specific* impermissible "extraterritorial effect"—they deliberately "prevent[ed out-of-state

Opinion of the Court

firms] from undertaking competitive pricing" or "deprive[d] businesses and consumers in other States of 'whatever competitive advantages they may possess.'" *Healy*, 491 U. S., at 338–339 (quoting *Brown-Forman*, 476 U. S., at 580).

In recognizing this much, we say nothing new. This Court has already described "[t]he rule that was applied in *Baldwin* and *Healy*" as addressing "price control or price affirmation statutes" that tied "the price of . . . in-state products to out-of-state prices." *Pharmaceutical Research and Mfrs. of America* v. *Walsh*, 538 U. S. 644, 669 (2003) (internal quotation marks omitted). Many lower courts have read these decisions in exactly the same way. See, *e.g.*, 6 F. 4th, at 1028–1029; *Association for Accessible Medicines* v. *Frosh*, 887 F. 3d 664, 669 (CA4 2018); *Energy and Environment Legal Inst.* v. *Epel*, 793 F. 3d 1169, 1174 (CA10 2015); *American Beverage Assn.* v. *Snyder*, 735 F. 3d 362, 373 (CA6 2013).

Consider, too, the strange places petitioners' alternative interpretation could lead. In our interconnected national marketplace, many (maybe most) state laws have the "practical effect of controlling" extraterritorial behavior. State income tax laws lead some individuals and companies to relocate to other jurisdictions. See, *e.g.*, *Banner* v. *United States*, 428 F. 3d 303, 310 (CADC 2005) (*per curiam*). Environmental laws often prove decisive when businesses choose where to manufacture their goods. See *American Beverage Assn.*, 735 F. 3d, at 379 (Sutton, J., concurring). Add to the extraterritorial-effects list all manner of "libel laws, securities requirements, charitable registration requirements, franchise laws, tort laws," and plenty else besides. J. Goldsmith & A. Sykes, The Internet and the Dormant Commerce Clause, 110 Yale L. J. 785, 804 (2001). Nor, as we have seen, is this a recent development. Since the founding, States have enacted an "immense mass" of "[i]nspection laws, quarantine laws, [and] health laws of every description" that have a "considerable" influence on

Opinion of the Court

commerce outside their borders. *Gibbons*, 9 Wheat., at 203; see also *Cooley*, 12 How., at 317–321. Petitioners' "almost *per se*" rule against laws that have the "practical effect" of "controlling" extraterritorial commerce would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers. It would provide neither courts nor litigants with meaningful guidance in how to resolve disputes over them. Instead, it would invite endless litigation and inconsistent results. Can anyone really suppose *Baldwin*, *Brown-Forman*, and *Healy* meant to do so much?

In rejecting petitioners' "almost *per se*" theory we do not mean to trivialize the role territory and sovereign boundaries play in our federal system. Certainly, the Constitution takes great care to provide rules for fixing and changing state borders. Art. IV, §3, cl. 1. Doubtless, too, courts must sometimes referee disputes about where one State's authority ends and another's begins—both inside and outside the commercial context. In carrying out that task, this Court has recognized the usual "legislative power of a State to act upon persons and property within the limits of its own territory," *Hoyt* v. *Sprague*, 103 U. S. 613, 630 (1881), a feature of our constitutional order that allows "different communities" to live "with different local standards," *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989). But, by way of example, no one should think that one State may adopt a law exempting securities held by the residents of a second State from taxation in that second State. *Bonaparte* v. *Tax Court*, 104 U. S. 592, 592–594 (1882). Nor, we have held, should anyone think one State may prosecute the citizen of another State for acts committed "outside [the first State's] jurisdiction" that are not "intended to produce [or that do not] produc[e] detrimental effects within it." *Strassheim* v. *Daily*, 221 U. S. 280, 285 (1911).

To resolve disputes about the reach of one State's power,

Opinion of the Court

this Court has long consulted original and historical understandings of the Constitution's structure and the principles of "sovereignty and comity" it embraces. *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 572 (1996). This Court has invoked as well a number of the Constitution's express provisions—including "the Due Process Clause and the Full Faith and Credit Clause." *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 818 (1985). The antidiscrimination principle found in our dormant Commerce Clause cases may well represent one more effort to mediate competing claims of sovereign authority under our horizontal separation of powers. But none of this means, as petitioners suppose, that *any* question about the ability of a State to project its power extraterritorially must yield to an "almost *per se*" rule under the dormant Commerce Clause. This Court has never before claimed so much "ground for judicial supremacy under the banner of the dormant Commerce Clause." *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. 330, 347 (2007). We see no reason to change course now.[1]

---

[1] Beyond *Baldwin*, *Brown-Forman*, and *Healy*, petitioners point to *Edgar* v. *MITE Corp.*, 457 U. S. 624 (1982), as authority for the "almost *per se*" rule they propose. Invoking the dormant Commerce Clause, a plurality in that case declined to enforce an Illinois securities law that "*directly* regulate[d] transactions which [took] place . . . wholly outside the State" and involved individuals "having no connection with Illinois." *Id.*, at 641–643 (emphasis added). Some have questioned whether the state law at issue in *Edgar* posed a dormant Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers. See, *e.g.,* D. Regan, Siamese Essays: (I) *CTS Corp. v. Dynamics Corp. of America* and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation, 85 Mich. L. Rev. 1865, 1875–1880, 1897–1902 (1987); cf. *Shelby County* v. *Holder*, 570 U. S. 529, 535 (2013) ("[A]ll States enjoy equal sovereignty"). But either way, the *Edgar* plurality opinion does not support the rule petitioners propose. That decision spoke to a law that *directly* regulated out-

Opinion of the Court

## IV

Failing in their first theory, petitioners retreat to a second they associate with *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970). Under *Pike*, they say, a court must at least assess "'the burden imposed on interstate commerce'" by a state law and prevent its enforcement if the law's burdens are "'clearly excessive in relation to the putative local benefits.'" Brief for Petitioners 44. Petitioners then rattle off a litany of reasons why they believe the benefits Proposition 12 secures for Californians do not outweigh the costs it imposes on out-of-state economic interests. We see problems with this theory too.

## A

In the first place, petitioners overstate the extent to which *Pike* and its progeny depart from the antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence. As this Court has previously explained, "no clear line" separates the *Pike* line of cases from our core antidiscrimination precedents. *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298, n. 12 (1997). While many of our dormant Commerce Clause cases have asked whether a law exhibits "'facial discrimination,'" "several cases that have purported to apply [*Pike,*] including *Pike* itself," have "turned in whole or in part on the discriminatory character of the challenged state regulations." *Ibid.* In other words, if some of our cases focus on whether a state law discriminates on its face, the *Pike* line serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose.

*Pike* itself illustrates the point. That case concerned an

––––––––

of-state transactions by those with *no* connection to the State. Petitioners do not allege those conditions exist here. To the contrary, they acknowledge that Proposition 12 regulates only products that companies choose to sell "within" California. Cal. Health & Safety Code Ann. §25990(b).

Arizona order requiring cantaloupes grown in state to be processed and packed in state. 397 U. S., at 138–140. The Court held that Arizona's order violated the dormant Commerce Clause. *Id.,* at 146. Even if that order could be fairly characterized as facially neutral, the Court stressed that it "requir[ed] business operations to be performed in [state] that could more efficiently be performed elsewhere." *Id.*, at 145. The "practical effect[s]" of the order in operation thus revealed a discriminatory purpose—an effort to insulate in-state processing and packaging businesses from out-of-state competition. *Id.*, at 140, 145.

Other cases in the *Pike* line underscore the same message. In *Minnesota* v. *Clover Leaf Creamery Co.*, the Court found no impermissible burden on interstate commerce because, looking to the law's effects, "there [was] no reason to suspect that the gainers" would be in-state firms or that "the losers [would be] out-of-state firms." 449 U. S. 456, 473 (1981); see also *id.*, at 474–477, and n. 2 (Powell, J., concurring in part and dissenting in part) (asking whether the "actual purpose," if not the "'avowed purpose,'" of the law was discrimination). Similarly, in *Exxon Corp.* v. *Governor of Maryland*, the Court keyed to the fact that the effect of the challenged law was only to shift business from one set of out-of-state suppliers to another. 437 U. S. 117, 127 (1978). And in *United Haulers*, a plurality upheld the challenged law because it could not "detect" any discrimination in favor of in-state businesses or against out-of-state competitors. 550 U. S., at 346. In each of these cases and many more, the presence or absence of discrimination in practice proved decisive.

Once again, we say nothing new here. Some time ago, *Tracy* identified the congruity between our core dormant Commerce Clause precedents and the *Pike* line. 519 U. S., at 298, n. 12. Many lower courts have done the same. See, *e.g.*, *Rosenblatt* v. *Santa Monica*, 940 F. 3d 439, 452 (CA9 2019); *Park Pet Shop, Inc.* v. *Chicago*, 872 F. 3d 495, 501

(CA7 2017); *Amanda Acquisition Corp.* v. *Universal Foods Corp.*, 877 F. 2d 496, 505 (CA7 1989). So have many scholars. See, *e.g.*, R. Fallon, The Dynamic Constitution 311 (2d ed. 2013) (observing that *Pike* serves to "'smoke out' a hidden" protectionism); B. Friedman & D. Deacon, A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause, 97 Va. L. Rev. 1877, 1927 (2011); Regan, 84 Mich. L. Rev., at 1286.

Nor does any of this help petitioners in this case. They not only disavow any claim that Proposition 12 discriminates on its face. They nowhere suggest that an examination of Proposition 12's practical effects in operation would disclose purposeful discrimination against out-of-state businesses. While this Court has left the "courtroom door open" to challenges premised on "even nondiscriminatory burdens," *Davis*, 553 U. S., at 353, and while "a small number of our cases have invalidated state laws . . . that appear to have been genuinely nondiscriminatory," *Tracy*, 519 U. S., at 298, n. 12,[2] petitioners' claim falls well outside

---

[2] Most notably, *Tracy* referred to, and petitioners briefly allude to, a line of cases that originated before *Pike* in which this Court refused to enforce certain state regulations on instrumentalities of interstate transportation—trucks, trains, and the like. See, *e.g.*, *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520, 523–530 (1959) (concerning a state law specifying certain mud flaps for trucks and trailers); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 763–782 (1945) (addressing a state law regarding the length of trains). Petitioners claim these cases support something like the extraterritoriality or balancing rules they propose. But at least some decisions in this line might be viewed as condemning state laws that "although neutral on their face . . . were enacted at the instance of, and primarily benefit," in-state interests. *Raymond Motor Transp., Inc.* v. *Rice*, 434 U. S. 429, 447 (1978); see also B. Friedman & D. Deacon, A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause, 97 Va. L. Rev. 1877, 1927 (2011). In any event, this Court "has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede *the flow* of interstate goods."

Opinion of GORSUCH, J.

*Pike*'s heartland. That is not an auspicious start.

### B

Matters do not improve from there. While *Pike* has traditionally served as another way to test for purposeful discrimination against out-of-state economic interests, and while some of our cases associated with that line have expressed special concern with certain state regulation of the instrumentalities of interstate transportation, see n. 2, *supra*, petitioners would have us retool *Pike* for a much more ambitious project. They urge us to read *Pike* as authorizing judges to strike down duly enacted state laws regulating the in-state sale of ordinary consumer goods (like pork) based on nothing more than their own assessment of the relevant law's "costs" and "benefits."

That we can hardly do. Whatever other judicial authorities the Commerce Clause may imply, that kind of freewheeling power is not among them. Petitioners point to nothing in the Constitution's text or history that supports such a project. And our cases have expressly cautioned against judges using the dormant Commerce Clause as "a roving license for federal courts to decide what activities are appropriate for state and local government to undertake." *United Haulers*, 550 U. S., at 343. While "[t]here was a time when this Court presumed to make such binding judgments for society, under the guise of interpreting the Due Process Clause," we have long refused pleas like petitioners' "to reclaim that ground" in the name of the dormant Commerce Clause. *Id.*, at 347.

Not only is the task petitioners propose one the Commerce Clause does not authorize judges to undertake. This Court has also recognized that judges often are "not institutionally suited to draw reliable conclusions of the kind

---

*Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 128 (1978) (emphasis added). Nothing like that exists here. We do not face a law that impedes the flow of commerce. Pigs are not trucks or trains.

that would be necessary . . . to satisfy [the] *Pike*" test as petitioners conceive it. *Davis*, 553 U. S., at 353.

Our case illustrates the problem. On the "cost" side of the ledger, petitioners allege they will face increased production expenses because of Proposition 12. On the "benefits" side, petitioners acknowledge that Californians voted for Proposition 12 to vindicate a variety of interests, many noneconomic. See App. to Pet. for Cert. 192a (alleging in their complaint that "Proposition 12's requirements were driven by [a] conception of what qualifies as 'cruel' animal housing" and by the State's concern for the "'health and safety of California consumers'"). How is a court supposed to compare or weigh economic costs (to some) against noneconomic benefits (to others)? No neutral legal rule guides the way. The competing goods before us are insusceptible to resolution by reference to any juridical principle. Really, the task is like being asked to decide "whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 897 (1988) (Scalia, J., concurring in judgment).

Faced with this problem, petitioners reply that we should heavily discount the benefits of Proposition 12. They say that California has little interest in protecting the welfare of animals raised elsewhere and the law's health benefits are overblown. But along the way, petitioners offer notable concessions too. They acknowledge that States may sometimes ban the in-state sale of products they deem unethical or immoral without regard to where those products are made (for example, goods manufactured with child labor). See Tr. of Oral Arg. 51 ("[A] state is perfectly entitled to enforce its morals in state"); see also *Western Union Telegraph Co.* v. *James*, 162 U. S. 650, 653 (1896) (holding that States may enact laws to "promote . . . public morals"). And, at least arguably, Proposition 12 works in just this way—banning from the State all whole pork products derived from practices its voters consider "cruel." Petitioners

also concede that States may often adopt laws addressing even "imperfectly understood" health risks associated with goods sold within their borders. Reply Brief 13. And, again, no one disputes that some who voted for Proposition 12 may have done so with just that sort of goal in mind. See, *e.g.*, USDA Proposed Rule To Amend Organic Livestock and Poultry Production Requirements, 87 Fed. Reg. 48565 (2022) (affording animals more space "may result in healthier livestock products for human consumption").

So even accepting everything petitioners say, we remain left with a task no court is equipped to undertake. On the one hand, some out-of-state producers who choose to comply with Proposition 12 may incur new costs. On the other hand, the law serves moral and health interests of some (disputable) magnitude for in-state residents. Some might reasonably find one set of concerns more compelling. Others might fairly disagree. How should we settle that dispute? The competing goods are incommensurable. Your guess is as good as ours.

More accurately, your guess is *better* than ours. In a functioning democracy, policy choices like these usually belong to the people and their elected representatives. They are entitled to weigh the relevant "political and economic" costs and benefits for themselves, *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 279 (1978), and "try novel social and economic experiments" if they wish, *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). Judges cannot displace the cost-benefit analyses embodied in democratically adopted legislation guided by nothing more than their own faith in "Mr. Herbert Spencer's Social Statics," *Lochner* v. *New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting)—or, for that matter, Mr. Wilson Pond's Pork Production Systems, see W. Pond, J. Maner, & D. Harris, Pork Production Systems: Efficient Use of Swine and Feed Resources (1991).

If, as petitioners insist, California's law really does

Opinion of GORSUCH, J.

threaten a "massive" disruption of the pork industry, see Brief for Petitioners 2, 4, 19—if pig husbandry really does "'imperatively demand'" a single uniform nationwide rule, *id.*, at 27—they are free to petition Congress to intervene. Under the (wakeful) Commerce Clause, that body enjoys the power to adopt federal legislation that may preempt conflicting state laws. That body is better equipped than this Court to identify and assess all the pertinent economic and political interests at play across the country. And that body is certainly better positioned to claim democratic support for any policy choice it may make. But so far, Congress has declined the producers' sustained entreaties for new legislation. See Part I, *supra* (citing failed efforts). And with that history in mind, it is hard not to wonder whether petitioners have ventured here only because winning a majority of a handful of judges may seem easier than marshaling a majority of elected representatives across the street.

## C

Even as petitioners conceive *Pike*, they face a problem. As they read it, *Pike* requires a plaintiff to plead facts plausibly showing that a challenged law imposes "substantial burdens" on interstate commerce *before* a court may assess the law's competing benefits or weigh the two sides against each other. Brief for Petitioners 44. And, tellingly, the complaint before us fails to clear even that bar.

To appreciate petitioners' problem, compare our case to *Exxon*. That case involved a Maryland law prohibiting petroleum producers from operating retail gas stations in the State. 437 U. S., at 119–121, and n. 1. Because Maryland had no in-state petroleum producers, Exxon argued, the law's "divestiture requirements" fell "solely on interstate companies" and threatened to force some to "withdraw entirely from the Maryland market" or incur new costs to serve that market. *Id.*, at 125–127. All this, the company said, amounted to a violation of the dormant Commerce

Opinion of GORSUCH, J.

Clause.

This Court found the allegations in Exxon's complaint insufficient as a matter of law to demonstrate a substantial burden on interstate commerce. Without question, Maryland's law favored one business structure (independent gas station retailers) over another (vertically integrated production and retail firms). *Ibid.* The law also promised to increase retail gas prices for Maryland consumers, allowing some to question its "wisdom." *Id.*, at 124, 128. But, the Court found, Exxon failed to plead facts leading, "either logically or as a practical matter, to [the] conclusion that the State [was] discriminating against interstate commerce." *Id.*, at 125. The company failed to do so because, on its face, Maryland's law welcomed competition from interstate retail gas station chains that did not produce petroleum. *Id.*, at 125–126. And as far as anyone could tell, the law's "practical effect" wasn't to protect in-state producers; it was to shift market share from one set of out-of-state firms (vertically integrated businesses) to another (retail gas station firms). *Id.*, at 125, 127. This Court squarely rejected the view that this predicted "'change [in] the market structure'" would "impermissibly burde[n] interstate commerce." *Id.,* at 127. If the dormant Commerce Clause protects the "interstate market . . . from prohibitive or burdensome regulations," the Court held, it does not protect "particular . . . firms" or "particular structure[s] or methods of operation." *Id.,* at 127–128.

If Maryland's law did not impose a sufficient burden on interstate commerce to warrant further scrutiny, the same must be said for Proposition 12. In *Exxon*, vertically integrated businesses faced a choice: They could divest their production capacities or withdraw from the local retail market. Here, farmers and vertically integrated processors have at least as much choice: They may provide all their pigs the space the law requires; they may segregate their operations to ensure pork products entering California

meet its standards; or they may withdraw from that State's market.  In *Exxon*, the law posed a choice *only* for out-of-state firms.  Here, the law presents a choice primarily—but not exclusively—for out-of-state businesses; California does have some pork producers affected by Proposition 12.  See App. to Pet. for Cert. 205a.  In *Exxon*, as far as anyone could tell, the law threatened only to shift market share from one set of out-of-state firms to another.  Here, the pleadings allow for the same possibility—that California market share previously enjoyed by one group of profit-seeking, out-of-state businesses (farmers who stringently confine pigs and processors who decline to segregate their products) will be replaced by another (those who raise and trace Proposition 12-compliant pork).  In both cases, some may question the "wisdom" of a law that threatens to disrupt the existing practices of some industry participants and may lead to higher consumer prices.  437 U. S., at 128.  But the dormant Commerce Clause does not protect a "particular structure or metho[d] of operation."  *Id.*, at 127.  That goes for pigs no less than gas stations.

Think of it another way.  Petitioners must plead facts "plausibly" suggesting a substantial harm to interstate commerce; facts that render that outcome a "speculative" possibility are not enough.  *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544, 555, 557 (2007).  In an effort to meet this standard, petitioners allege facts suggesting that certain out-of-state farmers and processing firms will find it difficult to comply with Proposition 12 and may choose not to do so.  See App. to Pet. for Cert. 198a, 208a, 313a.  But the complaint also acknowledges that many producers have already converted to some form of group housing, even if they have not all yet met Proposition 12's standards.  *Id.*, at 186a.  From these facts, the complaint plausibly alleges that *some* out-of-state firms may face difficulty complying (or may choose not to comply) with Proposition 12.  But from all anyone can tell, *other* out-of-state competitors seeking to

Opinion of GORSUCH, J.

enhance their own profits may choose to modify their existing operations or create new ones to fill the void.[3]

Of course, as the complaint alleges, a shift from one set of production methods to another promises some costs. *Id.*, at 214a. But the complaint concedes that complying producers will be able to "pas[s] along" at least "some" of their increased costs to consumers. *Id.,* at 178a. And no one thinks that costs ultimately borne by in-state consumers thanks to a law they adopted counts as a cognizable harm under our dormant Commerce Clause precedents. See *United Haulers*, 550 U. S., at 345 (holding that the dormant Commerce Clause is not offended by higher prices "likely to fall upon the very people who voted for the [challenged] la[w]"). Nor does the complaint allege facts plausibly suggesting that out-of-state consumers indifferent to pork production methods will have to pick up the tab (let alone explain how petitioners might sue to vindicate their interests). Instead, at least one declaration incorporated by reference into the complaint avers that some out-of-state consumers will "not value these changes and will not pay an increased price."

---

[3]Though it is unnecessary to adorn the point, we note that a number of smaller out-of-state pork producers have filed an *amicus* brief in this Court hailing the "opportunities" Proposition 12 affords them to compete with vertically integrated firms with "'concentrated market power'" that are wedded to their existing processing practices. Brief for Small and Independent Farming Businesses et al. as *Amici Curiae* 1, 12, 19–20. Other *amici* have noted that even some large vertically integrated processing firms have already begun to modify (or else have indicated their intention to modify) their operations to comply with Proposition 12. See Brief for Perdue Premium Meat Co., Inc., as *Amicus Curiae* 3–7; see also Brief for Economic Research Organizations as *Amici Curiae* 16–17 (reciting public statements from Hormel, Smithfield, and Tyson). Another large processing firm, Cargill, has boasted that, "'[b]efore we sold our pork business in 2015, we led the industry in removing gestation stalls to house pregnant sows.'" *Id.*, at 16. Petitioner National Pork Producers Council lists Cargill as an "allied industry compan[y]." National Pork Producers Council, Pork Alliance Program, https://nppc.org/get-involved/join-the-pork-alliance/.

App. to Pet. for Cert. 335a; see also Brief for Agricultural and Resource Economics Professors as *Amici Curiae* 15, 23 (suggesting negligible effect on out-of-state prices for consumers not interested in Proposition 12-compliant pork). Further experience may yield further facts. But the facts pleaded in this complaint merely allege harm to some producers' favored "methods of operation." *Exxon*, 437 U. S., at 127. A substantial harm to interstate commerce remains nothing more than a speculative possibility. *Ibid.*

### D

THE CHIEF JUSTICE's concurrence in part and dissent in part (call it "the lead dissent") offers a contrasting view. Correctly, it begins by rejecting petitioners' "almost *per se*" rule against laws with extraterritorial effects. *Post*, at 1. And correctly, it disapproves reading *Pike* to endorse a "freewheeling judicial weighing of benefits and burdens." *Post*, at 2. But for all it gets right, in other respects it goes astray. In places, the lead dissent seems to advance a reading of *Pike* that would permit judges to enjoin the enforcement of any state law restricting the sale of an ordinary consumer good if the law threatens an "'excessive'" "har[m] to the interstate market" for that good. *Post*, at 4–9. It is an approach that would go much further than our precedents permit. So much further, in fact, that it isn't clear what separates the lead dissent's approach from others it purports to reject.

Consider an example. Today, many States prohibit the sale of horsemeat for human consumption. See *Cavel Int'l, Inc.* v. *Madigan*, 500 F. 3d 551, 552–555 (CA7 2007). But these prohibitions "har[m] the interstate market" for horsemeat by denying outlets for its sale. Not only that, they distort the market for animal products more generally by pressuring horsemeat manufacturers to transition to different products, ones they can lawfully sell nationwide. Under the lead dissent's test, all it would take is one complaint

Opinion of GORSUCH, J.

from an unhappy out-of-state producer and—presto—the Constitution would protect the sale of horsemeat. Just find a judge anywhere in the country who considers the burden to producers "excessive." *Post*, at 9. The same would go for all manner of consumer products currently banned by some States but not by others—goods ranging from fireworks, see, *e.g.,* Mass. Gen. Laws Ann., ch. 148, §39 (2020)*,* to single-use plastic grocery bags, see, *e.g.,* Me. Rev. Stat. Ann., Tit. 38, §§1611(2)(A), (4) (2022). Rather than respecting federalism, a rule like that would require any consumer good available for sale in one State to be made available in every State. In the process, it would essentially replicate under *Pike's* banner petitioners' "almost *per se*" rule against state laws with extraterritorial effects.

Seeking a way around that problem, the lead dissent stumbles into another. It suggests that the burdens of Proposition 12 are particularly "substantial" because California's law "carr[ies] implications for producers as far flung as Indiana and North Carolina." *Post*, at 7–10. Why is that so? JUSTICE KAVANAUGH's solo concurrence in part and dissent in part says the quiet part aloud: California's market is so lucrative that almost any in-state measure will influence how out-of-state profit-maximizing firms choose to operate. *Post,* at 4–5. But if that makes all the difference, it means voters in States with smaller markets are constitutionally entitled to greater authority to regulate in-state sales than voters in States with larger markets. So much for the Constitution's "fundamental principle of *equal* sovereignty among the States." *Shelby County* v. *Holder*, 570 U. S. 529, 544 (2013) (internal quotation marks omitted).

The most striking feature of both dissents, however, may be another one. They suggest that, in assessing a state law's burdens under *Pike*, courts should take into account not just economic harms but also all manner of "derivative harms" to out-of-state interests. *Post*, at 5–6 (opinion of

Opinion of the Court

ROBERTS, C. J.).  These include social costs that are "diffi-
cult to quantify" such as (in this case) costs to the "national
pig population," "animal husbandry" traditions, and (again)
"industry practice." *Post,* at 6–9; see also *post,* at 3–5 (opin-
ion of KAVANAUGH, J.).  But not even petitioners read *Pike*
so boldly.  While petitioners argue that Proposition 12 does
not benefit pigs (as California has asserted), they have not
asked this Court (or any court) to treat putative harms to
out-of-state animal welfare or other noneconomic interests
as freestanding harms cognizable under the dormant Com-
merce Clause.  Nor could they have proceeded otherwise.
Our decisions have authorized claims alleging "burdens on
commerce." *Davis*, 553 U. S., at 353.  They do not provide
judges "a roving license" to reassess the wisdom of state leg-
islation in light of any conceivable out-of-state interest, eco-
nomic or otherwise. *United Haulers*, 550 U. S., at 343.[4]

## V

Before the Constitution's passage, Rhode Island imposed
special taxes on imported "*New-England* Rum"; Connecti-
cut levied duties on goods "brought into th[e] State, by Land

——————
[4] Both dissents seek to characterize today's decision as "fractured" in
an effort to advance their own overbroad readings of *Pike* and layer their
own gloss on opinions they do not join. *Post,* at 1, 8 (opinion of
KAVANAUGH, J.); see also *post* at 2–4, 8–10 (opinion of ROBERTS, C. J.).
But the dissents are just that—dissents.  Their glosses do not speak for
the Court.  Today, the Court unanimously disavows petitioners' "almost
*per se*" rule against laws with extraterritorial effects.  See Parts II and
III, *supra*.  When it comes to *Pike*, a majority agrees that heartland *Pike*
cases seek to smoke out purposeful discrimination in state laws (as illu-
minated by those laws' practical effects) or seek to protect the instrumen-
talities of interstate transportation.  See Part IV–A, *supra*.  A majority
also rejects any effort to expand *Pike*'s domain to cover cases like this
one, some of us for reasons found in Part IV–B, others of us for reasons
discussed in Part IV–C.  Today's decision depends equally on the analysis
found in both of these sections; without either, there is no explaining the
Court's judgment affirming the decision below.  A majority also sub-
scribes to what follows in Part V.

Opinion of the Court

or Water, from any of the United States of *America*"; and Virginia taxed "vessels coming within th[e S]tate from any of the United States." An Act Laying Certain Duties of Excise Upon Certain Articles, Feb. 24, 1783 R. I. Acts and Resolves 45; An Act for Levying and Collecting a Duty on Certain Articles of Goods, Wares and Merchandize Imported into this State, by Land or Water, 1784 Conn. Acts and Laws 271; An Act to Amend the Act for Ascertaining Certain Taxes and Duties, and for Establishing a Permanent Revenue (May 6, 1782), in 11 Statues at Large, Laws of Virginia 70 (W. Hening ed. 1823).

Whether moved by this experience or merely worried that more States might join the bandwagon, the Framers equipped Congress with considerable power to regulate interstate commerce and preempt contrary state laws. See U. S. Const., Art. I, §8, cl. 3; Art. IV, §2; see also Regan, 84 Mich. L. Rev., at 1114, n. 55; A. Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn. L. Rev. 432, 448–449 (1941). In the years since, this Court has inferred an additional judicially enforceable rule against certain, especially discriminatory, state laws adopted even against the backdrop of congressional silence. But "'extreme caution'" is warranted before a court deploys this implied authority. *Tracy*, 519 U. S., at 310 (quoting *Northwest Airlines, Inc.* v. *Minnesota*, 322 U. S. 292, 302 (1944) (Black, J., concurring)). Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of "extreme delicacy," something courts should do only "where the infraction is clear." *Conway* v. *Taylor's Executor*, 1 Black 603, 634 (1862).

Petitioners would have us cast aside caution for boldness. They have failed—repeatedly—to persuade Congress to use its express Commerce Clause authority to adopt a uniform rule for pork production. And they disavow any reliance on

Opinion of the Court

this Court's core dormant Commerce Clause teachings focused on discriminatory state legislation.  Instead, petitioners invite us to endorse two new theories of implied judicial power.  They would have us recognize an "almost *per se*" rule against the enforcement of state laws that have "extraterritorial effects"—even though this Court has recognized since *Gibbons* that virtually all state laws create ripple effects beyond their borders.  Alternatively, they would have us prevent a State from regulating the sale of an ordinary consumer good within its own borders on nondiscriminatory terms—even though the *Pike* line of cases they invoke has never before yielded such a result.  Like the courts that faced this case before us, we decline both of petitioners' incautious invitations.

The judgment of the Ninth Circuit is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–468

_____

## NATIONAL PORK PRODUCERS COUNCIL, ET AL., PETITIONERS *v.* KAREN ROSS, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE CALIFORNIA DEPARTMENT OF FOOD & AGRICULTURE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 11, 2023]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, concurring in part.

I join all but Parts IV–B and IV–D of JUSTICE GORSUCH's opinion. Given the fractured nature of Part IV, I write separately to clarify my understanding of why petitioners' *Pike* claim fails. In short, I vote to affirm the judgment because petitioners fail to allege a substantial burden on interstate commerce as required by *Pike*, not because of any fundamental reworking of that doctrine.

\* \* \*

In *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970), the Court distilled a general principle from its prior cases. "Where [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*, at 142. Further, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Ibid.*

SOTOMAYOR, J., concurring in part

As the Court's opinion here explains, *Pike*'s balancing and tailoring principles are most frequently deployed to detect the presence or absence of latent economic protectionism. See *ante*, at 15–18. That is no surprise. Warding off state discrimination against interstate commerce is at the heart of our dormant Commerce Clause jurisprudence. See *ante*, at 7, 9–11, 15–16.

As the Court's opinion also acknowledges, however, the Court has "generally le[ft] the courtroom door open" to claims premised on "even nondiscriminatory burdens." *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 353 (2008); see *ante*, at 17. Indeed, "a small number" of this Court's cases in the *Pike* line "have invalidated state laws . . . that appear to have been genuinely nondiscriminatory" in nature. *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298, n. 12 (1997); see *ante*, at 17. Often, such cases have addressed state laws that impose burdens on the arteries of commerce, on "trucks, trains, and the like." *Ibid.*, n. 2. Yet, there is at least one exception to that tradition. See *Edgar* v. *MITE Corp.*, 457 U. S. 624, 643–646 (1982) (invalidating a nondiscriminatory state law that regulated tender offers to shareholders).

*Pike* claims that do not allege discrimination or a burden on an artery of commerce are further from *Pike*'s core. As THE CHIEF JUSTICE recognizes, however, the Court today does not shut the door on all such *Pike* claims. See *ante*, at 17–18, and n. 2; *post*, at 2–3. Thus, petitioners' failure to allege discrimination or an impact on the instrumentalities of commerce does not doom their *Pike* claim.

Nor does a majority of the Court endorse the view that judges are not up to the task that *Pike* prescribes. JUSTICE GORSUCH, for a plurality, concludes that petitioners' *Pike* claim fails because courts are incapable of balancing economic burdens against noneconomic benefits. See *ante*, at 18–21. I do not join that portion of JUSTICE GORSUCH's

SOTOMAYOR, J., concurring in part

opinion.  I acknowledge that the inquiry is difficult and delicate, and federal courts are well advised to approach the matter with caution.  See *ante*, at 28.  Yet, I agree with THE CHIEF JUSTICE that courts generally are able to weigh disparate burdens and benefits against each other, and that they are called on to do so in other areas of the law with some frequency.  See *post*, at 3–4.  The means-ends tailoring analysis that *Pike* incorporates is likewise familiar to courts and does not raise the asserted incommensurability problems that trouble JUSTICE GORSUCH.

In my view, and as JUSTICE GORSUCH concludes for a separate plurality of the Court, petitioners' *Pike* claim fails for a much narrower reason.  Reading petitioners' allegations in light of the Court's decision in *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117 (1978), the complaint fails to allege a substantial burden on interstate commerce.  See *ante*, at 21–25.  Alleging a substantial burden on interstate commerce is a threshold requirement that plaintiffs must satisfy before courts need even engage in *Pike*'s balancing and tailoring analyses.  Because petitioners have not done so, they fail to state a *Pike* claim.

BARRETT, J., concurring in part

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–468

_____

## NATIONAL PORK PRODUCERS COUNCIL, ET AL., PETITIONERS *v.* KAREN ROSS, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE CALIFORNIA DEPARTMENT OF FOOD & AGRICULTURE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 11, 2023]

JUSTICE BARRETT, concurring in part.

A state law that burdens interstate commerce in clear excess of its putative local benefits flunks *Pike* balancing. *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970). In most cases, *Pike*'s "general rule" reflects a commonsense principle: Where there's smoke, there's fire. *Ibid.* Under our dormant Commerce Clause jurisprudence, one State may not discriminate against another's producers or consumers. A law whose burdens fall incommensurately and inexplicably on out-of-state interests may be doing just that.

But to weigh benefits and burdens, it is axiomatic that both must be judicially cognizable and comparable. See *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 354–355 (2008). I agree with JUSTICE GORSUCH that the benefits and burdens of Proposition 12 are incommensurable. California's interest in eliminating allegedly inhumane products from its markets cannot be weighed on a scale opposite dollars and cents—at least not without second-guessing the moral judgments of California voters or making the kind of policy decisions reserved for politicians. *Ante*, at 18–21; *Davis*, 553 U. S., at 360 (Scalia, J., concurring in part). None

BARRETT, J., concurring in part

of our *Pike* precedents requires us to attempt such a feat.

That said, I disagree with my colleagues who would hold that petitioners have failed to allege a substantial burden on interstate commerce. *Ante*, at 21–25; *ante*, at 3 (SOTOMAYOR, J., concurring in part). The complaint plausibly alleges that Proposition 12's costs are pervasive, burdensome, and will be felt primarily (but not exclusively) outside California. See *post*, at 6–7 (ROBERTS, C. J., concurring in part and dissenting in part). For this reason, I do not join Part IV–C of JUSTICE GORSUCH's opinion. If the burdens and benefits were capable of judicial balancing, I would permit petitioners to proceed with their *Pike* claim.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–468

_____

## NATIONAL PORK PRODUCERS COUNCIL, ET AL., PETITIONERS *v.* KAREN ROSS, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE CALIFORNIA DEPARTMENT OF FOOD & AGRICULTURE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 11, 2023]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO, JUSTICE KAVANAUGH, and JUSTICE JACKSON join, concurring in part and dissenting in part.

I agree with the Court's view in its thoughtful opinion that many of the leading cases invoking the dormant Commerce Clause are properly read as invalidating statutes that promoted economic protectionism. See *ante*, at 8–11. I also agree with the Court's conclusion that our precedent does not support a *per se* rule against state laws with "extraterritorial" effects. See *ante*, at 11–14. But I cannot agree with the approach adopted by some of my colleagues to analyzing petitioners' claim based on *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970). See *ante*, at 15–27 (opinion of GORSUCH, J.); *ante*, at 3 (SOTOMAYOR, J. concurring in part); *ante*, at 1–2 (BARRETT, J., concurring in part).

*Pike* provides that nondiscriminatory state regulations are valid under the Commerce Clause "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U. S., at 142. A majority of the Court thinks that petitioners' complaint does not make for "an auspicious start" on that claim. *Ante*, at 18. In my view, that is through no fault of their own.

Opinion of ROBERTS, C. J.

The Ninth Circuit misapplied our existing *Pike* jurisprudence in evaluating petitioners' allegations. I would find that petitioners' have plausibly alleged a substantial burden against interstate commerce, and would therefore vacate the judgment and remand the case for the court below to decide whether petitioners have stated a claim under *Pike*.

I

The Ninth Circuit stated that "[w]hile the dormant Commerce Clause is not yet a dead letter, it is moving in that direction." 6 F. 4th 1021, 1033 (2021). Today's majority does not pull the plug. For good reason: Although *Pike* is susceptible to misapplication as a freewheeling judicial weighing of benefits and burdens, it also reflects the basic concern of our Commerce Clause jurisprudence that there be "free private trade in the national marketplace." *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 287 (1997) (quoting *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 437 (1980)); see also *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 350 (1977) (*Pike* protects "a national 'common market'"). "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them." *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 539 (1949).

The majority's discussion of our *Pike* jurisprudence highlights two types of cases: those involving discriminatory state laws and those implicating the "instrumentalities of interstate transportation." *Ante*, at 17, n. 2. But *Pike* has not been so narrowly typecast. As a majority of the Court acknowledges, "we generally leave the courtroom door open to plaintiffs invoking the rule in *Pike*, that even nondiscriminatory burdens on commerce may be struck down on a

Opinion of ROBERTS, C. J.

showing that those burdens clearly outweigh the benefits of a state or local practice." *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 353 (2008); see also *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. 330, 346 (2007) (plurality opinion) (*Pike* applies to "a nondiscriminatory statute like this one"). Nor have our cases applied *Pike* only where a State regulates the instrumentalities of transportation. *Pike* itself addressed an Arizona law regulating cantaloupe packaging. See 397 U. S., at 138. And we have since applied *Pike* to invalidate nondiscriminatory state laws that do not concern transportation. *Edgar* v. *MITE Corp.*, 457 U. S. 624, 643–646 (1982). As a majority of the Court agrees, *Pike* extends beyond laws either concerning discrimination or governing interstate transportation. See *ante*, at 2 (opinion of SOTOMAYOR, J.); *post*, at 1–2 (KAVANAUGH, J., concurring in part and dissenting in part).

Speaking for three Members of the Court, JUSTICE GORSUCH objects that balancing competing interests under *Pike* is simply an impossible judicial task. See *ante*, at 18–21. I certainly appreciate the concern, see *United Haulers*, 550 U. S., at 343, 347, but sometimes there is no avoiding the need to weigh seemingly incommensurable values. See, *e.g.*, *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147, 162 (1939) (weighing "the purpose to keep the streets clean and of good appearance" against the "the constitutional protection of the freedom of speech and press"); *Winston* v. *Lee*, 470 U. S. 753, 760 (1985) ("The reasonableness" under the Fourth Amendment "of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure."); *Addington* v. *Texas*, 441 U. S. 418, 425 (1979) ("In considering what standard should govern in a civil commitment proceeding, we must assess both the extent of the individual's interest in not being involuntarily confined indefinitely and the

state's interest in committing the emotionally disturbed under a particular standard of proof."). Here too, a majority of the Court agrees that it is possible to balance benefits and burdens under the approach set forth in *Pike*. See *ante*, at 2–3 (opinion of SOTOMAYOR, J.); *post*, at 1–2 (opinion of KAVANAUGH, J.).

## II

This case comes before us on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, and in my view the court below erred in how it analyzed petitioners' allegations under *Pike*. The Ninth Circuit reasoned that "[f]or dormant Commerce Clause purposes, laws that increase compliance costs, without more, do not constitute a significant burden on interstate commerce." 6 F. 4th, at 1032. The panel then dismissed petitioners' claim under *Pike* by concluding that the complaint alleged only an increase in compliance costs due to Proposition 12. 6 F. 4th, at 1033. But, as I read it, the complaint alleges more than simply an increase in "compliance costs," unless such costs are defined to include all the fallout from a challenged regulatory regime. Petitioners identify broader, market-wide *consequences* of compliance—economic harms that our precedents have recognized can amount to a burden on interstate commerce. I would therefore find that petitioners have stated a substantial burden against interstate commerce, vacate the judgment below, and remand this case for the Ninth Circuit to consider whether petitioners have plausibly claimed that the burden alleged outweighs any "putative local interests" under *Pike*. 397 U. S., at 142.

### A

Our precedents have long distinguished the costs of complying with a given state regulation from other economic harms to the interstate market. *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520 (1959), illustrates the point. In

that case, we considered an Illinois law requiring that
trucks and trailers use a particular kind of mudguard. The
"cost of installing" the mudguards was "$30 or more per ve-
hicle," amounting to "$4,500 to $45,840" for the trucking
companies at issue. *Id.*, at 525. But beyond documenting
those direct costs of complying with the Illinois law, we also
noted other derivative harms flowing from the regulation.
The mudguard rule threatened "significant delay in an op-
eration where prompt movement may be of the essence."
*Id.*, at 527. Also, changing mudguard types when crossing
into Illinois from a State with a different standard would
require "two to four hours of labor" and could prove "exceed-
ingly dangerous." *Ibid.* We concluded that "[c]ost taken
into consideration" together with those "*other* factors" could
constitute a burden on interstate commerce. *Id.*, at 526
(emphasis added). Subsequent cases followed *Bibb*'s logic
by analyzing economic impact to the interstate market sep-
arately from immediate costs of compliance. See *Kassel* v.
*Consolidated Freightways Corp. of Del.*, 450 U. S. 662, 674
(1981) (plurality opinion) (separating "increas[ed] . . . costs"
from the fact that the challenged "law may aggravate . . .
the problem of highway accidents" in describing the burden
on interstate commerce); *Raymond Motor Transp., Inc.* v.
*Rice*, 434 U. S. 429, 445, and n. 21 (1978) (analyzing an in-
crease in "cost" independently of other consequential ef-
fects, such as "slow[ing] the movement of goods").

*Pike* itself did not conflate harms to the interstate market
with compliance costs. In *Pike*, we analyzed an Arizona law
requiring that cantaloupes grown in the State be packed
prior to shipment across state lines. 397 U. S., at 138. We
noted repeatedly that the regulation would require the ap-
pellee to construct an unneeded packing facility in Arizona
at a cost of $200,000. *Id.*, at 140, 144, 145. But we consid-
ered that cost together with the "nature" of a regulation "re-
quiring business operations to be performed in the home

Opinion of ROBERTS, C. J.

State." *Id.*, at 145.  The Court in *Pike* found both compliance costs and consequential market harms cognizable in determining whether the law at issue impermissibly burdened interstate commerce.

The derivative harms we have long considered in this context are in no sense "noneconomic."  *Ante*, at 27 (opinion of GORSUCH, J.).  Regulations that "aggravate . . . the problem of highway accidents," *Kassel*, 450 U. S., at 674, or "slow the movement of goods," *Rice*, 434 U. S., at 445, impose economic burdens, even if those burdens may be difficult to quantify and may not arise immediately.  Our cases provide no license to chalk up *every* economic harm—no matter how derivative—to a mere cost of compliance.

Nor can the foregoing cases be dismissed because they either involved the instrumentalities of transportation or a state law born of discriminatory purpose.  As discussed above, we have applied *Pike* to state laws that neither concerned transportation nor discriminated against commerce.  See *Edgar*, 457 U. S., at 643–646.  The *Pike* balance may well come out differently when it comes to interstate transportation, an area presenting a strong interest in "national uniformity."  *Tracy*, 519 U. S., at 298, n. 12.  But the error below does not concern a particular balancing of interests under *Pike*; it concerns how to analyze the burden on interstate commerce in the first place.

B

As in our prior cases, petitioners here allege both compliance costs and consequential harms to the interstate market.  With respect to compliance costs, petitioners allege that Proposition 12 demands significant capital expenditures for farmers who wish to sell into California.  "Producers . . . will need to spend" between $290 and $348 million "of additional capital in order to reconstruct their sow housing and overcome the productivity loss that Proposition 12 imposes."  App. to Pet. for Cert. 214a.  All told, compliance

will "increase production costs per pig by over $13 dollars per head, a 9.2% cost increase at the farm level." *Ibid.*

Separate and apart from those costs, petitioners assert harms to the interstate market itself. The complaint alleges that the interstate pork market is so interconnected that producers will be "forced to comply" with Proposition 12, "even though some or even most of the cuts from a hog are sold in other States." *Id.*, at 213a; *id.*, at 239a. Proposition 12 may not expressly regulate farmers operating out of State. But due to the nature of the national pork market, California has enacted rules that carry implications for producers as far flung as Indiana and North Carolina, whether or not they sell in California. The panel below acknowledged petitioners' allegation that, "[a]s a practical matter, given the interconnected nature of the nationwide pork industry, all or most hog farmers will be forced to comply with California requirements." 6 F. 4th, at 1028.

We have found such sweeping extraterritorial effects, even if not considered as a *per se* invalidation, to be pertinent in applying *Pike*. In *Edgar*, we assessed the constitutionality of an Illinois corporate takeover statute that authorized the secretary of state to scrutinize tender offers, even for transactions occurring wholly beyond the State's borders. As the majority explains, only a plurality of the Court in *Edgar* concluded that the Illinois statute constituted a *per se* violation of the dormant Commerce Clause. See *ante*, at 14, n. 1. But a majority in *Edgar* analyzed those same extraterritorial effects under our approach in *Pike*, concluding that the "nationwide reach" of Illinois's law constituted an "obvious burden . . . on interstate commerce." 457 U. S., at 643. The Ninth Circuit did not consider whether, by effectively requiring compliance by farmers who do not even wish to ship their product into California, Proposition 12 has a "nationwide reach" similar to the regulation at issue in *Edgar*.

The complaint further alleges other harms that cannot

fairly be characterized as mere costs of compliance but that the panel below seems to have treated as such.  Because of Proposition 12's square footage requirements, farms will be compelled to adopt group housing, which is likely to produce "worse health outcome[s]" and "sprea[d] pathogens and disease."  App. to Pet. for Cert. 229a.  Such housing changes will also "upen[d] generations of animal husbandry, training, and knowledge."  *Id.*, at 211a.  And "[b]y preventing the use of breeding stalls during the 30 to 40 day period between weaning and confirmation of pregnancy, Proposition 12 puts sows at greater risk of injury and stress during the vulnerable stages of breeding and gestation."  *Id.*, at 223a.  These consequential threats to animal welfare and industry practice are difficult to quantify and are not susceptible to categorization as mere costs of compliance.

Writing for a plurality of the Court, JUSTICE GORSUCH relies on this Court's decision in *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117 (1978), to conclude that petitioners' complaint does not plead a substantial burden against interstate commerce. See *ante*, at 21–25; see also *ante*, at 3 (opinion of SOTOMAYOR, J.) (also relying on *Exxon*).  In *Exxon*, petroleum producers sued after Maryland prohibited their sale of retail gas within the State.  437 U. S., at 119.  The Court concluded that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business[es] to shift from one interstate supplier to another."  *Id.*, at 127.  Fair enough.  But the complaint before us pleads facts going far beyond the allegations in *Exxon*.  The producers in *Exxon* operated within Maryland and wished to continue doing so.  By contrast, petitioners here allege that Proposition 12 will force compliance on farmers who do not wish to sell into the California market, exacerbate health issues in the national pig population, and undercut established operational practices.  In my view, these allegations amount to economic harms against "the interstate market"—not just "particular

interstate firms," *ibid.*—such that they constitute a sub-
stantial burden under *Pike*. At the very least, the harms
alleged by petitioners are categorically different from the
cost of installing $30 mudguards, *Bibb*, 359 U. S., at 525, or
of constructing a $200,000 cantaloupe packing facility, *Pike*,
397 U. S., at 140.

JUSTICE GORSUCH asks what separates my approach
from the *per se* extraterritoriality rule I reject. *Ante*, at 25.
It is the difference between mere cross-border effects and
broad impact requiring, in this case, compliance even by
producers who do not wish to sell in the regulated market.
And even then, we only invalidate a regulation if that bur-
den proves "clearly excessive in relation to the putative lo-
cal benefits." *Pike*, 397 U. S., at 142. Adhering to that es-
tablished approach in this case would not convert the
inquiry into a *per se* rule against extraterritorial regula-
tion.

Rather than analyze petitioners' alleged harms to the in-
terstate market on their own terms, the Ninth Circuit rea-
soned that the "crux" of the complaint is "the cost of compli-
ance with Proposition 12." 6 F. 4th, at 1033. Such "cost
increases," the panel below concluded, "do not qualify as a
substantial burden to interstate commerce." *Ibid.* Those
statements ignore the industry-wide harms discussed
above.

The panel below itself recognized that petitioners "plau-
sibly alleged that Proposition 12 will have dramatic up-
stream effects and require pervasive changes to the pork
production industry nationwide." *Ibid.* Yet it nevertheless
reduced the myriad harms detailed by petitioners in their
complaint to so-called "compliance costs" and wrote them
off as independently insufficient to state a claim under *Pike*.
Our precedents do not support such an approach. A major-
ity of the Court agrees that—were it possible to balance
benefits and burdens in this context—petitioners have
plausibly stated a substantial burden against interstate

Opinion of ROBERTS, C. J.

commerce.  See *ante*, at 2 (opinion of BARRETT, J.) ("The complaint plausibly alleges that Proposition 12's costs are pervasive, burdensome, and will be felt primarily (but not exclusively) outside California.").

\*    \*    \*

In my view, petitioners plausibly allege a substantial burden against interstate commerce.  I would therefore remand the case for the Ninth Circuit to decide whether it is plausible that the "burden . . . is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U. S., at 142.

Opinion of KAVANAUGH, J.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–468

_____

## NATIONAL PORK PRODUCERS COUNCIL, ET AL., PETITIONERS *v.* KAREN ROSS, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE CALIFORNIA DEPARTMENT OF FOOD & AGRICULTURE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 11, 2023]

JUSTICE KAVANAUGH, concurring in part and dissenting in part.

In today's fractured decision, six Justices of this Court affirmatively retain the longstanding *Pike* balancing test for analyzing dormant Commerce Clause challenges to state economic regulations. *Ante,* at 1 (SOTOMAYOR, J., joined by KAGAN, J., concurring in part); *ante,* at 2–3 (ROBERTS, C. J., joined by ALITO, KAVANAUGH, and JACKSON, JJ., concurring in part and dissenting in part); see *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970). Although Parts IV–B and IV–D of JUSTICE GORSUCH's opinion would essentially overrule the *Pike* balancing test, those subsections are not controlling precedent, as I understand it.

But Part IV–C of JUSTICE GORSUCH's opinion is controlling precedent for purposes of the Court's judgment as to the plaintiffs' *Pike* claim. There, a four-Justice plurality of the Court applies *Pike* and rejects the plaintiffs' dormant Commerce Clause challenge under *Pike*. The plurality reasons that the plaintiffs' complaint did not sufficiently allege that the California law at issue here imposed a substantial burden on interstate commerce

2        NATIONAL PORK PRODUCERS COUNCIL *v.* ROSS

Opinion of KAVANAUGH, J.

under *Pike*.  I respectfully disagree with that conclusion for the reasons well stated in THE CHIEF JUSTICE's separate opinion.[1]

I add this opinion to point out that state economic regulations like California's Proposition 12 may raise questions not only under the Commerce Clause, but also under the Import-Export Clause, the Privileges and Immunities Clause, and the Full Faith and Credit Clause.

I

In the 1780s, the Framers in Philadelphia and the people of the United States discarded the Articles of Confederation and adopted a new Constitution.  They did so in order to, among other things, create a national economic market and overcome state restrictions on free trade—and thereby promote the general welfare.  By the summer of 1787, when the delegates met in Philadelphia, state interference with interstate commerce was cutting off the lifeblood of the Nation.  See *Tennessee Wine and Spirits Retailers Assn.* v. *Thomas*, 588 U. S. ___, ___ (2019) (slip op., at 7).  For the delegates, therefore, "removing state trade barriers was a principal reason for the adoption of the Constitution."  *Ibid.*  In the state ratifying conventions, moreover, "fostering free trade among the States was prominently cited as a reason for ratification."  *Id.,* at ___ (slip op., at 8).

The Constitution crafted by the Framers contains several provisions protecting free trade among the States.  The Constitution's protection of free trade among the States has resulted in an extraordinary 234-year record of progress:  It has facilitated robust economic activity within the United States and has helped generate remarkable (albeit at times uneven) economic prosperity and growth in America relative to the other nations of the world.

This case involves the American pork industry, which

───────────

[1] The Court also unanimously rejects plaintiffs' separate claim under *Healy* v. *Beer Institute*, 491 U. S. 324 (1989).

Opinion of KAVANAUGH, J.

today is a $20 billion-plus industry that generates hundreds of thousands of American jobs and serves millions of American consumers.  Importantly for this case, the vast majority of pig farms are located in States other than California—such as Iowa, Minnesota, Illinois, Indiana, and North Carolina.  And the vast majority of pork is likewise produced in States other than California.

In 2018, California voters nonetheless passed a ballot initiative, Proposition 12, that not only regulates pig farming and pork production in California, but also in effect regulates pig farming and pork production *throughout the United States*.  Under Proposition 12, all pork sold to consumers in California must be derived from pigs raised in compliance with California's strict standards for pig farming, including California's minimum square footage of space required for housing individual pigs.  By its terms, Proposition 12 applies to pigs raised and pork produced *outside California*.

California's requirements for pig farms and pork production depart significantly from common agricultural practices that are lawful in major pig-farming and pork-producing States such as Iowa, Minnesota, Illinois, Indiana, and North Carolina.  See Brief for Indiana et al. as *Amici Curiae* 24–32.  Moreover, according to various *amici*, some of the scientific literature suggests that California's requirements could worsen animal health and welfare.  See, *e.g.,* Brief for American Association of Swine Veterinarians as *Amicus Curiae* 4–19; Brief for State Pork Producers Association of Iowa et al. as *Amici Curiae* 25–34.  Regardless of whether the *amici* are correct on that point, it is evident that absent California's Proposition 12, relatively few pig farmers and pork producers in the United States would follow the practices that California now demands.  Yet American pig farmers and pork producers have little choice but to comply with California's regulatory dictates.    It would  be  prohibitively  expensive  and

Opinion of KAVANAUGH, J.

practically all but impossible for pig farmers and pork producers to segregate individual pigs based on their ultimate marketplace destination in California or elsewhere.   And California's 13-percent share of the consumer pork market makes it economically infeasible for many pig farmers and pork producers to exit the California market.

California's required changes to pig-farming and pork-production practices throughout the United States will cost American farmers and pork producers hundreds of millions (if not billions) of dollars.  And those costs for pig farmers and pork producers will be passed on, in many cases, to American consumers of pork via higher pork prices nationwide.  The increased costs may also result in lower wages and reduced benefits (or layoffs) for the American workers who work on pig farms and in meatpacking plants. See generally Brief for Indiana et al. as *Amici Curiae* 29–32; Brief for North Carolina Chamber Legal Institute et al. as *Amici Curiae* 9–13.[2]

In short, through Proposition 12, California is forcing massive changes to pig-farming and pork-production practices throughout the United States.  Proposition 12 therefore substantially burdens the interstate pork market. See *ante,* at 6–10 (opinion of ROBERTS, C. J.).

Under the Constitution, Congress could enact a national law imposing minimum space requirements or other regulations on pig farms involved in the interstate pork market.  In the absence of action by Congress, each State may of course adopt health and safety regulations for products sold *in that State*.  And each State may regulate

------

[2]The majority opinion dismisses this case as not presenting a "weighty" issue.  *Ante,* at 2.  That phrasing is misplaced.  This case presents a weighty constitutional question, as the Framers surely would have recognized.  And it is important for the American workers, farmers, and consumers who will be significantly affected by the outcome of today's decision.

Opinion of KAVANAUGH, J.

as it sees fit with respect to farming, manufacturing, and production practices *in that State*.  Through Proposition 12, however, California has tried something quite different and unusual.  It has attempted, in essence, to unilaterally impose its moral and policy preferences for pig farming and pork production on the rest of the Nation.  It has sought to deny market access to out-of-state pork producers unless their farming and production practices in those other States comply with California's dictates.  The State has aggressively propounded a "California knows best" economic philosophy—where California in effect seeks to regulate pig farming and pork production in *all* of the United States.  California's approach undermines federalism and the authority of individual States by forcing individuals and businesses in one State to conduct their farming, manufacturing, and production practices in a manner required by the laws of a *different* State.

Notably, future state laws of this kind might not be confined to the pork industry.  As the *amici* brief of 26 States points out, what if a state law prohibits the sale of fruit picked by noncitizens who are unlawfully in the country?  Brief for Indiana et al. as *Amici Curiae* 33.  What if a state law prohibits the sale of goods produced by workers paid less than $20 per hour?  Or as those States suggest, what if a state law prohibits "the retail sale of goods from producers that do not pay for employees' birth control or abortions" (or alternatively, that do pay for employees' birth control or abortions)?  *Ibid.*

If upheld against all constitutional challenges, California's novel and far-reaching regulation could provide a blueprint for other States.  California's law thus may foreshadow a new era where States shutter their markets to goods produced in a way that offends their moral or policy preferences—and in doing so, effectively force other States to regulate in accordance with those idiosyncratic state demands.  That is not the Constitution the Framers

Opinion of KAVANAUGH, J.

adopted in Philadelphia in 1787.[3]

## II

Thus far, legal challenges to California's Proposition 12 have focused on the Commerce Clause and this Court's dormant Commerce Clause precedents.

Although the Court today rejects the plaintiffs' dormant Commerce Clause challenge as insufficiently pled, state laws like Proposition 12 implicate not only the Commerce Clause, but also potentially several other constitutional provisions, including the Import-Export Clause, the Privileges and Immunities Clause, and the Full Faith and Credit Clause.

*First*, the Import-Export Clause prohibits any State, absent "the Consent of the Congress," from imposing "any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing" its "inspection Laws." Art. I, §10, cl. 2. This Court has limited that Clause to imports from *foreign countries*. See *Woodruff* v. *Parham*, 8 Wall. 123, 133–136 (1869). As Justice Scalia and JUSTICE THOMAS have explained, that limitation may be mistaken as a matter of constitutional text and history: Properly interpreted, the Import-Export Clause may also prevent States "from imposing certain especially burdensome" taxes and duties on imports from other States—not just on imports from foreign countries. *Comptroller of Treasury of Md.* v. *Wynne*, 575 U. S. 542, 573 (2015) (Scalia, J., dissenting); see also *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 621–637 (1997) (THOMAS,

---

[3] The portions of JUSTICE GORSUCH's opinion that speak for only three Justices (Parts IV–B and IV–D) refer to THE CHIEF JUSTICE's opinion as a "dissent." *Ante,* at 18–21, 25–27. But on the question of whether to retain the *Pike* balancing test in cases like this one, THE CHIEF JUSTICE's opinion reflects the majority view because six Justices agree to retain the *Pike* balancing test: THE CHIEF JUSTICE and JUSTICES ALITO, SOTOMAYOR, KAGAN, KAVANAUGH, and JACKSON. On that legal issue, JUSTICE GORSUCH's opinion advances a minority view.

J., dissenting); *Brown* v. *Maryland*, 12 Wheat. 419, 438−439, 449 (1827).

In other words, if one State conditions sale of a good on the use of preferred farming, manufacturing, or production practices in another State where the good was grown or made, serious questions may arise under the Import-Export Clause. I do not take a position here on whether such an argument ultimately would prevail. I note only that the question warrants additional consideration in a future case.

*Second*, the Privileges and Immunities Clause provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Art. IV, §2, cl. 1; see *South Dakota* v. *Wayfair, Inc.*, 585 U. S. ___, ___−___ (2018) (GORSUCH, J., concurring) (slip op., at 1–2); see also *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 265 (1987) (Scalia, J., concurring in part and dissenting in part); J. Eule, Laying the Dormant Commerce Clause To Rest, 91 Yale L. J. 425, 446−448 (1982). Under this Court's precedents, one State's efforts to effectively regulate farming, manufacturing, or production in other States could raise significant questions under that Clause. Again, I express no view on whether such an argument ultimately would prevail. But the issue warrants further analysis in a future case.

*Third*, the Full Faith and Credit Clause requires each State to afford "Full Faith and Credit" to the "public Acts" of "every other State." Art. IV, §1. That Clause prevents States from "adopting any policy of hostility to the public Acts" of another State. *Carroll* v. *Lanza*, 349 U. S. 408, 413 (1955). A State's effort to regulate farming, manufacturing, and production practices in another State (in a manner different from how that other State's laws regulate those practices) could in some circumstances raise questions under that Clause. See, *e.g.,* M. Rosen, State Extraterritorial Powers Reconsidered, 85 Notre Dame

8        NATIONAL PORK PRODUCERS COUNCIL *v.* ROSS

Opinion of KAVANAUGH, J.

L. Rev. 1133, 1153 (2010) ("[T]he Full Faith and Credit Clause is the more natural source for limitations on state extraterritorial powers because that clause at its core is concerned with extraterritoriality"); see also D. Laycock, Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law, 92 Colum. L. Rev. 249, 290, 296−301 (1992).

For example, the plaintiffs in this case say that Ohio law expressly authorizes pig farmers in Ohio to do precisely what California's Proposition 12 forbids. Brief for Petitioners 30−31; see Ohio Admin. Code §§901:12−8−02(G)(4), (5) (2011). If so, the Full Faith and Credit Clause might preclude California from enacting conflicting regulations on Ohio pig farmers.

Once again, I express no view on whether such an argument ultimately would succeed. But the question deserves further examination in a future case.

*        *        *

As I understand it, the controlling plurality of the Court (reflected in Part IV–C of JUSTICE GORSUCH's opinion) today rejects the plaintiffs' dormant Commerce Clause challenge on the ground that the plaintiffs' complaint does not sufficiently allege that the California law at issue here imposes a substantial burden on interstate commerce under *Pike.* See *ante,* at 21−25 (plurality opinion); *ante,* at 1–3 (opinion of SOTOMAYOR, J.). It appears, therefore, that properly pled dormant Commerce Clause challenges under *Pike* to laws like California's Proposition 12 (or even to Proposition 12 itself) could succeed in the future—or at least survive past the motion-to-dismiss stage. Regardless, it will be important in future cases to consider that state laws like Proposition 12 also may raise substantial constitutional questions under the Import-Export Clause, the Privileges and Immunities Clause, and the Full Faith and Credit Clause.