1                  **UNITED STATES DISTRICT COURT**

2                        **DISTRICT OF IDAHO**

3

    PLANNED PARENTHOOD GREAT        )   CASE NO. 1:23-cv-00142-BLW
4   NORTHWEST, HAWAII, ALASKA,      )
    INDIANA, KENTUCKY, on behalf    )   **MOTION HEARING**
5   of itself, its staff,           )
    physicians and patients,        )
6   CAITLIN GUSTAFSON, M.D., on     )
    behalf of herself and her       )
7   patients, and DARIN L.          )
    WEYRICH, M.D., on behalf of     )
8   himself and his patients,       )
                                    )
9                      Plaintiffs,  )
                                    )
10            vs.                   )
                                    )
11  RAÚL LABRADOR, in his official  )
    capacity as Attorney General    )
12  of the State of Idaho; MEMBERS  )
    OF THE IDAHO STATE BOARD OF     )
13  MEDICINE and IDAHO STATE BOARD  )
    OF NURSING, in their official   )
14  capacities, COUNTY PROSECUTING  )
    ATTORNEYS, in their official    )
15  capacities,                     )
                                    )
16                     Defendants.  )
    _____ )
17

18

19            **TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**
              **BEFORE THE HONORABLE B. LYNN WINMILL**
20             **MONDAY, APRIL 24, 2023; 2:05 P.M.**
                      **BOISE, IDAHO**

21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23   _____

24            **TAMARA I. HOHENLEITNER, CSR 619, CRR**
                 FEDERAL OFFICIAL COURT REPORTER
25         550 WEST FORT STREET, BOISE, IDAHO  83724

```
1                    A P P E A R A N C E S

2


3      FOR PLAINTIFFS
            Peter Neiman
4           WILMER CUTLER PICKERING HALE and DORR, LLP
            7 World Trade Center
5           New York, NY 10007

6      FOR DEFENDANT RAÚL LABRADOR
            Lincoln Davis Wilson, Chief of Civil and Constitutional
7            Defense
            Brian V. Church, Deputy Attorney General
8           Timothy J. Longfield, Deputy Attorney General
            OFFICE OF THE ATTORNEY GENERAL
9           P.O. Box 83720
            Boise, ID 83720-0010
10
       FOR DEFENDANT ST. LUKE'S HEALTH SYSTEM
11          Wendy J. Olson
            STOEL RIVES, LLP
12          101 South Capitol Boulevard, Suite 1900
            Boise, ID 83702
13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
                        I N D E X

                     APRIL 24, 2023


      Proceeding                                    Page

      Plaintiff's argument by Mr. Neiman................. 11
      Defendant St. Luke's argument by Ms. Olson......... 23
      Defendant Labrador's argument by Mr. Wilson........ 28
      Plaintiff's argument by Mr. Neiman................. 46
      Defendant Labrador's argument by Mr. Wilson........ 48
</pre>

P R O C E E D I N G S

April 24, 2023

1       THE CLERK:  United States District Court for the

2  District of Idaho is now in session, the Honorable B. Lynn

3  Winmill presiding.

4       The Court will now hear oral argument on the motion

5  for preliminary injunction in Case 1:23-cv-142, Planned

6  Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky,

7  versus Raul Labrador.

8       THE COURT:  Good afternoon, Counsel.  I want to first

9  thank counsel for accommodating the hearing today.  We had

10  discussed the need for an expedited process.  I know the defense

11  objected, but I appreciate counsel being willing to work with us

12  on this schedule.

13       I do need to warn you.  I have been back in the

14  country for all of 36 hours, so I'm seriously jet-lagged.  I'll

15  try not to let that reflect my questions.  I did read all of the

16  briefing in some detail over the last few days on the way back.

17  So I think I'm pretty much up to speed on what the issue is, and

18  I'm going to offer some preliminary comments here in a moment.

19       With regard to the -- there were a couple of

20  procedural or housekeeping matters that need to be addressed.

21  One has to do with objections to amicus briefs.  I've generally

22  found amicus briefs to be helpful, sometimes not, but usually

23  helpful.  I'm going to overrule the objection to the amicus

1    briefs but allow the defendants to file a response to that

2    amicus brief by Thursday at noon.  I'll give you until Thursday

3    at noon, which will then allow the matter to be fully at issue

4    and ready for a decision.

5         I know that's also somewhat expedited, but we need to

6    move quickly given the nature of the proceedings as a request

7    for preliminary injunction.

8         I'm also going to, I guess, sustain the objection to

9    Mr. Gonick's motion for *pro hac vice* status without a sponsoring

10   attorney.  I apparently have relaxed that requirement in a

11   couple hearings in the last little while, but I'm not sure why I

12   did that.  I think maybe I was just tired and wasn't aware of,

13   frankly, what was going on.  And I have been pretty insistent

14   that we have local counsel even for amicus.

15        It should be a pretty simple matter, and I would

16   require that the attorney generals who have filed an amicus

17   brief, that they obtain local counsel also by Thursday at

18   noon -- Thursday, April 27th, at noon, for the Court to consider

19   their briefs.  I've read it, so I'm well informed.

20        But I do think, just as a matter of procedure, that if

21   you're going to enter an appearance, you will need to have an

22   attorney admitted in the state of Idaho.  It shouldn't be a real

23   difficult thing to accomplish since I'm sure there is any number

24   of attorneys who would be willing to participate in this

25   proceeding.

1          I would indicate there is a couple of issues -- there

2     is at least one issue I really don't want to spend a lot of time

3     on.  There was an argument that we don't have all the defendants

4     served and represented here.

5          I understand the argument and concern, but if the

6     plaintiffs are entitled to injunctive relief as to the served

7     and represented defendants, it seems to me that we can and must

8     proceed as to them.  As additional defendants are added and

9     represented -- and perhaps they have already been added and are

10    represented in some fashion.  But if that is not true and they

11    are added and represented in the future, the plaintiffs can seek

12    to extend any injunction to those defendants, and those

13    defendants can oppose it and make additional arguments as to why

14    any injunction should not apply to them.  And likewise, if I

15    deny the request for injunction, then obviously it would be

16    moot, and they wouldn't need to take any action at all.

17          Finally, St. Luke's asked for oral argument time.  I

18    indicated I would grant that as long as the plaintiffs would be

19    willing to share that time.  I think that's only fair to the

20    defendants.  So I understand they're going to cede five minutes

21    of their time to St. Luke's.

22          I think Ms. Pugh indicated that we would try to limit

23    this to about 20 minutes per side.  I can be a little more

24    flexible than that.  I might add on five minutes depending on

25    how oral argument is proceeding, but I want to see how that

1     plays out.

2          Nevertheless, because I've read the briefing and I'm

3     going to offer some comments as to my preliminary thoughts, for

4     that reason, I think you can get right at the issues, and we

5     won't have to spend a lot of time arguing matters that, frankly,

6     do not interest me at this point.

7          So here, let me turn then to the merits, the substance

8     of the matter, and I'll lay out my thinking so you can play off

9     from that.

10         Now, let me indicate that it's very difficult to lay

11    out my thinking without showing, frankly, where I'm leaning, but

12    it is at most a leaning; it is not a firm decision at all.  It's

13    really just a way to signal to you what the issues are in my

14    mind, how I typically would look at those issues, and provide

15    you with an opportunity either to reassure me that I'm right in

16    that analysis or indicate why I'm wrong.

17         So let me go ahead and start off with that.

18         I think clearly the biggest issue in this case is that

19    of standing and whether there is injury in fact.  Just to be

20    clear, I think the standard is in the *Susan B. Anthony List*

21    case, where the injury-in-fact requirement requires three

22    showings: one, that the plaintiff shows that they intend to

23    engage in conduct arguably affected with the constitutional

24    interest; second, that they intend conduct which arguably would

25    be prescribed by the challenged statute; and, third, that the

1    plaintiff faces a substantial threat of future enforcement under
2    the statute.
3         It seems to me that the plaintiffs have clearly and
4    unequivocally stated their past practice and future intention of
5    referring patients to out-of-state clinics for medically
6    necessary abortions.  So I think the first requirement is
7    clearly met.
8         The second two requirements, in different ways, hinge
9    really upon the attorney general's letter of March 27th, I
10   believe, offering his opinion that such conduct would violate
11   Idaho's abortion statute.
12        Now, the attorney general argues that his withdrawal
13   of the letter puts plaintiffs in the same position they were in
14   if it had not been written.  I may have added to that by a
15   comment during our status conference earlier that it is -- you
16   know, the withdrawal of the letter means it no longer has any
17   legal effect.  I think that's probably accurate.  Nevertheless,
18   the question is whether that conduct can, I guess, successfully
19   unring the bell.
20        It does seem significant to me that General Labrador
21   indicated in his withdrawal letter that the original letter
22   should not have been issued because it was procedurally
23   improper.
24        However, even so, it strikes me that it does not
25   change the fact that it was a public statement made by Idaho's

1    chief legal officer that a physician's referral of patients to

2    an out-of-state clinic for an abortion would constitute a

3    violation of the statute and subject the referring doctor to

4    both criminal prosecution and loss of their licensure.

5        This coupled with his decision not to disavow the

6    legal analysis -- and I think they have cited public statements

7    in which General Labrador has indicated his intent to vigorously

8    enforce Idaho's abortion statute -- it would seem at first blush

9    to create a genuine fear among physicians that their past and

10   intended future conduct of referring patients to out-of-state

11   clinics for an abortion would create a well-founded fear that

12   they may lose their licensure and face criminal prosecution.  At

13   first blush, that would seem sufficient to establish standing.

14       Now, you know, again, I understand and I know that

15   with the errata that was filed by the plaintiffs, that it's now

16   clear that the attorney general is not the primary or does not

17   have the authority to be the primary enforcement agency for the

18   general abortion statute.  But nevertheless, given the fact --

19   as chief legal officer, their opinion carries weight.

20       And I think for that reason, that, in and of itself,

21   would suggest that the second and third requirements under the

22   *Susan B. Anthony List* case are satisfied, that is, that the

23   plaintiff's intended conduct is arguably proscribed by the

24   challenged statute -- that is because the state's chief legal

25   officer has said so -- and second, that they face a substantial

1    threat of future enforcement under the statute because it is,

2    again, the opinion of the chief lawyer for the State of Idaho.

3          So that's my initial thinking on that issue.  I think

4    the argument about ripeness -- it does seem to me that,

5    particularly in the area of the First Amendment concern, that

6    the issue of a pre-enforcement challenge really is looked upon

7    favorably because of the chilling effect that enforcement

8    measures would take against a doctor or any plaintiff who is

9    trying to exercise their First Amendment rights.

10          I'm also concerned with the defense argument that the

11    Eleventh Amendment bars this suit.  Clearly, there is the

12    exception that injunctive relief against a state officer who has

13    a significant tie or connection to the enforcement, as expressed

14    by the Ninth Circuit in *Wasden*, would seem to still apply.

15          And I need to hear from the defense as to why that is

16    no longer good law.  I know you have argued that somehow the

17    passage of this new statute -- I think it's termed the Abortion

18    Trafficking Statute -- and the provision of specific enforcement

19    authority to the attorney general somehow bears some relevance

20    as to why the *Wasden* decision is or is not still binding.

21          And I'm also struggling a little bit with the argument

22    that the *Dobbs* decision itself has changed the lay of the land

23    so that the *Wasden* decision simply no longer applies.  I need

24    some real clarity on that because I'm not sure I understand

25    that.

1          So, with that, let me hear the arguments of counsel,

2     starting with the plaintiff.

3          Is it Mr. Neiman?

4          MR. NEIMAN:  It is, Your Honor.  Thank you for asking.

5          THE COURT:  All right.

6          MR. NEIMAN:  And welcome back.

7          THE COURT:  Thank you.

8          MR. NEIMAN:  And thank you for accommodating our

9     desire to be heard on your first day back in court.  We very

10    much appreciate that.

11         And also thank you for sharing your initial views.

12    Obviously, we are not going to try to talk you out of any of

13    those, but let me see if I can reinforce them a little bit.

14         So this is, as you say, a pre-enforcement challenge.

15    And I think it's, you know, pretty clear that a prosecutor can't

16    defeat a pre-enforcement challenge by saying you don't have a

17    credible fear of enforcement, while at the same time straining

18    at every turn to preserve his freedom to bring the very

19    enforcement action he claims you have no reason to fear; right?

20    And that's exactly what the attorney general has tried to do

21    here.

22         If he really wanted to try to address the fear of

23    enforcement that led our clients to file this lawsuit, as

24    documented in their affidavits, it would have been easy for him

25    to say that his March 27th letter was wrong substantively.

1          THE COURT:  Mr. Neiman, do you agree that if Attorney

2     General Wasden had, in fact, said that -- that, "Never mind.

3     You know, it was written by a first-year attorney in our office.

4     He has now been fired.  He was wrong, and we are rejecting that

5     analysis," we wouldn't be here?  Do you agree with that?

6          MR. NEIMAN:  It would certainly be a much tougher case

7     for us to pursue, Your Honor.

8          THE COURT:  Okay.

9          MR. NEIMAN:  We obviously still have concerns about

10    the actions of other people who have -- within the state of

11    Idaho who have the ability to enforce this law, but it would

12    certainly go -- it would be a much tougher case for us on

13    standing than it is right now.

14          THE COURT:  Okay.  Go ahead.

15          MR. NEIMAN:  So -- but he hasn't done that; right?

16    And he has had a lot of opportunities to do that; and instead,

17    he has done the opposite.  He's just been very careful in

18    everything that he's said, from his April 7th letter, to the

19    meeting we had with Mr. Wilson on April 10th, to the briefs that

20    he has filed in this case, to preserve for himself the ability

21    to, tomorrow, if this case were dismissed, to go out and

22    continue to seek enforcement on the theory that he laid out in

23    his March 27th letter.

24          And, really, Your Honor, it shouldn't be a heavy lift

25    for the Attorney General's Office to do just what you said.  I

1    mean, the proposition that underlies the March 27th letter

2    that -- which must be that Idaho outlaws at least some abortions

3    that are performed outside the state, is just plainly contrary

4    to the allocation of authority between the states that's the

5    bedrock of our federal system.

6          It should have been easy for the attorney general to

7    renounce that premise, but he hasn't.  He has chosen over and

8    over again not to do that, and I think it's reasonable to ask

9    why he hasn't done that.

10         And I think the only reasonable inference here is that

11   he is hoping to kind of his cake and eat it too to get the

12   benefit of the intimidation that the March 27th letter caused

13   for our clients while insulating himself from judicial review of

14   that letter.  And that's fundamentally wrong and shouldn't be

15   permitted.

16         You know, our clients -- Dr. Gustafson, Dr. Wehyrich,

17   Planned Parenthood -- they are healthcare providers.  They have

18   patients, some of whom have pressing medical or personal need to

19   terminate their pregnancies.  And before March 27th, my clients

20   knew exactly what they should do.

21         They could advise patients that abortions were

22   lawfully available outside of the state.  They could give them

23   information about appropriate out-of-state providers.  They

24   could help schedule proceedings out of state, connect their

25   patients with travel assistance, and they could talk to

1    providers outside the state to ensure continuity of care.  And

2    they also could themselves provide abortions out of state, as

3    Planned Parenthood does in Washington and as Dr. Gustafson

4    anticipated doing.  Although she is a licensed Idaho provider,

5    she is also licensed in Oregon, and she anticipated providing

6    abortions there as well.

7            And my clients radically changed their behavior after

8    the March 27th letter.  And the attorney general has kind of

9    tried to minimize that letter.  But as Your Honor pointed out,

10   it's a letter from the top law enforcement officer in Idaho.

11   It's on his letterhead.  It's under his signature, his personal

12   signature.

13           And, you know, it's interesting, Mr. Wilson included

14   in their reply brief -- I shouldn't say Mr. Wilson -- the

15   Attorney General's Office included in their reply brief, you

16   know, their internal procedural guidance about opinion letters.

17           And if you look at that, Your Honor -- I would

18   encourage you to, if you haven't had a chance to look at it

19   yet -- it lays out kind of three tiers of opinion letter that

20   the attorney general could issue.  There's kind of the informal

21   conversation.  There is the letter that's sort of a nonbinding

22   letter that comes from an assistant in the office and has a

23   little proviso at the end that says this is a preliminary view.

24   And then there is the highest level, the formal opinion letter,

25   which is characterized by coming out under the signature of the

1    attorney general.

2          That's what this is.  This is not a small thing when

3    an attorney general issues a letter like this.

4          And that kind of formal statement quite naturally

5    chilled my clients, and it's very understandable that they

6    remain chilled when the attorney general isn't willing to say

7    that the analysis is wrong.

8          So, look, he puts in this April 7th letter -- and I

9    think maybe a sensible way to analyze that letter is under the

10   whole body of case law that addresses sort of voluntary

11   cessation; right?  There is a whole body of case law out there.

12   Your Honor actually had a case involving that in the abortion

13   context a few years ago in the *McCormack* case.

14         And as Your Honor found in *McCormack* and confirmed by

15   the Ninth Circuit, what's required for a voluntary cessation to

16   kind of make a case go away is it has to be absolutely clear --

17   that's the words, the legal standard, "absolutely clear" -- that

18   the party is not simply going to go back to the prior position

19   as soon as the litigation ends.

20         There is nothing in the April 7th letter that would

21   make that absolutely clear.  And indeed, the attorney general

22   has, you know, quite carefully tried to preserve to himself, in

23   everything he said in this case, the ability to do just that, to

24   go right back to the position that he had once this lawsuit was

25   over.

1          And that's why, as our supplemental affidavits laid

2     out, our clients can't go back to business as usual as it was

3     before March 27th.  They are still right where they were when

4     that letter came out, because the state's highest law

5     enforcement officer has said this is what the law means, and has

6     taken it back on procedural grounds but hasn't been willing to

7     say that it was wrong substantively.

8          So they have every reason to continue to reasonably

9     fear, which is all that's required here, that if they resume

10    making referrals or whatever it is that the attorney general

11    calls a referral or if they otherwise assist in or perform a

12    lawful abortion outside of Idaho, they could face license

13    revocation and perhaps criminal prosecution.

14         I think what the attorney general is saying to you is:

15    That's fine.  It's fine if my clients continue to labor under

16    that fear, that reasonable fear, that the Court shouldn't do

17    anything, and that our clients -- you know, I don't think he

18    uses these exact words, but sort of the suggestion that, you

19    know, our clients are somehow just looking for a lawsuit and

20    being unreasonable in what they said in their supplemental

21    affidavits, that they haven't gone back to business as usual.

22         But that's wrong.  I mean, my clients, Dr. Gustafson,

23    Dr. Weyhrich, the dedicated people at Planned Parenthood, they

24    take their work and their obligations to their patients

25    extremely seriously.  They don't want to be in a lawsuit with

1   the attorney general.  They want to be able to go back and tell

2   their patients the truth about the availability of the care

3   their patients need out of state.  They want to go back to being

4   able to help their patients access that care without fear of

5   losing their professional licenses or going to jail.

6          And that's a perfectly appropriate exercise of this

7   Court's authority, to step in, to protect my clients, who are

8   self-censoring in the face of the Attorney General's letter.

9          THE COURT:  Mr. Neiman, could you just address one

10  concern.

11         MR. NEIMAN:  Sure.

12         THE COURT:  And this goes back to the errata that you

13  filed.

14         MR. NEIMAN:  Yep.

15         THE COURT:  I understand what happened.  You took an

16  earlier draft, or someone in your office took an earlier draft

17  of the bill which included kind of an expansive -- or an

18  expansion of the attorney general's authority to initiate

19  prosecutions under Idaho's general abortion statute if a local

20  prosecuting attorney fails or is unwilling to do so.  That was

21  changed, and it only applies now to that abortion trafficking,

22  the new bill that takes effect July 1.

23         So what that means, then, is we are left in the same

24  posture as we were, I think -- and maybe, again, Mr. Wilson will

25  want to address this -- that we were in terms of the *Wasden*

1    case, where what we have is the attorney general having the

2    ability to come in when invited to do so and participate in

3    prosecution, presumably make referrals to a county prosecutor

4    for possible prosecution.  And I don't recall -- I didn't get a

5    chance to go back and reread *Wasden*, although I've read it in

6    the past -- whether or not there was any specific reference to

7    just the persuasive effect of the chief legal officer for the

8    state offering an opinion and how that may impact local

9    prosecutors' decision to seek enforcement.

10           But, given that, doesn't that limit -- you know, with

11   no prosecutor having made any similar statement, no prosecutor

12   having indicated we are going to interpret the statute the same

13   way the attorney general does, how does that affect your

14   argument with regard to standing and the idea of threatened

15   injury?

16           MR. NEIMAN:  Sure, Your Honor.  First, just a couple

17   of quick points on that.  I mean, I think *Wasden* is still

18   controlling authority on the Eleventh Amendment issue here.

19   There is nothing in *Dobbs* that undermines *Wasden*.

20           And I think that I'd also point you to the *Culinary*

21   *Workers Union* case that I think is cited in our briefs that does

22   talk about the kind of persuasive force of a recommendation from

23   the attorney general being important.

24           And us thinking about this in sort of two pieces.

25   One:  Is the attorney general an appropriate defendant in this

1      case?  And *Wasden* answers that question.

2             And then the question is:  Does the attorney general

3      have to be able to carry out the threatened prosecution all by

4      himself in order for our clients to be afraid?  And the answer

5      to that as a practical matter is no; right?  I mean, the chief

6      law enforcement officer has said:  This is what the statute

7      means, and I'm not taking it back except on procedural grounds.

8      That gives us ample reason to be afraid that his mantle will be

9      picked up by others.

10            By the way, Your Honor, just, you know, in terms of

11     what the Idaho law is on this point, right, I think it's the

12     *Summer* case that's cited in our briefs and also I think in the

13     attorney general's briefs -- is a case in which the attorney

14     general -- prior attorney general just went into a local grand

15     jury, obtained an indictment, prosecuted the case.  The

16     defendant objected and said, like, that's not -- the attorney

17     general doesn't have primary authority.

18            And what the state Supreme Court said in that case

19     was:  Well, okay, but ultimately the local DA was fine with

20     this -- or local prosecuting authority, I should say -- was fine

21     with this.  So no harm, no foul; the prosecution is sustained.

22            So what that means, Your Honor, is that even if he

23     couldn't get a DA to bring case in the first instance, he could

24     bring the case himself, and then there would just be this

25     question about whether the local prosecuting authority would go

1      to the perhaps politically perilous route of objecting to him

2      having done so.

3              So this is not a case where he's at all -- I don't

4      think we have to show that he could bring a case himself in

5      order to have standing here.  The question is whether we have

6      fear of enforcement, and we do based on what he said and his

7      influence.  But I think it's important to recognize that he can

8      do more than just be influential.

9              THE COURT:  Let me ask a related question very

10     quickly.  And I'm sure I'm taking up all your time.  But you

11     cited in your -- I think it was in your reply brief the idea

12     that the failure to disavow the intent to prosecute can be

13     relevant in terms of determining whether or not there is a real

14     threat of injury.

15             I didn't get a chance to go back and read those cases

16     that you cited.  Were those cases -- and maybe you don't recall

17     either, but do you know whether those cases involve simply a

18     bringing of an action offering some reason for the plaintiff to

19     think that a prosecutor might, in fact, seek to enforce a law in

20     a particular way and where the prosecuting attorney or district

21     attorney failed to disavow his intent to do so -- his or her

22     intent to do so, and that that in some way then becomes relevant

23     in terms of the threat of prosecution?  Can you fill me on that?

24     Because that would seem to be quite relevant to this issue.

25             You know, we've got a number of prosecuting attorneys

1        who have now been joined and are represented here, not all of

2        them presumably.  And would their failure to disavow an intent

3        to prosecute, would that be relevant here or not?

4                MR. NEIMAN:  I think it is -- I think -- I think

5        that's the Ninth Circuit law, Your Honor, is that, you know, a

6        failure to disavow can sustain the credible threat standard.

7        And I think the *Tingley* case says that that we cited in our

8        briefs.  You know, it's sensible; right?

9                It just makes me think back, Your Honor.  I had a case

10       earlier in my career where we were working with some British

11       lawyers because our client was British and being prosecuted in

12       the United States.  And the British lawyers were saying to us:

13       Well, shouldn't our first argument be the government didn't warn

14       us that they would -- they might charge our client under this

15       law?  It was like a novel interpretation of the law.

16               And I said to them:  No, that's actually not a defense

17       in the United States.  The government doesn't have to tell you

18       that they're reading a law in a particular way before they

19       prosecute you.  Right?  The threat of prosecution is created by

20       the law itself and by the attorney general's interpretation of

21       the law.  We don't need to have, on top of that, a prosecutor

22       saying, "By the way, I also think I'm going to follow that

23       interpretation," in order to have a threat.

24               THE COURT:  Okay.  Go ahead.

25               MR. NEIMAN:  So, Your Honor, I did want to just make a

1    quick note on potential ripeness, which you addressed briefly in

2    your remarks, just because we didn't have a chance to address

3    that in our briefing because it was raised for the first time in

4    the reply of the defendants.

5           I would just say, first of all, that's a waiver,

6    right, failure to raise that argument.  Potential ripeness is

7    waivable when it wasn't raised until reply, and that's a waiver.

8           The document is on thin ice right now given the *Susan*

9    *B. Anthony List* decision of the Supreme Court raises doubts

10   about whether potential ripeness is even a valid doctrine

11   anymore given the obligations of the federal court to hear a

12   case when its jurisdiction has been properly invoked.

13          And potential ripeness isn't appropriate here

14   substantively because this is a legal dispute about whether

15   Idaho can sort of apply its law to out-of-state conduct and can

16   restrict First Amendment protected speech in Idaho about conduct

17   lawful outside of Idaho, not a factual dispute where further

18   development is required.

19          So, for multiple reasons, we don't think that that's

20   well taken, but I did want to just address it briefly --

21          THE COURT:  Okay.

22          MR. NEIMAN:  -- because it was not addressed in our

23   brief.

24          Finally, Your Honor, unless you have other

25   questions --

```
1            THE COURT:  Well, you have used your 15 minutes.  I'm
2    going to add five more minutes for rebuttal and give the defense
3    25 minutes so as to keep a level playing field here.
4            MR. NEIMAN:  Thank you, Your Honor.
5            THE COURT:  Thank you.
6            Ms. Olson.
7            MS. OLSON:  Thank you, Your Honor.
8            St. Luke's Health System, on behalf of its providers
9    and the mission to serve its community, asks this Court to
10   consider five points as it decides the legal issue before it.
11           First, Your Honor, Idaho healthcare providers need
12   some certainty on whether they can continue to provide
13   out-of-state referrals so their patients can obtain the
14   appropriate standard of care on essential reproductive health
15   matters.
16           THE COURT:  Ms. Olson, does St. Luke's operate
17   anything outside the state of the Idaho?  In Oregon?
18           MS. OLSON:  Your Honor, it has a facility in Ontario,
19   Oregon.
20           THE COURT:  I thought it did, and I wondered how that
21   plays into this, if at all.
22           MS. OLSON:  Well, Your Honor, I would say that the way
23   it works for St. Luke's within Idaho, I mean, that is where the
24   concern is with the application of this particular statute.  And
25   so the facility in Ontario serves people who live in Ontario and
```

1      Eastern Oregon.  And sometimes when Idahoans end up over there,

2      they may -- they may end up going there.

3              But the focus here is on the impact it has within

4      Idaho.  Because, as I'm sure the Court knows, you know, the --

5      St. Luke's is the only health system that is, you know, fully

6      based within Idaho and operates essentially throughout Idaho.

7      And the numbers of patients it serves in terms of actual visits

8      exceeds a million.

9              So the focus for St. Luke's is --

10             THE COURT:  The reason I asked the question is:  If

11     General Labrador's interpretation is correct, then a doctor in

12     Boise faced with a patient for whom an abortion is medically

13     necessary because of preeclampsia or for whatever other reason

14     and which it is uncertain -- now, of course, the law has changed

15     in terms of, you know, protecting the woman's life, but it

16     would -- the General's interpretation of the statute would

17     clearly be relevant to whether they could refer them to a doctor

18     in the same clinic or the same system in Ontario.

19             And that's part of the concern I guess your client

20     would have, is that we couldn't make referrals even within our

21     own system; is that correct?

22             MS. OLSON:  I think that's -- I mean, that would

23     absolutely be correct, Your Honor.

24             And I think most significantly, the attorney general's

25     letter, even withdrawn, would have an impact on making such a

1    referral anywhere out of state, whether it was to St. -- if

2    you're in Northern -- if you're in, I guess, South Central Idaho

3    and Oregon might not be the closest place, you also couldn't

4    refer to another out-of-state location.

5         THE COURT:  To Nevada, for example.

6         MS. OLSON:  Yeah, to Nevada, to Washington.  As the

7    Court knows, as a long-term Idahoan, I should have better

8    geography than that.  But I think that's -- that's absolutely --

9    that's absolutely correct.

10        And I think the Court, in its initial comments when it

11   referred to the -- you know, the proverbial bell that can't be

12   unrung, that is part of St. Luke's real concern here, is that

13   the fact that the letter is out there and asserted that a

14   healthcare provider who made such a referral may have her

15   license suspended or -- and the statute provides on a second

16   offense, not for a short period of time, but revoked

17   altogether -- that the chilling effect that that has on

18   St. Luke's providers and on their patients in what could be the

19   most critical moments for obtaining healthcare, you know, for

20   wanted pregnancies, for women who have other children, for the

21   simple everyday conversations that the St. Luke's providers are

22   used to having with their patients, there is a significant

23   impact there.

24        And I think, Your Honor, among the other things that

25   St. Luke's wants the Court to really consider and think about as

1    it decides the legal issue before it is that the chilling effect

2    and the impact this will have on the Idaho OBGYN and other

3    reproductive healthcare providers who already are leaving the

4    state because of the challenges of practicing reproductive

5    health medicine here.

6         And although in opposing St. Luke's motion to file the

7    brief, Your Honor, the State says:  Well, most of the things you

8    cite occurred prior to March 27 and the date when Attorney

9    General Labrador issued the letter -- that may be true,

10   Your Honor, but I think it stands to reason that this

11   interpretation by the chief law enforcement officer in the

12   state, even if withdrawn, will serve as a further impetus for

13   people to leave the state.  And significantly, it will detour --

14   deter other healthcare providers from coming in.

15        As St. Luke's sets out in its brief, one of the

16   doctors from Northern Idaho with the medical center that's

17   leaving in Bonner County, you know, people who go into the field

18   of medicine, and particularly young, bright residents, have

19   many, many choices of where to go.  Even if they are from Idaho,

20   they have opportunities outside.  And doctors don't like so much

21   having interaction with the legal profession, and there is

22   simply -- there's no reason for them to come here if they are

23   worried that actually practicing medicine to their standard of

24   care means that they might have increased contact with the --

25   with the legal profession, Your Honor.

1          THE COURT:  Okay.  I think your time is essentially

2     up.  But go ahead, and you can wrap up here.

3          MS. OLSON:  Yes, Your Honor.

4          I just wanted to emphasize, kindly, Your Honor, it is

5     important here for Idaho providers and their patients to have

6     some legal certainties, and that's why we think it's important

7     for the Court to address the issue that plaintiffs have brought

8     before it.

9          And I thank the Court and also plaintiffs for

10    providing this time to St. Luke's.

11         THE COURT:  All right.  Thank you.

12         Mr. Wilson.  Mr. Wilson, just before you start your

13    time, I will at some point want you to answer a question I'm

14    going to give you -- you can kind of mull it over as I'm asking

15    it and then think about it as you're arguing.  I'm sure you're

16    capable of doing two things at once there.

17         But imagine yourself as a doctor -- or excuse me -- as

18    a lawyer, perhaps in Ms. Olson's shoes, and you have an OBGYN

19    doctor who comes to you, and she indicates that she feels the

20    need to refer a patient to a place where they can obtain an

21    abortion for medical reasons; it's a wanted pregnancy but one in

22    which it is not clear to the doctor that the referral would

23    comply -- or that the abortion could be performed in Idaho and,

24    therefore, the referral is being made out of state.

25         Can you advise that doctor, in the face of General

1    Labrador's letter, even with the withdrawal of that, that they

2    will not face prosecution or loss of licensure if they proceed

3    to make that referral?

4          So that's the question I want you to answer.  You can

5    work that into your -- I often ask counsel on one side to

6    imagine what their role would be as a counselor if on the other

7    side, as a way of kind of testing the arguments that you're

8    making.

9          So go ahead with your argument.

10          MR. WILSON:  Thank you, Your Honor.  I appreciate it,

11    and I'll definitely make sure to touch upon that.

12          First of all, we really appreciate the Court making

13    time for us despite the jet lag.  We would be happy to have the

14    hearing at 2:00 in the morning.  If that's when your good hours

15    are right now --

16          THE COURT:  Great idea.

17          MR. WILSON:  -- we could reschedule for that time.

18          But aside from that, I would like to just set the

19    table for what we think this dispute is really about and kind of

20    some of the things that I think have been a bit misleading about

21    the way the issues have been presented.

22          You know, when you look at a typical pre-enforcement

23    challenge in this context, you have someone who -- you have a

24    law that criminalizes the plaintiff's conduct, and the plaintiff

25    brings a lawsuit about it, saying:  Well, this law, on its face,

criminalizes my conduct -- and particularly if it's expressive
conduct -- and they say that I'm -- there is a threat of
enforcement just because this law is on the books, and I'm
concerned about it, and so I'm bringing a lawsuit on it.

That's what you have, for example, in the *Tingley*
case.  And the Ninth Circuit says:  Well, the law is on the
books.  Presumably it will be enforced unless there has been
some disavowal that it will be enforced, and so the plaintiff
has standing to challenge the law.

And usually in that case, you also have the government
responding, and the government's point one of their brief is:
The plaintiff doesn't have any standing whatsoever to bring the
challenge that they are bringing.  And point two is:  If the
Court finds that the plaintiff has challenging *[sic]*, we're
totally right anyway, and everything we did is perfect and
constitutional in every way.

Well, let's -- let's take that typical context,
pre-enforcement standing, contrast it with this case.  This case
is not about a challenge to the law itself.  The plaintiffs
don't allege that 622 prohibits their conduct.  In fact, they
allege the opposite.  They say that even when 622 is in effect,
this is what they were already doing, and they believe that
their conduct complies with the law.

They say the problem is not the law itself.  The
problem is the Crane letter that the attorney general sent.  And

1      the Crane letter -- it's important to clarify here.  The

2      attorney general has withdrawn that letter, and it's important

3      to understand why.

4            Because if -- you know, I think the Court knows

5      General Labrador well enough to know that if General Labrador

6      believed in this policy and if this was an official policy, you

7      would see that point two in our brief.  You would see:  The

8      plaintiffs don't have standing; but if the Court finds they have

9      standing, everything was right about this.

10           But the fact is we don't have a policy.  The attorney

11     general doesn't have a policy.  And the Crane letter was not a

12     policy about this.  And so there is nothing to defend.  It's

13     been withdrawn.

14           And getting into the details of why it was withdrawn

15     matters.  This is a situation where the attorney general -- he

16     gets requests from legislators all the time for advice, and it's

17     his duty under Idaho law to provide that advice.  Sometimes it's

18     a phone call.  Sometimes it's a letter or an email.  And

19     sometimes it's a formal attorney general opinion.  And our

20     attorney general opinion policy outlines those three different

21     types of opinions.

22           Mr. Neiman says that, oh, this is a type 3 opinion

23     because the Attorney General signed it.  I think, respectfully,

24     if Mr. Neiman had seen more actual attorney general opinions, he

25     would know that this was not a type 3 opinion.  This was a

1     letter or an email response.

2          An official attorney general opinion has a different

3     formatting.  It's got issues presented section; it's got an

4     analysis section; it's got the discussion and the list of

5     authorities considered at the end.

6          That's not what has been provided here because this is

7     not an official attorney general opinion.  This was a private

8     request by a legislator, and an attorney general provided a

9     private response.  The Crane letter, on its face, has

10    Representative Crane's address only in the block that it was

11    sent to.

12          But what we learned and didn't know at the time that

13    General Labrador signed this opinion was that Representative

14    Crane had requested this on behalf of a third party.  And so as

15    soon as he received the letter from General Labrador, he

16    immediately forwarded it to his constituent, who really wanted

17    to know.  And the constituent published it on the Internet.

18          This opinion never would have been published but for

19    that.  It would have been private advice provided by the

20    attorney general to Representative Crane.  Only the constituent

21    published it.

22          And we learned about it because the plaintiffs here,

23    they saw it published on the website.  They sued about it.  And

24    we heard about it when the lawsuit was filed.  And when we

25    realized what had happened here, that Representative Crane had

1       just served as a pass-through for a request by a constituent, we

2       said:  That's not the proper use of the Attorney General's

3       opinion -- opinion authority, and this is not something that is

4       the proper use of it.

5               And so General Labrador has been clear and unequivocal

6       that the opinion is withdrawn, void, and does not state the

7       attorney general's opinion on any question of Idaho law.

8               And that's why you don't see that point two in our

9       brief, where we say:  And in any event, General Labrador is 100

10      percent right.  Because he doesn't have an opinion on this

11      issue.  All he did was answer a private request for a legislator

12      that turned out to be an improper --

13              THE COURT:  But, Mr. Wilson, how can you -- well, how

14      can you say that he doesn't have an opinion when he has written

15      a letter, even if it was mistakenly written, was withdrawn -- he

16      has written a letter which has now entered the public forum

17      expressing an opinion as to how the statute should be

18      formulated?

19              Now, whether it's his personal opinion, it's on his

20      letterhead.  It's not signed, you know, "Raul" with no reference

21      to his status as the Attorney General.  How does that not

22      trigger the concerns under the *Susan B. Anthony List* case about

23      their conduct is at least arguably a violation of the statute?

24      Because it's arguably a violation of the statute because

25      Attorney General Labrador has said so in a letter which has now

1  become public, and there are credible threats of prosecution

2  because, obviously, that information is now in the public

3  domain, and all 44 prosecuting attorneys in the state of Idaho

4  know of that opinion.

5         So how can we just ignore the letter?

6         I understand that it was, I guess, a mistake.  It was

7  not intended to be some kind of binding guidance or any binding

8  statement of the attorney general, but it does reflect an

9  opinion of the Attorney General's Office that was publicly

10  disseminated.  And I don't know how you put that genie back in

11  the bottle, even if it has -- it should not have been and even

12  if it was withdrawn.

13         So that's my concern, which really ties me back into

14  the question I asked at the beginning:  How do you advise a

15  doctor if they come to you and say, "I need to refer this

16  patient to Ontario, Oregon, to our office there to perform this

17  surgery which we don't think would be lawful under Idaho law but

18  is lawful under Oregon law and is medically necessary"?

19         MR. WILSON:  Well, Your Honor, I think that's a great

20  question.  And the first thing I would say is that we wouldn't

21  characterize issuing this opinion as a mistake.  We would

22  characterize the request for this opinion as having been an

23  abuse of the opinion process.

24         And, you know, while the federal courts lack authority

25  to issue advisory opinions, General Labrador does have the

1    authority and the duty to issue advisory opinions but only in

2    specific circumstances.  And so if those circumstances are not

3    present, that's why he's withdrawn the opinion, because it

4    became clear that this was not a proper request.

5            But to get to the heart of the Court's concerns that I

6    think really answers the issue here, I'm going to tell you how I

7    would answer that physician if that physician came to me and I

8    was the counsel for the physician.  I would say:  There's three

9    reasons that you don't have to be concerned here, and these are

10   the three reasons that tie into the things that plaintiffs have

11   to show to show that they have standing here.

12           And I'd say:  First, you don't have to be concerned

13   because the attorney general lacks general prosecutorial

14   jurisdiction in Idaho and any specific jurisdiction over this

15   statute.  And I'd say:  Second, the Crane letter didn't threaten

16   anybody, much less you, with any prosecution.  And I'd say:

17   Third, there is no ongoing conduct of any kind into the future

18   by the attorney general or any of the other defendants in this

19   action that would give rise to a claim.

20           So taking each of those in turn, and whether you look

21   at this through standing, whether you look at it through

22   ripeness, mootness, irreparable harm, all three things required

23   in the same situation -- sorry -- under every doctrine.  You've

24   got to be able to show that you can threaten; you've got to show

25   that you did threaten prosecution; and you've got to show that

1    it's continuing.  None of them are present here.

2            So on the question of whether the attorney general can

3    threaten, the Court's characterized him as the chief law

4    enforcement officer of the state.  I believe a better

5    characterization would be chief legal officer.  Because in law

6    enforcement, the attorney general's jurisdiction is limited to

7    assisting local process, the prosecutors.

8            And so you would have to have an initial action by the

9    prosecutor under this theory -- of which there has been none

10   here and none alleged -- and then the attorney general assisting

11   it in some way.  You don't have that.

12           And the passage of the new law giving the attorney

13   general limited jurisdiction over Section 623 only, that just

14   reinforces the point.  There was a specific proposal to give the

15   attorney general prosecutorial jurisdiction over this statute.

16   The legislature removed that, and the version that the governor

17   signed doesn't give him that authority.

18           So he is not the chief law enforcement officer with

19   respect to the criminal law in this state.  He has the ability

20   to assist those local prosecutors if they've asked.

21           He did not communicate this letter to anyone other

22   than to Representative Crane.  It only got into the hands of

23   local prosecutors likely when they were served with a lawsuit

24   about it.

25           And for these reasons, we don't think the *Wasden*

1    decision applies. *Wasden* applied a version of the attorney

2    general's statute that's a past iteration. And at the time, it

3    characterized in a footnote -- it said that recent changes that

4    -- had further cabined the attorney general's authority. He

5    said: Oh, those are just dicta, and so they don't matter in

6    this case.

7          Well, we think that what the Ninth Circuit called

8    dicta back then has become very clear with what the legislature

9    has just done in giving us authority over 623 but not over 622.

10   The attorney general lacks prosecutorial authority in this case.

11         And I also suspect, Your Honor, that it's not very

12   often that you have a government official coming here to not

13   defend the thing that he wrote on the merits and also say that

14   he doesn't have power over the issue. It's just simply the case

15   under Idaho law.

16         You know, Mr. Neiman has said that, you know, well,

17   the attorney general hasn't come around and agreed with us on

18   the issue, but we are not required to agree with the plaintiffs

19   to show that there is no controversy here, there is no

20   justiciable dispute. There can be no justiciable dispute simply

21   because we haven't weighed in, and we don't have the authority

22   to.

23         So if you look at the second prong here of whether

24   there actually was a threat, a credible threat of enforcement, I

25   mean -- and actually, I need to say one more thing before I miss

1    it.

2            In terms of our ability to threaten, we think Idaho

3    law is very clear and that *Wasden* has been superseded by the

4    subsequent changes in Idaho statutory law.  But if the Court has

5    any doubt on this question --

6            THE COURT:  How is that -- I'm not sure I understand

7    the -- I don't have the section number with me.  My

8    understanding was that the *Wasden* decision was based upon the

9    general attorney general authority and was not tied to any

10   specific prosecutorial authority under any abortion statute.

11   And my understanding is that that statute with regard to the

12   attorney general's general authority -- I think it's Title 67, I

13   think -- has not changed since *Wasden*.

14           So what statutory change has led to a change in law so

15   substantial that we should ignore *Wasden*?

16           MR. WILSON:  What I'd say that -- the two things are

17   -- is that in *Wasden*, you had the version of the statute that

18   was in effect.  Frankly, the attorney general argued, similar to

19   what we're arguing here, that his ability was limited to

20   assisting local prosecutors.  And the Ninth Circuit construed

21   that in a broad way under the context of a facial challenge to

22   an abortion statute.  They construed that in a broad way and

23   said:  You do have enforcement authority here.

24           And it dismissed comments of the Idaho Supreme Court

25   in the *Summer* decision which noted how this statute had cabined

1    the authority of the Attorney General.  It dismissed those as

2    dicta and said, you know, those don't really control because

3    they're dicta here.

4         Well, if it was dicta then, the legislature has made

5    it more clear precisely by statutes like the one the legislature

6    just passed, which reinforced this structure that the attorney

7    general doesn't have any general law enforcement authority

8    unless it's specifically delegated to him by the legislature or

9    referred to him by a prosecutor.

10        Now, we think, then, because this is an issue that

11   bears on Idaho's sovereigty, that, again, we think the statutes

12   are clear.  But if the Court had any doubt, this is a textbook

13   case for something that should be certified to the Idaho Supreme

14   Court because it depends on the interpretation of state law and

15   state law authority and what the attorney can actually -- the

16   attorney general can actually do.

17        And I also suspect that if we went to the Idaho

18   Supreme Court and if the Idaho Supreme Court said, yes, the

19   attorney general is right, he doesn't have law enforcement

20   jurisdiction over this, that would also redress any complaint

21   that the plaintiffs have here.  Because if the attorney general

22   doesn't have the ability to enforce it, then his opinion is just

23   a legal opinion in a vacuum that doesn't have any possibility of

24   harming them.

25        And that's -- moving on to the second point of whether

1       there has been an actual threat here, that's why we are in this

2       situation, is there hasn't been a threat.  At a minimum, for a

3       threat, you have to have something that's actually communicated

4       by the threatener to the threatened party.  And aside from the

5       fact that the attorney general has not -- cannot threaten, he

6       hasn't made that communication.

7               He wrote a letter to Representative Crane that was

8       then put out on the Internet, and a bunch of other people saw

9       it.

10              Now, they may know that, and on one respect they know

11      his -- the fact that he previously expressed this opinion.  But

12      that doesn't mean that there is a threat to them.

13              And you look at the *Twitter* case from the

14      Ninth Circuit; I think this really illustrates the point well

15      because the facts that you had in *Twitter* where the

16      Ninth Circuit said there was no standing are much more clear

17      than this case.

18              In that case, Attorney General Paxton from Texas had

19      served Twitter with a civil investigative demand requesting

20      documents related to Twitter's policies.  And Twitter brought a

21      lawsuit saying, well, this is a -- this is threatening our free

22      speech, and we are self-censoring because of this demand, and so

23      we have standing to challenge your demand.

24              And the Ninth Circuit said:  For one, a civil

25      investigative demand is not an adversarial proceeding.  It may

1    have been sent to Twitter, but it's just requesting documents.

2    There is no subsequent threat of legal proceedings, and

3    imagining what legal proceedings might follow would be purely

4    speculative.  So if plaintiffs have censored because of it, they

5    may have subjectively censored.  It was self-censorship.  It was

6    voluntarily, and it doesn't create standing.

7              Well, the same thing is true here.  If the attorney

8    general -- and much more so because the attorney general hasn't

9    even communicated to the plaintiffs.  He didn't send them

10   anything.

11             And their fear is not about any threat of adversarial

12   proceedings against them or any criminal proceedings against

13   them but rather the possibility that the attorney general might

14   restate an opinion that a prosecutor might credit and believe or

15   might request the assistance of the attorney general to enforce

16   and then bring charges against them, when no prosecutor has

17   threatened such a thing, and the attorney general has no opinion

18   on the question.

19             So if there was no standing in *Twitter*, it's much more

20   clear that there is no standing in this case, and especially,

21   again, because this was not an opinion that would have been made

22   public.  This was not in the format of an official attorney

23   general opinion.  It was not -- it was provided only to

24   Representative Crane, and it was a privileged communication

25   until it turned out --

1          THE COURT:  You use the word "privileged."  What do

2     you mean by that?  Privileged as in attorney-client privilege?

3          MR. WILSON:  Yes, sir.

4          THE COURT:  I'm not sure I understand what that means.

5          MR. WILSON:  Well, so the attorney general has a duty

6     under Idaho law to represent both the legislature, as a body,

7     and also individual legislators when they ask the attorney

8     general for legal advice.

9          And the opinion duty of the attorney general comes out

10    of that general duty to provide those -- that legal advice.  So

11    that means that in an ordinary circumstance, when a legislator

12    requests an opinion of the attorney general, the legislator

13    receives a private response.  And there might be --

14         THE COURT:  So you're saying the attorney-client

15    privilege?

16         MR. WILSON:  Yes, Your Honor.

17         THE COURT:  Well, then, hasn't the recipient, Senator

18    Crane, waived that by apparently passing it on to someone who

19    then used it as a fundraiser or at least were on the Internet

20    and then was used as a fundraiser?

21         I'm not sure -- how does the fact that it was

22    privileged -- how does that even enter into the discussion where

23    it clearly entered the public domain?

24         MR. WILSON:  We don't contest at all that

25    Representative Crane waived the privilege.

1          THE COURT:  Representative Crane.

2          MR. WILSON:  Yes.  He waived the privilege.

3          And -- but it was -- the point is, if you're saying

4     that the attorney general has threatened, we can't have possibly

5     threatened prosecution by providing a privileged communication

6     to a client, like, any more so than, you know, if I -- if I

7     represent a big corporation and I provide them with legal advice

8     about a lawsuit that they might bring against another

9     corporation, I haven't threatened litigation against that other

10    corporation just by providing legal advice about it.

11         In the same way, if Attorney General Labrador sends a

12    private letter to a legislator, he hasn't threatened anything

13    against anyone by doing that.  That's why the context of this

14    communication matters.

15         He's not saying it's enforcement policy of Idaho law,

16    because he wouldn't have the authority to do that anyway.  He is

17    just providing a private opinion to the legislator about what

18    Idaho law means, and that opinion has now been completely

19    withdrawn.

20         So turning now to the last --

21         THE COURT:  Well, just to be clear, you -- not only on

22    behalf of the attorney general but also the prosecuting

23    attorneys that you represent, there is still no disavowal of the

24    legal analysis or conclusions drawn in that letter; correct?

25         MR. WILSON:  Your Honor, I'd say that that is -- it's

1      correct, but it's not the right framing of the issue.  And

2      that's because if there is no properly presented context for us

3      to have an opinion on this issue, then we don't have an opinion

4      on this issue.  Nothing has called on us to do so.

5              But more importantly --

6              THE COURT:  Well, that's part of the problem with the

7      First Amendment issue.  You're saying that the doctor should go

8      ahead, do what they are going to do, and then wait for a

9      criminal enforcement or a loss of their license, and then they

10     can challenge the First Amendment issue.

11             Isn't that almost precisely why there is a fairly

12     loose standard for injury in fact on First Amendment

13     pre-enforcement claims?  Just so that we don't subject someone

14     who is trying to assert a First Amendment right or other

15     constitutional right to the jeopardy of criminal prosecution and

16     loss of medical licensing privileges as a condition of

17     exercising those rights.

18             MR. WILSON:  Well, Your Honor, I'd say that you -- we

19     do have a more lax standard in the First Amendment context, but

20     it's still not met here because, again, this is from someone who

21     cannot threaten and who has not threatened.  There is nothing

22     about the Attorney General's private communication to a

23     legislator that constitutes a threat to a doctor.

24             THE COURT:  Well, it's not a threat, but it's a

25     statement of an interpretation of a statute which, if adopted by

```
 1        prosecuting authorities, would, in fact, result in criminal
 2        action and loss of licensure.
 3               MR. WILSON:  But I think that --
 4               THE COURT:  Do you agree with that?
 5               MR. WILSON:  The latter clause that the Court just
 6        gave there is key, "if adopted by prosecuting authorities."
 7        They are the ones who have the power here.  They are the ones
 8        who matter.  And none of them --
 9               THE COURT:  Well, they would have the same ability
10        right now to disavow that interpretation of General Labrador and
11        simply say:  That's not what we're doing; that's not our
12        interpretation of the statute, and we will not prosecute.
13               We have not heard that from anyone; correct?
14               MR. WILSON:  I don't think they've -- the prosecutors
15        have not taken any position about it either before, after, or
16        during.  I think they've got many other things that they are
17        busy with.
18               But I'd also -- I'd note that on the disavowal point,
19        when you look where disavowal is an issue -- like, for example,
20        in the *Tingley* case -- it's not disavowal of your position where
21        you say, "I'm sorry.  I was wrong.  I never should have said it.
22        It was a mistake.  Please forgive me."  It's disavowal of
23        enforcement, which can happen for any number of different
24        reasons that -- and that's in the context of a law on the books.
25               So *Tingley* was a case about Washington's ban on
```

1      conversion therapy.  And it was because Washington State had not

2      disavowed enforcement of that policy the Ninth Circuit said,

3      well, that gives -- that gives standing to challenge it because

4      you haven't --

5           THE COURT:  How is that different from disavowing an

6      interpretation of a statute which has been publicly disseminated

7      by the state's chief legal officer?

8           MR. WILSON:  Well, I think that, you know, I would

9      read -- frankly, Your Honor, when the attorney general said in

10      this letter here -- he said the Crane letter is void; it is

11      withdrawn; it does not state the opinion of the attorney general

12      on any question of Idaho law -- if that's not a disavowal for

13      Ninth Circuit purposes, I don't know what is.  It's --

14           THE COURT:  Well, yeah.  I can tell you exactly what

15      it would be, which is that there was an error in the analysis,

16      and that is not the opinion of the attorney general; not that it

17      should not have been issued but that the substantive decision

18      itself was wrong, and we should not have issued it because it is

19      wrong.  That's a disavowal.

20           MR. WILSON:  That would also be a disavowal.  But

21      there's two -- I think there's -- the Ninth Circuit language is

22      not just disavowal; it's disavowal of enforcement.

23           And an opinion that does not state the attorney

24      general's opinion on any question of Idaho law and is void and

25      withdrawn, that is not an opinion that is being enforced.  So we

1    have -- you have the equivalent of that disavowal in this

2    situation.

3         Now, you can also disavow by saying, "I was wrong, and

4    I'm sorry."  But that's not -- that's not required.  It

5    doesn't -- it's not that every case moves forward and there's

6    always a justiciable controversy until the defendant agrees with

7    the plaintiff.  Sometimes there is not a justiciable controversy

8    because the two sides have a joint issue.  There is not a

9    dispute.  They are not in conflict over the same territory.

10        And that's what's happened here.  The attorney general

11   has said:  This does not reflect any opinion I have about Idaho

12   law.  So there is not a dispute here.

13        I see that my time is up.  I'm happy to answer any

14   other questions you have.

15             THE COURT:  No.  That's fine.  Thank you very much.

16             MR. WILSON:  Thank you, Your Honor.

17             THE COURT:  Mr. Neiman.

18             MR. NEIMAN:  Just very briefly, Your Honor.  I think

19   it's four points.

20        First, a suggestion that somehow this communication

21   with the legislator was privileged is a little hard to

22   understand because the statute requires the attorney general

23   opinion letters to be made public and advice that's required to

24   be made public is the opposite of privileged advice.

25        Second, a suggestion that somehow it's enough to

1    disavow the -- the -- I'm trying to think of how he said it.

2    Mr. Wilson was suggesting that there has been a disavowal of

3    enforcement here.  There has been no disavowal of enforcement

4    here.

5            He couldn't have been clearer in responding to

6    Your Honor's questions that they are absolutely reserving to

7    themselves the right to move forward on a prosecution

8    cooperatively with the various district attorneys, local

9    prosecuting attorneys that Mr. Wilson represents on exactly the

10   theory that was put forth in the letter.  Nothing has disavowed

11   their ability to do that, which is exactly the problem.

12           Which gets me to my last point, Your Honor, which is,

13   you know, I think, Mr. Wilson has valiantly tried to give an

14   answer to your question about how would you advise a doctor if

15   you were representing them.  That was the best answer, I guess,

16   that can be given for someone sitting in his shoes defending his

17   position.

18           But the only rational advice that any lawyer could

19   give a doctor right now, given that the Attorney General wrote,

20   under his own signature, that a referral violates Idaho's law,

21   is:  You are at risk of prosecution if you make a referral.  And

22   for that reason, injunctive relief is appropriate here,

23   Your Honor.

24           And just the last thing I want to say is that the core

25   of our claim is a First Amendment claim, but we also have a very

1    important due process claim, and I don't want that to be lost

2    here.

3            THE COURT:  Now, We are not -- you know, I, in fact,

4    was going to note -- and it's really what Mr. Wilson alluded

5    to -- the reason why he doesn't go to number two, you know:  And

6    we don't argue that even if there is standing; what we did is

7    completely constitutional.  There was nothing in the briefing by

8    the attorney general or the other defendants which really

9    addresses that issue, the substantive issues of whether there

10   was a constitutional violation.

11           Now, I want to be clear, by saying that, Mr. Wilson,

12   I'm not suggesting you are waiving that in any way.  I'm just

13   noting that, for purposes of our decision here today, we are

14   going to focus only on the issues that are briefed, which will

15   include primarily standing, whether it's moot, issues of that

16   sort.  We are not going to weigh into those other issues simply

17   because they are not briefed here today.

18           It does make it difficult because I do have to make a

19   determination of likelihood of success on the merits, but I will

20   just have to base that upon what's already been submitted.

21           All right.  Anything else?

22           MR. NEIMAN:  No, Your Honor.  Thank you.

23           MR. WILSON:  Your Honor, may I briefly respond?

24           THE COURT:  Yes.

25           MR. WILSON:  Just one point, that Mr. Neiman said that

1        the statute requires attorney general opinions to be made

2        public.  I understand this is probably not something that

3        Mr. Neiman is super familiar with, because it's just the way the

4        Attorney General's Office has operated.  But the attorney

5        general does not make every opinion public.  There are many

6        opinions that he renders that are just provided privately to

7        legislators and remain privileged.  That was true in the last

8        administration just as much as it's true in this one.

9                THE COURT:  Well, you know, that's an interesting

10       problem.  I don't -- you know, the State's equivalent of the

11       Freedom of Information Act -- are you saying those could not be

12       obtained by an interested citizen because they are privileged as

13       a communication by the state's elected attorney general and a

14       state-elected member of the House or Senate?

15               MR. WILSON:  That's exactly right, Your Honor.

16               If Representative Crane hadn't waived privilege by

17       voluntarily disclosing this opinion, it would have remained

18       private until the end of time.  And if anyone had requested it

19       through a Freedom of Information Act request, we would have said

20       that we have no responsive nonprivileged documents.

21               THE COURT:  Okay.  Well, I don't want to weigh into

22       that; and fortunately, I don't have to.

23               It does seem to me, if I were a state court judge, I

24       would find that to be a rather interesting issue to address just

25       in terms of transparency of state government.  But I would think

1          any action taken by a state attorney general, except in the

2          context of actual litigation, would seem to be public.  But, you

3          know, what do I know?

4                    I don't obviously get into that.  It just strikes me

5          as, I guess, a citizen of the state that I would be a little

6          surprised if the attorney general, as an elected state official,

7          cannot reveal the opinions they offer.  But it's not an issue I

8          have to address, and it's not an issue that would ever come

9          before me.  That's just purely an issue of state law.

10                   MR. WILSON:  And, Your Honor, I would say that it's

11         really just because, in that context, the legislator is acting

12         as a client of the attorney general.  And so it's privileged

13         legal advice.

14                   The legislators have the right to request these

15         opinions, and they are not made public and published unless the

16         legislator gives consent and it's on a major issue of Idaho law.

17         Then we will then publish the opinion under the appropriate

18         circumstances.

19                   But, otherwise, it's, you know, legislators in the

20         course of a legislative session have all kinds of questions

21         about, well, what does this law mean, what does that law mean.

22         And the Attorney General is there to provide those advisory

23         opinions and give legal advice to help them discharge their

24         duties.

25                   THE COURT:  Okay.  Well, as I said, it would be

1    interesting to get into it; but fortunately, I don't have to.

2    I've got enough other stuff on my plate.

3          So thank you, Counsel.  I will take the matter under

4    advisement.  We will not consider the matter to be at issue

5    until we see the briefing, if any submitted, by the defendants

6    with regard to the amicus briefs which were due, I think,

7    Thursday I think I said at noon.  Let's make it Thursday

8    5:00 p.m., and we'll consider the matter under advisement at

9    that point.

10          And I will have Ms. Pugh or Mr. Pedersen communicate

11    with the attorneys representing the other amicus about their

12    obligation to obtain local counsel before the Court will

13    formally consider their amicus brief, although I will have to

14    admit I have already read it, so I'm not sure what that means.

15    But it won't be considered specifically in any decision we issue

16    until they have retained local counsel.

17          All right.  Well, thank you, Counsel.  And we'll take

18    the matter under advisement.  Thank you.

19          MR. WILSON:  Thank you, Your Honor.

20      (Proceedings concluded at 3:13 p.m.)

21

22

23

24

25

1                         REPORTER'S CERTIFICATE

2

3

4            I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that

5      the foregoing is a correct transcript of proceedings in the

6      above-entitled matter.

7

8

9

10

11

12

13

14      /s/  Tamara I. Hohenleitner                06/08/2023

15      TAMARA I. HOHENLEITNER, CSR, RPR, CRR        Date

16

17

18

19

20

21

22

23

24

25