UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PLANNED PARENTHOOD GREATER NORTHWEST, on behalf of itself, its staff, physicians, and patients, CAITLIN GUSTAFSON, M.D., on behalf of herself and her patients, and DARIN L. WEYHRICH, M.D., on behalf of himself and his patients, | Case No. 1:23-cv-00142-BLW<br><br>MEMORANDUM DECISION AND ORDER |
| Plaintiffs, | |
| v. | |
| RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, MEMBERS OF THE IDAHO STATE BOARD OF MEDICINE and IDAHO STATE BOARD OF NURSING, in their official capacities, COUNTY PROSECUTING ATTORNEYS, in their official capacities, | |
| Defendants. | |

**INTRODUCTION**

This case involves a challenge to Attorney General Raúl Labrador's

interpretation of Idaho's criminal abortion statute, Idaho Code § 18-622. Earlier

**MEMORANDUM DECISION AND ORDER - 1**

this year, Attorney General Labrador drafted a letter interpreting this sentence of Section 18-622: "The professional license of any health care professional who . . . *assists* in performing or attempting to perform an abortion . . . shall be suspended . . . ." That letter interprets the "assisting" language to include providing information about or referring patients to legal out-of-state abortion services. Plaintiffs Planned Parenthood Greater Northwest, Caitlin Gustafson, M.D., and Darin L. Weyhrich, M.D. (collectively the "Medical Providers"), seek to enjoin the Attorney General, Members of the Idaho State Board of Medicine and Board of Nursing,[1] and the Prosecuting Attorneys for every Idaho county from bringing criminal cases and licensing actions based on that statutory interpretation. *See Plf.s' Motion*, Dkt. 2. Following the Medical Providers' request for a preliminary injunction, Attorney General Labrador and certain county prosecutors (collectively "the State") filed a competing motion to dismiss (Dkt. 41), claiming that various justiciability doctrines demand that the complaint be dismissed.[2]

---

[1] The Idaho State Board of Medicine and Board of Nursing have yet to appear in this matter. Thus, neither party has lodged an opposition to the Medical Providers' request for a preliminary injunction or joined in the State's motion to dismiss.

[2] Those prosecutors include: Jan Bennetts, Ada County Prosecutor; Chris Boyd, Adams County Prosecutor; Alex Gross, Boise County Prosecutor; Andrakay Pluid, Boundary County Prosecutor; Jim Thomas, Camas County Prosecutor; McCord Larsen, Cassia County Prosecutor; (Continued)

For the reasons explained below, the Court will: (1) grant the Medical Providers' motion for a preliminary injunction as it pertains to Attorney General Labrador; (2) deny the motion with respect to the members of the Idaho State Board of Medicine and Board of Nursing; and (3) deny the State's motion to dismiss.

## BACKGROUND

### A.    Procedural and Historic Background

Overturning nearly fifty years of precedent, the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), withdrew a federally protected right, returning the regulation of abortion to the province of the individual states. In the following summer, Idaho's criminal abortion statute first went into effect. That law provides that "every person who performs or attempts to perform an abortion . . . commits the crime of criminal

---

Trevor Misseldine, Gooding County Prosecutor; Mark Taylor, Jefferson County Prosecutor; Rob Wood, Madison County Prosecutor; Lance Stevenson, Minidoka County Prosecutor; Cody Brower, Oneida County Prosecutor; Benjamin Allen, Shoshone County Prosecutor; Grant Loebs, Twin Falls County Prosecutor; and Brian Naugle, Valley County Prosecutor. *See* Dkt. 41. However, since the motion was filed, most of the county prosecutors have joined in the joint motion and opposition to the preliminary injunction. *See* Dkts. 108, 113, and 130.

abortion." Idaho Code § 18-622.[3]

Criminal abortion is a felony punishable by at least two, and up to five, years' imprisonment. *Id*. § 18-622(2). The statute also imposes professional licensing penalties for any "health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection." *Id*. In such an event, the provider's license must be suspended for six months upon the first offense, and permanently revoked upon the second. *Id*. Unsurprisingly, the interpretation and potential prosecution of Idaho's criminal abortion statute is a polarizing and often discussed topic throughout the state.

On March 27, 2023, Attorney General Labrador sent a letter to Idaho Representative Brent Crane responding to his request for an opinion on the scope of Idaho's criminal abortion statute and whether that law "prohibit[ed] referring women across state lines to obtain abortion services." *See Crane Letter*, Dkt. 1-1. In relevant part, the Attorney General's letter states:

> Idaho law prohibits an Idaho medical provider from either referring a woman across state lines to access abortion services or prescribing abortion pills for the woman to pick up across state lines. Idaho law

---

[3] At the time this lawsuit was instigated, a prior version of Idaho's criminal abortion statute was in effect. *See* I.C. § 18-622 (eff. July 1, 2023). However, as discussed below, the relevant language in the prior version of the statute is unchanged.

> requires the suspension of a health care professional's license when he
> or she "*assists* in performing or attempting to perform an abortion."
> Idaho Code § 18-622(2) (emphasis added). The plain meaning of assist
> is to give support or aid. An Idaho health care professional who refers
> a woman across state lines to an abortion provider or who prescribes
> abortion pills for the woman across state lines has given support or aid
> to the woman in performing or attempting to perform an abortion and
> has thus violated the statute.

*Id*. at 2 (emphasis original). Although the State claims the letter was intended to be private, it was soon after disseminated to Stanton International—a pro-life organization—which posted the letter on its public website and used it in fundraising efforts. *See Def.s' Br.* at 3-4; Dkt. 41-1; *see also Idaho Attorney General Issues Legal Analysis Affirming the Prohibition of Abortion Pills*, Stanton Int'l, https://stantoninternational.org/chemicalabortion/ (last visited June 24, 2023).

On April 5, 2023, the Medical Providers sued. In their complaint, the Medical Providers raise First Amendment, Fourth Amendment, and dormant commerce clause challenges to the interpretation laid out in the Crane Letter. *See Compl*, Dkt. 1. Despite alleging multiple constitutional violations, the Medical Providers seek uniform relief: a finding that Attorney General Labrador's interpretation is unconstitutional because it extends the enforcement of Idaho Code § 18-622 to legal conduct outside of Idaho's borders. *See id.* at 18. In conjunction with the complaint, the Medical Providers filed a motion for a temporary restraining order and preliminary injunction to bar any prosecution under the Crane

Letter interpretation.[4] *See Plf.s' Motion*, Dkt. 2.

Following the Medical Providers' motion, the Court scheduled a status conference for April 7, 2023, to discuss a scheduling conflict with the parties and to determine the necessity for an immediate emergency hearing.[5] In the hours preceding the scheduling conference, the State provided the parties and this Court with a new letter from Attorney General Labrador titled "Withdrawal of the March 27 Letter." *See Withdrawal Letter*, Dkt. 42-2. In this letter, the Attorney General explained that "[d]ue to subsequent events in the legislative process and my determination that your request was not one I was required to provide under Idaho law, [the Crane Letter] analysis is now void." *Id.* at 1. The Withdrawal Letter was signed and dated that same day. *Id.*

_____

[4] Although the Medical Providers broadly seek to enjoin "the enforcement of Idaho Code § 18-622(2) as interpreted by Attorney General Labrador[,]" *Plf.s' Motion* at 2, Dkt. 2, it appears that the actual relief sought is to enjoin the enforcement of Idaho's criminal abortion statute in a way that would prohibit doctors from providing information or referring women to legal out-of-state abortion services. *See also Compl.* at 18, Dkt. 1. While the Medical Providers provided ample argument regarding protected speech, its discussion on any legal activity outside of the state is sparse. Without sufficient briefing, the Court will focus on the interpretation's prohibition of referring women to legal out-of-state abortion services or providing information about said services.

[5] Based on the Court's schedule, it could not hold a hearing on the Medical Providers' motion until April 24, 2023, at the earliest. The Court gave the Medical Providers the option to have the motion heard by a visiting judge or to postpone a hearing until the earliest available date on the Court's calendar.

**MEMORANDUM DECISION AND ORDER - 6**

At the status conference, the Medical Providers stated that despite the withdrawal of the Crane Letter, they remained concerned about the threat of enforcement of Idaho's criminal abortion laws under that interpretation and maintained that they are still forced to withhold vital information and recommendations about legal abortion services. *See Gibron Suppl. Decl.* ¶ 8-9, Dkt. 35-2; *Gustafson Suppl. Decl.* ¶ 6-9, Dkt. 35-3; *Weyrich Suppl. Decl.* ¶ 6-7, Dkt. 35-4. While the Medical Providers opted to forgo an emergency hearing, the Court ultimately set an expedited briefing schedule for the preliminary injunction, which allowed the State an opportunity to file a motion to dismiss in conjunction with its response.[6] *See* Dkt. 39.

On April 14, 2023, the State filed a combined response and motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *See Def.s' Br.*, Dkt. 41-1. In its opposition and motion to dismiss, the State elected not to address the constitutionality of the Crane Letter interpretation. *Id*. Instead, the State focused entirely on this Court's Article III power, maintaining that the case should be dismissed under all three justiciability doctrines—standing, ripeness, and

---

[6] During the status conference, counsel for Attorney General Labrador indicated that a motion to dismiss may be forthcoming. Given the overlap in the "likelihood of success" analysis and a potential motion to dismiss, the Court found that hearing both motions together would promote judicial economy.

mootness—and that Attorney General Labrador is not a proper defendant because he is entitled to sovereign immunity. *Id.*

On April 20, 2023, the parties' pending motions were fully briefed in accordance with the expedited schedule set by the Court. *See* Dkt. 85. However, on April 21, 2023, the Friday before the oral argument was scheduled, St. Luke's Health System, Ltd. ("St. Luke's") and the States of Washington, Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Maine, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, and the District of Columbia (collectively the "Amici States") requested leave to file Amici Curiae briefs in support of the Medical Providers' motion for a preliminary injunction. *See* Dkts. 86 and 94. The Amici States also requested to be admitted pro hac vice without the designation of local counsel, as they did not seek to present an argument at the hearing. *See* Dkt. 93. The State opposed allowing both Amici to file their memoranda and the Amici States' request to have the local counsel requirement waived. *See* Dkts. 88, 96, and 97.

On April 24, 2023, the Court heard oral argument on the motion for a preliminary injunction, motion to dismiss, and addressed the Amicis' submitted memoranda. During the hearing, the Court granted St. Luke's and the Amici States' motions to file; however, the Court conditioned the Amici States pro hac

admission, and consideration of their memoranda, on obtaining local counsel before the following Thursday.[7] The Court also provided the State with additional time to file an opposition to the Amici States' memorandum due to the limited opportunity the State had to respond before the hearing.

Three days later, in addition to its opposition, the State asked the Court for leave to file supplemental briefing to address two specific issues. *See* Dkt. 106. First, the State wanted to address the impact of the Withdrawal Letter, which interpreted Attorney General Labrador's authority to prosecute violations of the criminal abortion statute. *Id.* at 3. Second, apparently regretting the choice to litigate the case "solely on the ground that no Article III controversy exists[,]" the State sought "the opportunity to brief the extent to which Plaintiffs' intended conduct here—counseling and referrals for out-of-state abortions—constitutes protected speech under the First Amendment." *Id.*

On May 2, 2023, the Court denied the State's motion for leave to file supplemental briefing reasoning that both issues could have been addressed in accordance with the original briefing schedule. *See May 2, 2023 MDO* at 2, Dkt. 114. This Court further explained that "Plaintiffs have waited several weeks for

_____

[7] The Amici States successfully obtained local counsel and were granted pro hac admission on April 27, 2023. *See* Dkt. 102.

urgent relief—due in part to the Court's calendar—and the Court will not impose further delay for matters that could and should have been brought sooner." *Id*. at 3.

Despite the Court rejecting the submission of supplemental briefing, the State proceeded to file three separate notices of supplemental declarations regarding the Court's subject-matter jurisdiction. *See* Dkts. 116, 117, and 121. In each notice, the State provided identical declarations from various county prosecutors claiming that they were submitted in "connection with the Court's 'independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.'" *Id*. (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). The Medical Providers soon after filed a motion to strike the supplemental declarations, claiming that they were non-compliant with the local rules, untimely, and irrelevant. *See* Dkt. 122.

Nonetheless, the State continued to present its defense in the following weeks. First, the Attorney General's Office filed a notice of appearance on behalf of another group of county prosecutors.[8] *See* Dkts. 123-25. Then, on March 9, 2023, that same group of prosecutors filed a separate motion to dismiss and

---

[8] Those individual county prosecutors included Adam McKenzie, Bear Lake County; Bryan Taylor, Canyon County; S. Douglas Wood, Caribou County Prosecutor; Justin Coleman, Nez Perce County Prosecutor.

response to the Medical Providers' preliminary injunction.[9] *See* Dkts. 127 and 128. The Attorney General's office then filed additional notices of appearance for various county prosecutors, additional declarations, and joinder notices.

All totaled, the State provided thirty-two identical declarations stating that, among other things, the individual prosecutors did not receive the Crane Letter until this litigation, did not regard the letter as guidance or a directive, and that none of the Medical Providers have a facility in their respective county. *See, e.g., Marshall Decl.* ¶¶ 2-4, 10, Dkt. 116-1; *Dunham Decl.* ¶¶ 2-4, 10, Dkt. 116-2; *Allen Decl.* ¶¶ 2-4, 10, Dkt. 116-3. Additionally, out of the 44 county prosecutors, all but three have joined in the March 9, 2023 motion to dismiss, *see* Dkts. 131, 135, and 145, and the Attorney General's Office now represents all but two of the county prosecutors. *See* Dkts. 36, 89, 103, 110, 118, 123, 134, and 142.

With that complex procedural background set out, the Court will now address The Medical Providers' motion to strike (Dkt. 122), and the competing motions for a preliminary injunction (Dkt. 2) and to dismiss (Dkt. 41). However, the Court will separately issue a ruling on the prosecutors' motion to dismiss (Dkt. 127), which will also address the various declarations filed by the State.

---

[9] While those prosecutors filed a separate motion to dismiss and response, both filings' supporting memorandums were identical.

## LEGAL STANDARD

The Medical Providers seek a preliminary injunction to enjoin Attorney General Labrador, the Idaho State Board of Medicine and Board of Nursing, and the Prosecuting Attorneys for each of Idaho's counties from enforcing Idaho Code § 18-622(2) under the interpretation presented in the Crane Letter. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Fraihat v. United States Immigration & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (citation omitted).

To obtain relief, the Medical Providers must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). As to the last two factors, "[w]here the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

"A district court has considerable discretion in granting injunctive relief and in tailoring its injunctive relief." *United States v. AMC Entm't, Inc.*, 549 F.3d 760,

768 (9th Cir. 2008). Generally, a court must ensure that the relief is "tailored to eliminate only the specific harm alleged" and not "overbroad." *E.&J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Conversely, the State seeks dismissal of this action under Federal Rules of Civil Procedure 12(b)(1). *See Def.s' Motion to Dismiss*, Dkt. 41. Rule 12(b)(1) provides that an action may be dismissed for lack of subject matter jurisdiction. Federal courts are of "limited jurisdiction[,]" and the plaintiff bears the burden to prove the requisite federal subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A facial 12(b)(1) motion involves an inquiry confined to the allegations in the complaint, whereas a factual 12(b)(1) motion permits the court to look beyond the complaint to extrinsic evidence. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). Where both jurisdictional and merits grounds are presented in a motion, the Court looks to the jurisdictional issues first. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

The State's attack here is factual, as it relies on extrinsic evidence (i.e., the

Withdrawal Letter and supporting declarations not in the pleadings) and does not assert a lack of subject-matter jurisdiction based solely on the pleadings. Thus, the Court may look beyond the complaint without converting the motion into one for summary judgment and need not presume the truthfulness of the allegations in the complaint. *White*, 227 F.3d at 1242.

## ANALYSIS

### A.   Post-Hearing Filings

As a threshold matter, the Court will address the various filings submitted after oral argument, including the Medical Providers' motion to strike, the various declarations from county prosecuting attorneys, the latest motion to dismiss, and the opposition to the motion for preliminary injunction. *See* Dkts. 116, 117, 121, 122, 127, and 128. For the reasons below, the Court will deny the Medical Providers' motion to strike but will refrain from considering the declarations until it renders a decision on the second motion to dismiss (Dkt. 127).

As noted, just days after the Court denied the State's request for leave to file supplemental briefing, the State began filing declarations from various county prosecutors without reference or connection to any pending motion. *See* Dkts. 116, 117, 121, 132, 133, 135, 139, and 146. In all, the State provided twenty-four "independent" declarations in connection with their jurisdictional arguments, *Id.*,

which the Medical Providers seek to strike.[10] *See* Dkt. 122.

To support their motion to strike, the Medical Providers argue that the State failed to seek leave to file the declarations and that they do not comply with the local rules, were untimely, and are irrelevant to the pending motions. *See Plf.s' Br.* at 2, Dkt. 122. In response, the State argues that no leave was required nor were the declarations untimely because they "relate to a matter of mandatory, rather than discretionary, consideration by the Court: the Court's subject matter jurisdiction." *Def.s' Response* at 2, Dkt 126.

While the Court generally agrees with the Medical Providers and would usually strike such untimely and non-compliant filings, in this instance, it concurs with the State. As the State accurately notes, courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party[,]" *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583 (1999)), and subject-matter jurisdiction "can never be forfeited or waived." *Id.* (quoting *United States v. Cotton,* 535 U.S. 625, 630 (2002)). After reviewing the identical

---

[10] Although the Medical Providers' motion to strike only pertains to the declarations filed before they filed their motion (Dkts. 116, 117, and 121), the Court assumes the motion is pertinent to all similarly filed declarations.

declarations, it appears that they may raise a factual dispute regarding the Court's jurisdiction over the various county prosecutors. Thus, it will deny the Medical Providers' motion to strike.

Nevertheless, the Court will refrain from considering those declarations until it issues a decision addressing the later filed motion to dismiss (Dkt. 127). A separate motion is a better means of addressing all the motions related to the individual county prosecutors because even though some prosecutors were listed on the first motion to dismiss and response, aside from a limited argument regarding service, the State made no attempt to differentiate between the Attorney General and the individual prosecutors.[11] More importantly, outside of a single generally applicable sentence in its reply brief, the State's arguments and exhibits are almost entirely focused on Attorney General Labrador. *See Def.s' Reply* at 5, Dkt. 85.

In fact, it was not until a group of county prosecutors filed a separate motion to dismiss on March 9, 2023—long after oral argument was held—that the State presented any argument focused on the county prosecutors. As a result, the Medical Providers could not substantively respond to the arguments and

_____

[11] As discussed below, the State has since waived any such service argument.

declarations regarding the individual prosecutors until that juncture. *See* Dkts. 127 and 128. As mentioned, since that second motion to dismiss was filed, all but three county prosecutors have joined in the motion.[12] By issuing a separate decision, the Court will be able to adequately address all the individual county prosecutors with the benefit of a more developed record to resolve the factual issues around jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (noting that where there are both jurisdictional and merits grounds, courts should look to the jurisdictional issues first); *see also LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) ("We must assure ourselves that Plaintiffs have standing and that jurisdiction otherwise exists before we review the merits of the district court's preliminary injunction decision[.]").

Accordingly, the Court will defer making any determinations on the individual county prosecutors. This decision will address only Attorney General Labrador.

### B.     Defendant-Specific Jurisdictional Challenges

---

[12] Of the three country prosecutors that have not joined in the second motion to dismiss, Justin Oleson, Custer County Prosecutor, and Richard Roats, Lincoln County Prosecutor, are not represented by the Attorney General's office, nor have they joined the State's original motion to dismiss.

The Court will begin with the State's defendant-specific jurisdictional challenges, which it claims "frustrate a complete adjudication of the Plaintiff's claims and show that a preliminary injunction would be both unlawful and ill-advised." *Def.s' Br.* at 6-7, Dkt. 41-1. Specifically, Defendants argue that the Medical Providers' claims against Attorney General Labrador are barred by the Eleventh Amendment and suffer from the lack of proper service over several country prosecutors. *See id*.

### 1. Eleventh Amendment sovereign immunity

The State first argues that the Medical Providers' suit against Attorney General Labrador is barred by sovereign immunity under the Eleventh Amendment "because he has no legal authority to institute the prosecutions that [the Medical Providers] claim to fear." *Id*. at 7. That argument is foreclosed under Ninth Circuit precedent.

The Eleventh Amendment has consistently been "construed to prohibit federal courts from entertaining suits brought by a state citizen against the state or its instrumentality in the absence of consent." *Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022) (quoting *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999)). But as both parties acknowledge, *Ex parte Young*, 209 U.S. 123 (1908) creates an exception for actions seeking "injunctive relief against

state officers in their official capacities for their alleged violations of federal law so long as the state officer has some connection with enforcement of the act." *Id*. (quoting *Coal. To Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012)) (internal citations omitted). The Ninth Circuit has recently explained that the "modest [connection] requirement" under *Ex parte Young* merely demands that the implicated state official have a relevant role that goes beyond "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *Id*. (quoting *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004)).

Applying this analysis, the Ninth Circuit has already affirmatively answered whether the *Ex parte Young* exception applies to Attorney General Labrador. *See Wasden* 376 F.3d at 919. In *Planned Parenthood of Idaho, Inc. v. Wasden*, the Ninth Circuit addressed a nearly identical argument that the Attorney General was not a proper defendant under *Ex Parte Young* because, without direct enforcement power, he was immune from suit. 376 F.3d at 919. Relying on the "assistance powers the attorney general expressly retains under revised section 67-1401(7)," the Ninth Circuit squarely rejected this argument. *Id.* at n.7. As the court explained:

> Under Idaho law, the attorney general may "assist" county prosecutors in a "collaborative effort," but may not "assert[ ] dominion and control" over prosecutions against the county prosecutor's wishes. *Newman v. Lance,* 129 Idaho 98, 922 P.2d 395, 399–401 (1996); *see*

*also* Idaho Code § 67–1401(7). Idaho's governor may also direct the attorney general to assist a local prosecutor. *Id.* § 67–802(7).

However, and determinatively here, unless the county prosecutor objects, "[t]he attorney general may, in his assistance, *do every act* that the county attorney can perform." *Newman,* 922 P.2d at 399 (quoting *State v. Taylor,* 59 Idaho 724, 87 P.2d 454, 457 (1939)) (emphasis added). That is, the attorney general may in effect deputize himself (or be deputized by the governor) to stand in the role of a county prosecutor, and in that role exercise the same power to enforce the statute the prosecutor would have. That power demonstrates the requisite causal connection for standing purposes. An injunction against the attorney general could redress plaintiffs' alleged injuries, just as an injunction against the Ada County prosecutor could. For the same reasons, both defendants are properly named under *Ex parte Young.*

*Id.* at 919–20.

To avoid this precedent, the State claims—in a single unsupported sentence—that *Wasden* is "no longer good law because it construed a prior version of the attorney general statute and the Supreme Court has now repudiated its past abortion cases, which had 'diluted the strict standard for facial constitutional challenges.'" *Def.s' Br.* at 8, Dkt. 41-1 (quoting *Dobbs*, 142 S. Ct. at 2275); *see also Def.s' Reply* at 3, Dkt. 85. The Court is unpersuaded.

While the State accurately notes that Idaho Code § 67-1401 has undergone amendments since *Wasden*, the assisting language in the statute that the Ninth Circuit relied on remains unchanged. *Compare Id.* ("[w]hen required by the public service, [he is] to repair to any county in the state and assist the prosecuting

attorney thereof in the discharge of duties.") (quoting I.C. § 67-1401(7) (2003))

*with* I.C. § 67-1401(7) (same). Thus, the subsequent changes to the statute have no

effect on the reasoning in *Wasden*, nor do they call into question its holding.

Further, the State has failed to explain why *Dobbs* would somehow render

the Ninth Circuit's Eleventh Amendment analysis in *Wasden* inapplicable. Nor can

it. Under the applicable standard, Ninth Circuit precedent is "effectively overruled"

when "the reasoning or theory of our prior circuit authority is clearly irreconcilable

with the reasoning or theory of intervening higher authority." *Miller v. Gammie*,

335 F.3d 889, 890, 893 (9th Cir. 2003) (en banc). "The clearly irreconcilable

requirement is a high standard." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th

Cir. 2018) (quotation omitted). "[I]t is not enough for there to be some tension

between the intervening higher authority and prior circuit precedent, or for the

intervening higher authority to cast doubt on the prior circuit precedent." *Id.*

(quotation omitted).

Although the precedential effect is unquestionable, *Dobbs* does not abrogate,

or even call into question, *every* aspect of *every* case involving an abortion statute.

*See Def.s' B.* at n.4, Dkt. 41-1. This is especially true where, like here, the issue at

hand is a general principle that far exceeds the scope of *Dobbs* or even abortion

cases generally. That is, the sovereign immunity analysis hinges on a state actor's

connection or ability to enforce a law regardless of the law's subject matter.[13] Notably, *Dobbs* does not even address a sovereign immunity argument. Simply put, the Court has no reason to find that the sovereign immunity analysis in *Wasden* is irreconcilable with the Supreme Court's decision in *Dobbs*.

Accordingly, the Court finds, as the Ninth Circuit did in *Wasden*, that Attorney General Labrador is not entitled to Eleventh Amendment immunity under *Ex parte Young*. *See* 376 F.3d at 919.

### 2. Service

The State argues that there is no personal jurisdiction over certain prosecutors, claiming that the Medical Providers have "properly served some of the county prosecutors, but for others, [they have] failed to follow the service requirements[.]" *Def.s' Br.* at 10; Dkt. 41-1. The State, however, waived any service arguments. *See Def.s' Reply* at n.1; Dkt 85; Dkt. 138 ("the undersigned County Prosecutor Defendants wish to clarify that they agreed that they would not contest that they were served as of the date reflected on the docket, provided that

_____

[13] Although *Wasden* is an abortion case, the Eleventh Amendment analysis was based on the Attorney General's connection to the enforcement of a criminal statute; the subject matter of the challenged statute did not have any effect on the Court's reasoning. Thus, while *Wasden* is particularly relevant to the case at hand, that is not because the underlying challenges in both cases relate to abortion statutes. Rather it is because both focus on the language of Idaho Code § 67-1401(7) and the application of the "assisting" power of the Attorney General.

Plaintiffs agreed that their deadline to respond to the complaint would be 21 days from April 28, 2023.") Further, as discussed, the Court has already deferred ruling on the individual prosecutors. Therefore, the Court need not address service.

### C.    Article III Jurisdiction

The State argues that this case exceeds the Court's Article III authority. Although the justiciability concepts are intertwined, the State appears to challenge the Court's jurisdiction under all three requirements: standing, ripeness, and, to some extent, mootness. The Court will address each in turn.

#### 1.  Standing

Article III of the United States Constitution limits a federal court's exercise of judicial power to "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). As such, suits for declaratory or injunctive relief must present a live controversy justiciable under Article III. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007) (declaratory judgment); *L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (injunctive relief). The doctrine of standing gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014).

"To establish Article III standing, a plaintiff must show (1) an injury in fact,

(2) a sufficient causal connection between the injury and the conduct complained

of, and (3) a likelihood that the injury will be redressed by a favorable decision."

*Id*. (cleaned up). "Each element of standing 'must be supported with the manner

and degree of evidence required at the successive stages of the litigation.'" *Unified*

*Data Servs., LLC v. Fed. Trade Comm'n*, 39 F.4th 1200, 1209 (9th Cir. 2022)

(quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).[14]

First Amendment challenges, like the Medical Providers' pre-enforcement

challenge here, "present unique standing considerations" such that "the inquiry tilts

dramatically toward a finding of standing."[15] *Tingley v. Ferguson*, 47 F.4th 1055,

1066–67 (9th Cir. 2022) (quoting *Lopez*, 630 F.3d at 781) (internal quotation

marks omitted). That is so because "a chilling of the exercise of First Amendment

---

[14] In this matter, there is a different standard applied to the two pending motions. In the context of a motion to dismiss, "[w]hen the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with competent proof, under the same evidentiary standard that governs in the summary judgment context." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (cleaned up). That is, "[t]he plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.* (citations omitted). "[A]t the preliminary injunction stage, a plaintiff must make a 'clear showing' of his injury in fact." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (citing *Winter v. Natural Resources Def. Council, Inc.,* 555 U.S. 7, 23 (2008)).

[15] Although the Medical Providers raise First Amendment, Fourth Amendment, and dormant commerce-clause challenges, the parties' briefing predominately discusses jurisdiction in the context of the First Amendment and makes no specific arguments based on the individual claims. Additionally, as discussed below, the Medical Providers established a likelihood of success on their First Amendment claim, and the Court need not address the remaining claims. Thus, the Court will only address standing in the context of the First Amendment.

---

rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013); *see also Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010) ("[W]hen a challenged statute risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements and recognized 'self-censorship' as a harm that can be realized even without an actual prosecution.") (citations and internal quotation marks omitted).

Here, as with many First Amendments challenges, one of the key issues is determining whether there is a genuine threat of prosecution sufficient to establish an injury-in-fact. As the parties correctly note, to "determine whether a threat of enforcement is genuine enough to confer an Article III injury[,]" the Ninth Circuit applies the three-factor *Thomas* test: "(1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement.'" *Tingley*, 47 F.4th at 1066-67 (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).

The State has only challenged the injury-in-fact element of standing and, more specifically, whether there is a genuine threat of prosecution. *See Def.s' Br.*

at 12-21, Dkt. 41-1. In particular, the State argues that the Medical Providers cannot establish an injury because the Crane Letter was withdrawn, and even before the letter was withdrawn, they still did not have a cognizable injury. *See id.* Because it would be impossible for the Medical Providers to meet the injury-in-fact requirement without establishing that there is a genuine threat of prosecution under the Crane Letter interpretation, the Court will begin there.

> a.  *The Medical Providers have standing to bring their First Amendment claim against Attorney General Labrador under the Crane Letter interpretation.*

Mirroring the three-factor *Thomas* test, the State claims that even before the withdrawal of the Crane Letter—i.e., at the time this lawsuit was filed—the Medical Providers lack a cognizable injury because (1) they have not shown an intention to violate the law, (2) no one had threatened them, and (3) the law's enforcement history does not support an injury. *See Def.s' Br.* at 16-21, Dkt. 41-1. As discussed below, the Court finds that the Crane Letter and its interpretation of Idaho's criminal abortion statute is sufficient to establish standing under the less stringent requirements applied in First Amendment cases.

> i.  *The Medical Providers have already violated the Crane Letter interpretation of I.C. 18-622.*

The State first challenges whether the Medical Providers have sufficiently demonstrated an intent to violate Idaho's criminal abortion statute as interpreted by

the Crane Letter. *See Def.s' Br.* at 19, Dkt. 41-1. The State claims that the Medical Providers' nondefinitive statements fail to meet the first *Thomas* element because the complaint does not provide specific details "such as[,] when, to whom, where, or under what circumstances" they intend to violate the law in the future. *Id.* (quoting *Lopez*, 630 F.3d at 787). The State views the first *Thomas* element too narrowly.

As the Medical Providers correctly note, the Ninth Circuit has expressly rejected the proposition that a plaintiff must specify "when, to whom, where, or under what circumstances" he plans to violate a challenged law if a plaintiff has "already violated the law in the past." *Tingley*, 47 F.4th at 1068 (citing *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 836 (9th Cir. 2012)); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1123 (9th Cir. 2009) (finding that, "although the Appellees cannot control when a patient requesting Plan B will visit their pharmacy—prompting a refusal constituting a violation of the new rules—the Appellees can point to specific past instances when they have refused to sell Plan B or have made the decision not to stock the medication, which are direct violations of the challenged rules[,]" satisfying the concrete plan requirement.).

Like the plaintiffs in *Tingley v. Ferguson* and *Stormans, Inc. v. Selecky*, the Medical Providers "cannot control when a [patient] will come to [them]" seeking

medical advice that presents a set of circumstances warranting a referral or information regarding legal out-of-state abortion resources. *See Tingley*, 47 F.4th at 1068. However, the Medical Providers have sufficiently alleged that they have already provided care that would violate Idaho's abortion statute under the Crane Letter's interpretation. Indeed, the State all but concedes this point. *See Def.s' Br.* at 19-20, Dkt. 41-1.

The State summarizes the declarations supporting the Medical Providers' preliminary injunction as follows:

> A Planned Parenthood executive declares that Idaho Planned Parenthood facilities generally referred women to abortion providers in other states after *Dobbs* but stopped doing this when they learned about the Crane Letter. Dkt. 2-2 ¶¶ 12–14. But the executive does not say that these facilities plan to continue referring women for out-of-state abortions now or at any time in the future or when other providers will refer women for abortions out of state.
>
> Plaintiff Gustafson likewise asserts that she was referring women for out-of-state abortions before the Crane Letter's issuance and has since stopped doing so. *See* Dkt. 2-3 ¶¶ 12–18. But she never declares a specific intention to continue referring women for out-of-state abortions in any specific circumstances. *See generally,* Dkt. 2-3 (Gustafson Decl.).
>
> Plaintiff Weyhrich's declaration is even weaker. He asserts that he has not referred *any* women for out-of-state abortions since *Dobbs* but that it would be his "typical practice" to do so if the situation arose—and if the Crane Letter didn't exist. Dkt. 2-4 ¶¶ 12, 15.

*Id*. The State thus acknowledges that the Medical Providers previously made

referrals to out-of-state abortion services but have stopped since the Crane Letter. Further, following the Medical Providers' explanation of their past violations in their response, the State elected not to challenge their contentions. *See Def.s' Reply*, Dkt. 85.

The Court finds that Planned Parenthood, Dr. Gustafson, and Dr. Weyhrich have sufficiently demonstrated that prior to the Crane Letter, they referred patients to out-of-state abortion providers or provided related information and assistance and that they no longer will.[16] *See Gibron Decl.* ¶¶ 11-14, 17, and 24, Dkt. 2-2; *Gibron Suppl. Decl.* ¶¶ 8-9; Dkt. 35-2; *Gustafson Decl.* ¶¶ 6, 12, 13, and 15-18, Dk. 2-3; *Gustafson Suppl. Decl.* ¶¶ 7-9, Dkt. 35-3; *Weyhrich Decl.* ¶¶ 6, 9, and 11-17, Dkt. 2-4; *Weyhrich Suppl. Decl.* ¶¶ 6-7, Dkt. 35-4; *Compl.* ¶¶ 40-41, Dkt. 1. Thus, the first *Thomas* element is satisfied.

> ii. *Threat of enforcement against the Medical Providers.*

The State next argues that the Medical Providers lack a concrete injury

---

[16] While the Court recognizes that declarations could have provided more specific statements about the instances in which they provided information about or a referral to an out-of-state medical facility, based on the State's lack of objection and the nature of such conversations, the Court finds the declarations sufficient to establish standing at this stage of litigation. In particular, the Court finds that Dr. Gustafson's declarations provided the clearest depiction of her prior violations and the chilling effect of the Crane Letter, which is sufficient to establish standing in this matter. *See Wasden*, 376 F.3d at 918 (noting that where one plaintiff has standing to bring suit, the court need not consider the standing of the other plaintiffs).

because the complaint fails to identify a "specific warning or threat" of enforcement of Idaho law against them or anyone else. *See Def.s' Br.* at 18, Dkt. 41-1; *Def.s' Reply* at 5, Dkt. 85. The State first argues that the Crane Letter cannot satisfy the threat requirement because it "was sent to one legislator as private legal advice [and] it was not published by the Attorney General or offered as guidance in any capacity." *Def.s' Br.* at 18, Dkt. 41-1. Second, the State claims that there is no threat here because the Attorney General lacks any authority to direct the county prosecutors or prosecute violations of the criminal abortion law. *Id.* The Court is again unpersuaded.

The State's first claim ignores the reality of the circumstances. Even if the Crane Letter was intended as "private legal advice," the letter was promptly disseminated and became widely available to the general public. *See Def.s' Reply* at 5, Dkt. 85. Moreover, while the State tries to diminish the letter's significance by framing it as akin to any attorney providing advice to any client, it cannot be ignored that this letter was issued and *signed* by Attorney General Labrador— Idaho's chief legal officer—and was sent to a member of the Idaho Legislature. More importantly, this letter contained an expressed interpretation of Idaho's criminal abortion statute, which is the only available written interpretation of the statute, public or not, by Attorney General Labrador. The State's argument that the

Crane Letter was not an "official" statement does not negate the effect of the letter.

The State's second argument is essentially a recitation of its claim that Attorney General Labrador is entitled to sovereign immunity. *Def.s' Br.* at 18, Dkt. 41-1. Like that claim, *Wasden* is similarly dispositive on this issue.

In *Wasden*, the Ninth Circuit found that the Attorney General's prosecuting power not only satisfied "*Ex parte Young* with regard to the exposure to the risk of prosecution[,]" but "demonstrate[d] the requisite causal connection for standing purposes." *See Wasden*, 376 F.3d at 920. Moreover, the Ninth Circuit has consistently noted that "Article III justiciability and Eleventh Amendment analysis present 'a closely related—indeed, overlapping—inquiry[.]'" *See Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999) (quoting *Okpalobi v. Foster,* 190 F.3d 337, 347 (5th Cir.1999)) ("We have no difficulty, however, concluding that the requisite "connection" [for the *Ex parte Young* exception] exists here for the same reasons that the union has demonstrated that a case and controversy exists."); *see also Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022) ("The question of whether there is the requisite 'connection' between the sued official and the challenged law implicates an analysis that is 'closely related—indeed overlapping'—with the traceability and redressability inquiry already discussed.'"). Accordingly, for the reasons previously given, the Court

rejects the argument that the Medical Providers do not have standing because Attorney General Labrador lacks the authority to prosecute.

The State's corollary argument that the threat of prosecution is too general presents the strongest challenge to the Medical Providers' standing. The State generally claims that the threat of enforcement must be "particular to the plaintiff[,]" and because the Crane Letter was "wholly generalized[,]" the Medical Providers do not have standing. *Id*. (quoting *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*, 402 F. Supp. 3d 978 (W.D. Wash. 2019)). Although a closer call, as discussed below, the Medical Providers' self-censorship, which is based on a well-founded fear of enforcement, satisfies the second *Thomas* prong.

As the Ninth Circuit has explained, "in the context of pre-enforcement challenges to laws on First Amendment grounds, a plaintiff 'need only demonstrate that a threat of potential enforcement will cause him to self-censor'" to satisfy the "second prong of the *Thomas* inquiry[.]" *See Tingley*, 47 F.4th at 1068 (quoting *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014)).[17] "[W]here a plaintiff has refrained from engaging in expressive activity for fear of

---

[17] There is little doubt, and the State does not contest, that the Medical Providers have refrained from referring patients to out-of-state abortion providers since the Crane Letter and its interpretation. *See Gibron Suppl. Decl.* ¶¶ 8-9, Dkt. 35-2; *Gustafson Decl.* ¶¶ 17-18, Dk. 2-3; *Weyhrich Decl.* ¶¶ 14-17, Dkt. 2-4.

prosecution under the challenged statute, such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Human Life*, 624 F.3d at 1001 (citations and internal quotations omitted).

In *Tingley*, the plaintiff, who was a licensed marriage and family therapist, challenged Washington's ban on practicing conversion therapy on minors under the First Amendment. 47 F.4th at 1066. Similar to this case, the plaintiff sought a preliminary injunction, and the defendants filed motions to dismiss. *Id*. After recognizing the relaxed standard for standing in the First Amendment context, the Ninth Circuit held that "Washington's general warning of enforcement coupled with [plaintiff's] self-censorship in the face of the law satisfy the second prong of the *Thomas* inquiry for standing." *Id*. at 1068. The court explained that even though the defendants never issued a "warning or threat of enforcement to [the plaintiff,]" the government's failure to disavow enforcement of the challenged law weighed in favor of standing. *Id*.

The Court also looks to the Supreme Court's recent decision in *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023), which raised these same standing issues. In that case, the plaintiff, Lorie Smith, offered "website and graphic design, marketing advice, and social media management services" and "decided to expand

her offerings to include services for couples seeking websites for their weddings."
*Id.* at 2308. Although she "has yet to carry out her plans" to offer wedding website services, Ms. Smith became concerned that "if she enters the wedding website business . . . she faces a credible threat that Colorado will seek to use [the state's anti-discrimination statute] to compel her to create websites celebrating [homosexual] marriages she does not endorse." *Id.* at 2309. The Tenth Circuit held that Ms. Smith had standing because "she had established a credible threat that, if she follows through on her plans to offer wedding website services, Colorado will invoke CADA to force her to create speech she does not believe or endorse." *Id.* at 2310. Although the Supreme Court did not specifically address the standing issue—noting only that "no party challenges th[e] conclusion" that Ms. Smith had standing—the silence is instructive, since even the Supreme Court's jurisdiction is constitutionally limited to cases where plaintiffs have standing. *303 Creative* therefore underscores the low threshold for establishing standing for pre-enforcement First Amendment claims.

      Like the plaintiffs in *Tingley* and *303 Creative*, the Medical Providers' self-censorship is sufficient for standing. The Medical Providers' speech falls within the reach of Idaho's criminal abortion statute for purposes of this challenge. *See, e.g.*, *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)

("In the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach."). While referrals to out-of-state abortion services—the intended speech being chilled—may or may not facially fall within the ambit of Idaho's criminal abortion statute, Attorney General Labrador's own interpretation reveals that the intended speech falls directly in the crosshairs of the conduct prohibited by the statute. *See Lopez*, 630 F.3d at 786) (We have also considered a third factor, whether the challenged law is inapplicable to the plaintiffs, either by its terms or *as interpreted by the government*.") (emphasis added).

The Crane Letter unambiguously states that "Idaho law prohibits an Idaho medical provider from either referring a woman across state lines to access abortion services[,]" and any "Idaho health care professional who refers a woman across state lines to an abortion provider . . .  has given support or aid to the woman in performing or attempting to perform an abortion and has thus violated the statute." *See Crane Letter* at 2, Dkt. 1-1. Each of the Medical Provider Plaintiffs easily fall within the broad category of "medical provider." Moreover, the speech they say is chilled is the exact speech criminalized under the Attorney General's interpretation of the statute. *See Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (noting that "it is 'sufficient for

standing purposes that the plaintiff intends to engage in a course of conduct

arguably affected with a constitutional interest and that there is a credible threat

that the challenged provision will be invoked against the plaintiff") (quoting *LSO,*

*Ltd. v. Stroh,* 205 F.3d 1146, 1154–55 (9th Cir. 2000)).

Moreover, the Medical Providers have standing because although the Crane

Letter was not sent to them directly, it is more than a mere general warning about

enforcing Idaho's criminal abortion statute. Rather, the Crane Letter's

interpretation applies to only a small subset of individuals in the state—medical

providers who wish to refer individuals to legal out-of-state abortion services.

Thus, while the Medical Providers were not individually sent the Crane Letter, the

letter is targeted to them insofar as they belong to that small group of individuals

who would be subject to criminal prosecution and licensure action under the

letter's interpretation of the law.

Finally, the State's failure to disavow the Crane Letter interpretation also

weighs in favor of standing. *See, e.g., LSO, Ltd.*, 205 F.3d at 1155 ("Courts have

also considered the Government's failure to disavow application of the challenged

provision as a factor weighing in favor of a finding of standing."). The State claims

that the Ninth Circuit disavowal cases such as *LSO, Ltd. v. Stroh,* 205 F.3d 1146

(9th Cir. 2000) are not applicable because they concern situations where operative

state law prohibits the plaintiff's conduct, whereas here the Medical Providers do "not contend that the law as written prohibits their conduct (in fact, they contend the opposite)." *Def.s' Reply* at 6, Dkt. 85 (citing *Compl.*, ¶ 40, Dkt. 1 and *Plf.s' Br.* at 4-5, Dkt. 2-1).

While it is not exactly clear what the State is arguing, the State nonetheless misconstrues the Medical Providers' claim. The Medical Providers have not asserted that Idaho's criminal abortion statute allows or provides an exception for their intended speech. Rather, the Medical Providers are arguing that the Crane Letter's interpretation of Idaho's criminal abortion statute unconstitutionally prohibits their speech. In this respect, the Medical Providers' claim mirrors a run-of-the-mill First Amendment pre-enforcement challenge. Adopting the State's theory would essentially eliminate standing in all First Amendment disavowal cases, which is clearly not supported by the Ninth Circuit's prior decisions.

The State further argues that to the extent the disavowal cases apply, they refute standing because the Crane Letter "is not operative, having been 'withdrawn' and rendered 'void in its entirety.'" *Def.s' Reply* at 6, Dkt. 85 (quoting *Withdrawal Letter* at 1-2), Dkt. 85. While, as discussed below, the Withdrawal Letter is better analyzed under the mootness doctrine, a close examination of the

Withdrawal Letter refutes the State's assertion.[18]

The Withdrawal Letter offers two reasons why the Crane Letter "is void in its entirety [and] does not represent the views of the Attorney General on any question of Idaho law." *Withdrawal Letter* at 2, Dkt. 42-4. First, it claims that the letter's analysis is moot because "it relates to a law that has been significantly altered by intervening legislation[,]" which also "vitiates the 'question of law' upon which you asked me to opine, rendering the letter void." *Id.* at 1. Second, the Withdrawal Letter claims that "further examination of [Representative Crane's] request suggests it was not an authorized request for an Attorney General's Opinion[,]" because he was merely acting as a pass-through requestor. *Id.*

The problem is that Attorney General Labrador's asserted reasons for withdrawing the Crane Letter are procedural—not substantive.[19] Moreover, the Withdrawal Letter lacks any substantive discussion regarding the challenged interpretation, was provided only hours before the first status conference in this

---

[18] The Court acknowledges that the disavowal line of cases arguably diverges from the general proposition that standing should be determined as of the date a complaint is filed, which is discussed in much greater depth below. However, given the breadth of case law applying both concepts, it is not the place of this Court to ignore Ninth Circuit precedent. *See Am. C.L. Union of Nev. v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006).

[19] As discussed in depth below, the Court is unpersuaded by the State's claim that the law has been significantly altered by intervening legislation.

matter, and makes no affirmative statements about future prosecution. *See Withdraw Letter*, Dkt. 42-4. Indeed, the letter is best characterized as "a mere litigation position[.]" *Lopez*, 630 F.3d at 788 ("[o]f course, the government's disavowal must be more than a mere litigation position.") (citing *Am. Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991)). Accordingly, the Withdrawal Letter is not a disavowal under Ninth Circuit precedent.[20]

Finally, if there is any lingering doubt, the State's counsel unambiguously confirmed that it has *not* disavowed the Crane Letter during oral argument:

> The Court: Well, just to be clear you not only on behalf of the Attorney General but also the prosecuting attorneys that you represent, there is still no disavowal of the legal analysis or conclusion drawn in letter; correct?
>
> Mr. Wilson: Your Honor, I'd say that that is – it's correct.

---

[20] *Compare Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996) (finding the statement that the Attorney General's office "has not brought or indicated that it would bring any action" falls short of a disavowal of enforcement where the "Attorney General of California has *not stated affirmatively* that his office will not enforce the civil statute.") (emphasis added), *and Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999) ("[w]e do not agree with the state that the attorney general's subsequent disavowal of her authority can be construed to eliminate either the 'credibility,' the 'genuineness,' or the 'effectiveness' of her threat.") *with Lopez*, 630 F.3d at 792 (finding that a supervising official's statement "that no action will be taken against student for expressing their opinions is entitled to significant weight, and vitiates [plaintiff's] claim that he faces a credible threat of enforcement") *and Johnson v. Stuart,* 702 F.2d 193, 195 (9th Cir.1983) (finding plaintiffs did not have standing where the Oregon Attorney General and the school district's counsel "repeatedly disavowed any interpretation of [the statute] that would make it applicable in any way to teachers.").

*Transcript of Oral Argument* at 39, Dkt. 148. Accordingly, the Court finds that the State's refusal to disavow the Crane Letter interpretation weighs in favor of standing. *See Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) ("That the federal government has not disavowed enforcement of the Offset Provision is evidence of an intent to enforce it.").

The Court recognizes that this case presents a unique set of circumstances, and one that does not lend itself to a simple answer. However, the Medical Providers' decision to self-censor their speech was, at the very least, reasonable at the time this lawsuit was instigated. On April 5, 2023, it is undisputed that a letter signed by Idaho's chief legal officer unequivocally interpreted Idaho's recently enacted criminal abortion statute to prohibit medical providers from "referring a woman across state lines to access abortion services[.]" This letter was made available to the general public, and to the best of this Court's knowledge, was the first, and only, written interpretation of Idaho Code § 18-622 issued by any Idaho legal officer. Then, when this "private" letter became public, the Office of the Attorney General apparently declined to take any affirmative action to withdraw it or denounce its interpretation. Rather, it was only after this lawsuit was filed that Attorney General Labrador withdrew the letter, however, doing so on what can only be considered procedural and non-substantive grounds. To this day, the

Attorney General has refused to disavow the letter's interpretation or affirmatively state that Idaho's criminal abortion statute will not be enforced in such a manner.

For all these reasons, the Court finds that the Medical Providers' claims of self-censorship, coupled with the Crane Letter's interpretation of Idaho's criminal abortion statute, is sufficient to meet the second prong of the *Thomas* test. 220 F.3d at 1139. Simply put, the Medical Providers should not be required "to speak first and take their chances with the consequences." *Lopez*, 630 F.3d at 785 (citations omitted).

### iii. The enforcement history of Idaho's criminal abortion statute is entitled to little weight.

The State finally claims that absent evidence of past enforcement of "Idaho Code § 18-622(2) on the theory described in the Crane Letter," the Medical Providers have failed to show a genuine threat of prosecution. *Def.s' Br.* at 21, Dkt. 41-1. The State is incorrect. The history of enforcement has "'little weight' when the challenged law is 'relatively new and the record contains little information as to enforcement or interpretation.'" *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010)).

Here, only nine days passed between the issuance of the Crane Letter and the filing of this lawsuit. The Court therefore gives minimal, if any, weight to the

sparse enforcement history of Idaho's criminal abortion statute as interpreted by the Crane Letter. *See Tingley*, 47 F.4th at 1066 (finding that the sparse enforcement history in the three years between the enactment of the challenged statute and the litigation was "not dispositive.").[21]

Because the Court has determined that the first two *Thomas* factors are satisfied, and the third factor carries little weight, the Medical Providers have sufficiently demonstrated that they have standing to bring their First Amendment claim against Attorney General Labrador. *See id.*

> b. *The Withdrawal Letter should be analyzed under the mootness doctrine.*

The State also says that the Withdrawal Letter unequivocally eliminates any alleged threat of prosecution. *See Def.s' Br.* at 12-16, Dkt. 41-1. First, the State argues that following the Withdrawal Letter, the Medical Providers cannot show an imminent threat of prosecution since "the voidance of the [C]rane [L]etter returns [them] to their pre-March 27 position[,]" and the only cause of concern in the complaint is the Crane Letter. *Id.* at 13. Second, the State contends that the Medical Providers cannot maintain their threat of future injury because the

---

[21] Even considering the enforcement history of Idaho's criminal abortion statute as a whole, the Court finds the third factor is still entitled to little weight. Idaho Code § 18-622 has been in effect for less than a year, which is still considerably less than the three years in *Tingley*.

Withdrawal Letter clarifies that the Crane Letter "does not represent the views of the Attorney General on any questions of Idaho law." *Id*. at 13-14 (quoting *Withdrawal Letter* at 2).

By continuously referencing a threat of prosecution and citing cases discussing the *Thomas* test, the State appears to conflate standing—and, as discussed below, ripeness—with mootness. The Supreme Court has noted that "[s]uch confusion is understandable, given the Court's repeated description of mootness as 'the doctrine of standing set in a time frame[;]'" however, standing must exist—and is determined—at the commencement of the litigation. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see also Yamada v. Snipes*, 786 F.3d 1182, 1203–04 (9th Cir. 2015) ("As with all questions of subject matter jurisdiction *except mootness*, standing is determined as of the date of the filing of the complaint. . . . The party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint to establish its standing."") (quoting *Wilbur v. Locke,* 423 F.3d 1101, 1107 (9th Cir. 2005)) (emphasis added). By comparison, mootness is properly invoked when a party challenges the Court's Article III power because of some event that occurs during the pendency of a lawsuit. *Id*.; *see also Lomax*, 471 F.3d at 1016 ("Whereas standing is evaluated by the facts that existed when the complaint was filed,

mootness inquiries, however, require courts to look to changing circumstances that arise after the complaint is filed.") (cleaned up). In other words, "[s]tanding and mootness are similar doctrines. . . . Yet, the doctrines have important differences." *Jackson v. California Dep't of Mental Health*, 399 F.3d 1069, 1072-73 (9th Cir.), *opinion amended on reh'g sub nom. Jackson v. CA Dep't of Mental Health*, 417 F.3d 1029 (9th Cir. 2005).[22]

Here, the Medical Providers sued before the Withdrawal Letter had been authored or delivered. Accordingly, the effect of the Withdrawal Letter, whatever it may be, is not a question of standing but rather of mootness, and the State's claim that "the withdrawal of the Crane Letter defeats Plaintiffs' Article III standing" is misplaced. *Def.s' Br.* at 15, Dkt. 41-1. Even more importantly, although standing and mootness both demand a live case or controversy, "sometimes a case may not be moot even if the plaintiff would not have standing to bring it today." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1109 (9th Cir. 2020); *see also TOC*, 528

---

[22] The Court recognizes the condensed timeline of the conduct in this case raises issues that usually "arise later in the case, when the federal courts are already involved and resources have already been devoted to the dispute[,]" *id.*, it will not however attempt to draw an arbitrary line of when an issue should be analyzed under mootness or standing but rely on the clear statement that standing is analyzed based on "facts that existed when the complaint was filed." *Lomax*, 471 F.3d at 1016.

U.S. at 190 ("the plain lesson is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."). Therefore, the Court will address the Withdrawal Letter under the doctrine of mootness rather than standing.

> c. *The Medical Providers have not established they have standing to bring their motion against the Idaho State Board of Medicine or Board of Nursing.*

As mentioned, the Medical Providers' motion for a preliminary injunction not only seeks to enjoin Attorney General Labrador, but also the Idaho State Board of Medicine and Board of Nursing. *See Plaintiff's Motion*, Dkt. 2. However, as also discussed, the briefing almost entirely focused on the Attorney General. In fact, the Medical Providers provided no discussion, analysis, or factual information regarding standing for their claims against the Board of Medicine or Board of Nursing. Further, the Medical Providers failed to explain what authority either board has to prosecute or enforce violations of Idaho's criminal abortion statute. The Medical Providers therefore failed to make a clear showing that they have standing to bring their claims against the Board of Medicine or Board of Nursing. *See Lopez*, 630 F.3d at 785. Accordingly, the Court will deny the Medical Providers' motion as it relates to the Idaho State Board of Medicine and the Idaho

State Board of Nursing.

### 2. Ripeness

Although the State intertwines its justiciability arguments, it also contends that the Medical Providers' "case is infected with serious ripeness issues." *Def.s' Reply* at 7, Dkt. 85. The ripeness analysis is separated into constitutional and prudential components. *Twitter, Inc. v. Paxton,* 56 F.4th 1170, 1173 (9th Cir. 2022).[23]

Here, the constitutional component is met because that component "is synonymous with the injury-in-fact prong of the standing inquiry[,]" which the Court has determined is satisfied. *Twitter*, 56 F.4th at 1173 (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003)). Accordingly, the Court uses two interrelated considerations to evaluate whether to exercise jurisdiction under the prudential ripeness component. *Stormans*, 586 F.3d at 1126. Those guiding considerations "are the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Tingley*, 47 F.4th at 1070 (quoting *Thomas*, 220 F.3d at 114). Like standing, the ripeness requirements

---

[23] Although the Medical Providers hint at the fact that recent Supreme Court cases demonstrate disapproval of the prudential requirement, the Ninth Circuit continues to apply the dual constitutional and prudential components. *See, e.g.*, *Twitter*, 56 F.4th at 1173; *Tingley*, 47 F.4th at 1070.

are applied "less stringently in the context of First Amendment claims." *Twitter*, 56 F.4th at 1174 (quoting *Wolfson*, 616 F.3d at 1058).

The fitness prong is met when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Tingley*, 47 F.4th at 1070. Relevant considerations for a court include "whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 752 (9th Cir. 2020) (quoting *Stormans*, 586 F.3d at 1126).

The State first argues that the Medical Providers cannot meet the fitness prong because the Crane Letter "is not 'final'—it is void and withdrawn[,]" never had the status of law, did not require the Medical Providers to comply in any way, and the issues raised in this case "are *not* primarily legal and *will* require further factual development. *See Def.s' Reply* at 7-8, Dkt. 85 (emphasis original). The Court is not persuaded.

While the State is correct that the Crane Letter did not have the status of law, it was a "definitive statement of an agency's position[.]" *Skyline Wesleyan Church*, 968 F.3d at 752. Additionally, the letter expressly interpreted the law to prohibit

certain, specific conduct. Thus, even though the letter did not expressly demand "compliance," it put the Medical Providers in a corner: they could only avoid violating a criminal statute—as interpreted by Attorney General Labrador—by immediately changing the care they provide to patients.

Importantly, the issues raised in this matter are primarily legal and do not need significant factual development. The Medical Providers' claim is limited in scope and only asks whether it is constitutional to prevent a medical provider from referring a patient to legal out-of-state abortion services.[24] Really, the only "hypothetical question" is whether the statute will be enforced as interpreted by Attorney General Labrador. But the Court has already concluded there is a genuine threat of enforcement. Finally, although the State repeatedly asserts that the Crane Letter is "void" because of the Withdrawal Letter, that contention ignores the dispositive fact that the Withdrawal Letter had not been issued when this lawsuit was filed. *See Yamada*, 786 F.3d at 1203-04 ("Ripeness, like standing, is determined as of the date of the filing of the complaint.").

The second prudential prong similarly favors jurisdiction. "To meet the

---

[24] The Court recognizes that each claim should usually be addressed individually, but given the limited challenge, the significant overlap, and the parties' failure to differentiate between claims, the Court finds that an analysis of the prudential component regarding each claim is unnecessary.

hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Stormans*, 586 F.3d at 1126 (quoting *US West Commc'ns v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1118 (9th Cir. 1999)).

Here, the hardship requirement is easily met. If the Medical Providers do not prevail in this lawsuit, they will suffer the very injury they assert—they will be forced to choose between facing criminal penalties themselves and offering referrals and information about legal out-of-state medicinal services to their patients. Simply put, their speech will be chilled. *See, e.g.*, *id*. (the hardship "factor is certainly met, because unless Appellees prevail in this litigation, they will suffer the very injury they assert—they will be required to dispense Plan B over their religious and moral objections.").

The Court will decline the State's request to refrain from exercising its jurisdiction under prudential ripeness principles.

### 3. Mootness

Because the Court has an independent obligation to ensure jurisdiction exists, it will turn to the question of whether this matter has been rendered moot by

the Withdrawal Letter. [25]

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). However, it is well recognized that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Id*. (citing *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982)) (explaining that "[o]therwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."). The party asserting mootness, "has the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (cleaned up). Where the party asserting mootness is the government, it is presumed that it is acting in good faith. *Id.* However, "the government must still

---

[25] While the State did not focus on mootness in its briefing, there were passing references to the issue. The Court will therefore address the State's factual arguments, but under the correct legal standard. *See, e.g*., *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002) ("Although mootness was not raised by the County or briefed by the parties—other than Bernhardt's assertion that injuries 'capable of repetition, yet evading review' are an exception to mootness—we must raise issues concerning our subject matter jurisdiction sua sponte.").

demonstrate that the change in its behavior is 'entrenched' or 'permanent.'" *Id.* (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015)). Specifically, "a voluntary change in official stance or behavior moots an action only when it is 'absolutely clear' to the court, considering the 'procedural safeguards' insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practice(s), that the activity complained of will not reoccur." *Id.* at 139 (citations omitted).

Despite the State's protests, the voluntary cessation exception is the proper framework to analyze the Withdrawal Letter. The State claims that the voluntary cessation "doctrine [only] applies when a government official has initiated enforcement of a law and later ceases enforcement[.]" *Def.s' Reply* at 9, Dkt. 85. Not so.[26]

---

[26] *See, e.g.*, *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1153 (9th Cir. 2019) (analyzing the voluntary cessation exception to a change in policy regarding medical care); *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) (finding plaintiff's First Amendment challenge based on an investigation and harassment was not moot); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (analyzing the voluntary cessation exception regarding a "University's since-repealed (and never previously enforced) Student Code[.]"); *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003) (finding the plaintiff's claims were not "mooted by the Attorney General's withdraw of the [Notice of Intended Action] under the voluntary cessation exception."); *Miller v. Bonta*, No. 22CV1446-BEN (JLB), 2022 WL 17363887, at *4 (S.D. Cal. Dec. 1, 2022) (applying the voluntary cessation exception to an Attorney General's statement of non-enforcement of a statute, which had not yet been enforced against plaintiffs).

Rather, the voluntary cessation doctrine is more broadly applied where—as is the case here—a defendant attempts to moot a case through some sort of voluntary conduct. *See White,* 227 F.3d at 1243 ("[t]he Supreme Court has made clear that the standard for proving that a case has been mooted by *a defendant's voluntary conduct* is 'stringent[.]'") (citing *TOC*, 528 U.S. at 188) (emphasis added). More specifically, the Crane Letter is most akin to a change in policy or position, which the Ninth Circuit has repeatedly analyzed under the voluntary cessation doctrine. *See, e.g., Fikre*, 904 F.3d at 1038 (9th Cir. 2018) ("For cases that lie between these extremes [comparing a statutory change to an executive order], we ask whether the government's new position could be easily abandoned or altered in the future.") (internal quotations omitted); *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("Particularly relevant to this case, a policy change not reflected in statutory changes or even in changes in ordinances or regulations will not necessarily render a case moot."). Applying that appropriate voluntary cessation doctrine, the Withdrawal Letter does not moot this case.

The analysis underlying the Withdrawal Letter is entirely procedural. It neither rejects the Crane Letter's statutory interpretation, nor provides an alternative that would resolve the Medical Providers' concern that their conduct is unlawful under Idaho's criminal abortion statute. Simply put, the withdrawal letter

does not indicate that Attorney General Labrador has changed his position, much less establish that such a change is now "entrenched" or "permanent." *Fikre*, 904 F.3d at 1037. Accordingly, the State has not satisfied the heavy burden of establishing this case is moot.[27]

Additionally, the recently enacted amendments to Idaho's criminal abortion statute also fail to moot this case.[28] Although no explanation was provided, the State claims that the Crane Latter is "moot because it relates to a law that has been significantly altered by intervening legislation." *See Def.s' Br.* at 4, Dkt. 41-1; *Withdrawal Letter* at 1, Dkt. 42-4. While the amendments to the statute may be significant in some respects, this claim misses the mark because the specific, relevant language of Idaho's criminal abortion statute—the "assisting" language—

---

[27] *See, e.g.*, *Fikre*, 904 F.3d at 1041 (holding that a case was not moot because there were no "procedure hurdles to the government returning to its prior stance," nor any renouncement by the government of its prerogative and authority to do so" ); *Porter v. Bowen*, 496 F.3d 1009, 1017 (9th Cir. 2007) (finding that a letter from the former secretary of state, which stated he would not seek to prevent operation of websites like the plaintiff's until legislative clarifications were made, did not moot the case because the letter was not binding, nor did it create any legal obligations); *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003) (finding that the "Attorney General's withdrawal [of a notice of intent] thus does not make it absolutely clear that the enforcement action is not reasonably likely to recur.").

[28] The day after the Crane Letter was issued, the Idaho Legislature introduced H.B. 374, which amended various aspects of Idaho's abortion laws. H.B. 374 subsequently passed both houses and was signed by Idaho's Governor Brad Little on April 2, 2023. H.B. 374, 67th Leg., Reg. Sess. (Idaho 2023). The amendments to the statute became effective on July 1, 2023. *See id.*

remains unchanged.[29] *Compare* I.C. § 622(1) ("assists in performing or attempting to perform an abortion.") *with* I.C. § 18-622(2) (2020) (same).

In sum, the Court finds that the Medical Providers have established that there is a genuine threat of prosecution. This threat has resulted in the chilling of the Medical Providers' speech—a well-established concrete injury—meeting both the injury-in-fact requirement for standing and the constitutional ripeness requirement. Additionally, the Court sees no reason why it should decline to exercise its jurisdiction under the prudential ripeness component, nor does the Withdrawal Letter meet the burden of demonstrating that this case is moot. Thus, the Court has jurisdiction to hear the Medical Providers' request for a preliminary injunction on its First Amendment claim.

As a final note, whether analyzed through the lens of standing, ripeness, or mootness, it would not have been particularly difficult for the State to definitively establish that no case or controversy exists. That is, all it would have taken is for

---

[29] Specifically, the amendments made two primary changes to the statute. First, the current version of the statute removed the "trigger" language that became obsolete following *Dobbs*. *Compare* I.C. § 622 *with* I.C. § 18-622 (2020). Second, the current version also converts what used to be affirmative defenses into exceptions to performing a criminal abortion. *See id.* In addition to that change, the amendment added certain clarifying language to the now exceptions. *See id.* Importantly, the exceptions, including the newly added language, do not appear relevant to the issues in this matter, nor has the State argued such.

Attorney General Labrador to denounce the Crane Letter's interpretation or make an affirmative statement that he, or his office, will not enforce Idaho's criminal abortion statute in such a manner. Instead, the Attorney General has strained at every juncture possible to distance himself from his previous statement without committing to a new interpretation or providing any assurances to this Court or the Medical Providers. Attorney General Labrador's targeted silence is deafening.

### D.      Preliminary Injunction

Having determined that the Medical Providers' First Amendment claim is justiciable, the Court now turns to the merits of the preliminary injunction. As discussed below, the Medical Providers have shown that: (1) they are likely to succeed on the merits of their First Amendment claim; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.

#### 1.  Likelihood of success on the merits

As mentioned, the Medical Providers allege that the Crane Letter interpretation violates the First Amendment, the dormant commerce clause, and the due process clause. The Medical Providers claim they are "overwhelmingly" likely to succeed on the merits of all three claims. *See Plf.s' Br.* at 7, Dkt. 2-1. Interestingly, the State did not engage this argument in any way, relying instead

entirely on its jurisdictional challenges. *See Def.s' Br.*, Dkt. 41-1; *Def.s' Reply*, Dkt. 85. As discussed below, the Court finds that the Medical Providers are likely to succeed on their First Amendment cause of action.

In particular, the Medical Providers contend that the Crane Letter interpretation violates the First Amendment because it impermissibly regulates speech based on content and viewpoint. *See Plf.s' Br.* at 8, Dkt. 2-1. The Medical Providers explain that the interpretation's prohibition of medical providers offering "support or aid" to a woman seeking an abortion, including "refer[ring] a woman across state lines to an abortion provider[,]" is content-based because health care providers are silenced on a single topic—abortion—and is viewpoint discretionary because health care providers can provide information and referrals about out-of-state resources like anti-abortion counseling centers or prenatal care. *Id*. (citing *the Crane Letter*, Dkt. 1-1). The Medical Providers note that the interpretation is therefore subject to strict scrutiny. *Id.* (citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).

The Medical Providers explain that Crane Letter interpretation "furthers no legitimate state interest, much less a compelling one[,]" *Id.* at 9 (citing *Bigelow v. Virginia*, 421 U.S. 809, 827-28 (1975)). They further contend that the State cannot prove that the interpretation is narrowly tailored to further whatever compelling

interest could be found because it sweeps in a large swath of obviously protected speech. *Id.* at 10 (citing *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). Because the State has not opposed the First Amendment claim, and because the Court finds the Medical Providers' argument persuasive, the Court finds that the Medical Providers have shown that they are likely to succeed on the merits of their First Amendment challenge.[30]

### 2. Irreparable harm

In their briefing, the State does not differentiate between the injury in fact analysis for standing and the threat of imminent harm under a motion for a preliminary injunction. In any event, the Court finds that the Medical Providers have demonstrated they will likely suffer irreparable harm in the absence of preliminary relief. There is no doubt that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[.]" *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief.") (internal quotation marks omitted).

––––––––––––––––––––––

[30] Because the Medical Providers have demonstrated they are likely to succeed on their First Amendment challenge, the Court need not address their remaining claims.

### 3.  The balance of equities and public interest

Finally, the balance of equities and public interest in this case strongly favors issuing an injunction. *See Padilla*, 953 F.3d at 1141 (explaining that when the government is a party, the last two factors merge). First, the Ninth Circuit has consistently "recognized the significant public interest in upholding First Amendment principles." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (*Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014)); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("it is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted).

More importantly, the balance of equities strongly weighs in favor of the Medical Providers. The Ninth Circuit has "repeatedly recognized that individuals' interests in sufficient access to health care" can trump a state's interest. *Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1098 (9th Cir. 2010), *vacated and remanded on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, (2012). This case is no different.

In sum, the Medical Providers have met the requirements for a preliminary injunction. Accordingly, the Court will grant the motion, in part, and enjoin Attorney General Labrador from enforcing Idaho's criminal abortion statute as

interpreted in the Crane Letter.

**ORDER**

**IT IS ORDERED that:**

1.     The Medical Providers' Motion for Preliminary Injunction (Dkt. 2) is **GRANTED** as it pertains to Attorney General Labrador.

2.     Plaintiff's Motion for Preliminary Injunction (Dkt. 2) is **DENIED** as it pertains to the Idaho State Board of Medicine and the Idaho State Board of Nursing.

3.     The Court will **DEFER** issuing a ruling on any of the individual county prosecuting attorneys.

4.     The Medical Providers' Motion to Strike (Dkt. 122) is **DENIED**.

5.     The State's Motion to Dismiss (Dkt. 41) is **DENIED** as it relates to Attorney General Labrador.

6.     The parties shall submit a Litigation Plan and Discovery Plan within 14 days of the filing of this Order.

DATED: July 31, 2023

B. Lynn Winmill
U.S. District Court Judge